```
 1                    BEFORE THE U.S. DEPARTMENT OF LABOR

 2      In the matter of:            )

                                     )

 3      JUAN LOZADA-LEONI,           )

               Complainant,          )

 4                                   )

        V.                           ) Case No. 2018-SOX-00004

 5                                   )

        MONEYGRAM INTERNATIONAL,     )

 6             Respondent.           )

 7

 8      *************************************************************

 9                           ORAL DEPOSITION OF

10                           JUAN LOZADA-LEONI

11                             JUNE 19, 2018

12                                VOLUME 2

13      *************************************************************

14          ORAL DEPOSITION OF JUAN LOZADA-LEONI, produced as a witness

15      at the instance of the Respondent, and duly sworn, was taken in

16      the above-styled and numbered cause on the 19th day of June,

17      2018, from 9:59 a.m.  to 3:00 p.m., before AMBER KIRTON, CSR in

18      and for the State of Texas, reported by machine shorthand, at the

19      Law Offices of Juan Antonio Lozada, PLLC, 3305 W. Slaughter Lane

20      #2, Austin, Texas, pursuant to the Federal Rules of Civil

21      Procedure.

22

23

24

25

                                                              Page 1
```

```
 1          A.   Sure.

 2          Q.   At the bottom of Page 1 of Exhibit 24 Speaker 1, who is

 3     Juan Manuel, he says, "So here's the thing, guys.  You're going

 4     to need to rely on your experience to back judgment to ensure

 5     that you're making an adequate assessment of the potential risks

 6     and then determine what the corrective measure will be.  Without

 7     having done a deep dive of the 13 locations you're not going to

 8     be able to go full assess that, number one, without understanding

 9     what the agent is doing.  As an agent you're not going to have

10     visibility to how much you can really wait the seven days or not.

11     So it's a totality of all this to determine."  And do you

12     disagree with that overall assessment on his part?

13          A.   I do.

14          Q.   For the reason that you've explained earlier?

15          A.   For that and many other reasons, yes, and for our

16     conversations I had with him before, yes, when he expressed the

17     real reasons why.

18          Q.   Well, I didn't ask about what else he expressed.  I'm

19     asking whether you agree or disagree with what he expressed here?

20          A.   I disagree.

21          Q.   I may come back to some of these transcripts but I want

22     to move on.

23               (Exhibit No. 25 marked.)

24          Q.   (BY MR. BARCUS)  I'm going to hand you Exhibit 25.

25     What is Exhibit 25?
```

                                                              Page 104

```
 1          A.   It is a document my accountant created titled Profit

 2     and Loss Statement.

 3          Q.   And it's a profit and loss statement for your law

 4     office, correct?

 5          A.   That's right.

 6          Q.   For calendar year 2017?

 7          A.   That's right.

 8          Q.   And this is a document that was created for the purpose

 9     of this lawsuit, correct?

10          A.   No.

11          Q.   What was the purpose of the creation of this document?

12          A.   I think it's a good thing when you have a business to

13     know how you're doing.  So this is something that I was given at

14     the beginning of the year so that I had a general idea how I was

15     doing in my business.

16          Q.   So in my understanding from correspondence between

17     counsel is that this was a document that was created for the

18     purpose of showing your, I guess, lost wages claim.  I'm mistaken

19     in that regard?

20          A.   I believe so, yeah.

21          Q.   Is the accountant who created this Ramirez Accounting

22     Services?

23          A.   Yes.

24          Q.   And this shows that your law office had a total income

25     of a little over $139,000 in 2017, correct?
```

Page 105

1        A.    Gross profit, yes.

2        Q.    Well, also total income right above that, correct?

3        A.    I'm not an accountant so I don't know all these terms.

4    I only know the income of my law firm and the profit of my law

5    firm was about $30,000.

6        Q.    So on Page 1 do you see in bold letters it says total

7    income and then to the right of that it says $139,480.60?

8        A.    I do.

9        Q.    So do you think that's an accurate assessment of what

10    the total income of your law firm was for 2017?

11        A.    I assume so, but I don't know.  I mean, I didn't

12    calculate this or know how it was calculated.  So you need to ask

13    my accountant about that.

14        Q.    I may do that.

15        A.    Sure.

16        Q.    Who provided information to your accountant for the

17    purpose of creating this profit and loss statement?

18        A.    My mother.

19        Q.    Your mother did.  Is that what you said?

20        A.    Yeah.

21        Q.    What is your mother's name?

22        A.    Pilar Leoni.

23        Q.    And actually, let me correct the record.  It's only the

24    first two pages of Exhibit 25 that are the actual profit and loss

25    statement; is that correct?

Page 106

1        A.   Yes.

2        Q.   And then the third page is a balance sheet?

3        A.   Yes.

4        Q.   And then from the fourth page on is a copy of your law

5   office's corporate tax return for 2017?

6        A.   Yes.

7        Q.   And Ramirez Accounting Services prepared that tax

8   return as well?

9        A.   Yes.

10       Q.   Did you lease a vehicle for the purpose of your law

11  practice in 2017?

12       A.   I did.

13       Q.   Separate from your personal vehicle?

14       A.   Yes.

15       Q.   What kind of car was that?

16       A.   It was Nissan Rogue.

17       Q.   And why did you need a separate car for your law

18  practice?

19       A.   I just did.  Put a lot of my miles on my car.  I had a

20  Ford Focus.  I didn't want to be driving around everywhere I

21  went.

22       Q.   And so on Page 1 of Exhibit 25 you've got leased

23  vehicle under expenses for $3,573.  Do you see that?

24       A.   Yes.

25       Q.   And then up further towards the top, these expenses are

Page 107

1    in alphabetical order, you've got auto expenses of a little over

2    $4,300.  Do you see that?

3         A.   I do.

4         Q.   What is that, if you know?

5         A.   I think regular maintenance.  Just tires and different

6    things.

7         Q.   On this Nissan Rogue you did $4,000 worth of

8    maintenance?

9         A.   Uh-huh.

10        Q.   Is that yes?

11        A.   Yes.

12        Q.   And you didn't start your law practice until mid year

13   2017, correct?

14        A.   June, yes.

15        Q.   What are the contractor expenses that are referenced

16   that's a little over $13,900 there?

17        A.   Yeah.  So a lot of -- I'm not an expert in that area of

18   law.  I've got oftentimes immigration clients that might have

19   needs like business law or things like that.  So normally I would

20   go to another lawyer and, you know, they will -- we will work the

21   case together.  I wanted to learn the area.  So normally I will

22   pay that person to teach me, you know, how to do it and so they

23   got most of the fee.  I also -- in my old office I had -- I moved

24   to this building in January, but in my old office I would share a

25   secretary so there was a person that I gave money to there, one

Page 108

```
 1    of the lawyers, to contribute to -- so she would pay the taxes,

 2    she would pay everything and then I will pay her everything --

 3    one-third of everything.  So that's what that's about.

 4        Q.   Okay.  So going back down the page, and I apologize for

 5    skipping around, there is an entry for wages of $36,608.70.  Do

 6    you see that?

 7        A.   Yes.

 8        Q.   Did you pay yourself a wage out of the income from your

 9    law office or was that for somebody else?

10        A.   No, it was -- no, I pay a very small income for myself

11    because I wasn't sure if I was going to be making a profit.  I

12    had a legal assistant I paid some money to, like a paralegal

13    type.  She wasn't really a legal assistant.  It was more like a

14    paralegal.  And then we have a legal secretary that we pay.

15        Q.   And then on the second page there is a line item for

16    returns of $5,700.  Do you know what that is?

17        A.   That's money I have to return.  So I will do -- I will

18    tell you it's going to cost you $2,000 to do this but I only use

19    1,000 so I will give you back the money that I didn't use if we

20    were already finished with your work.  So I keep that in my old

21    account and whenever -- you know, so that's that.

22        Q.   So basically refunds of amounts that have been prepaid

23    that didn't end up costing that much?

24        A.   Exactly.

25        Q.   And so at the end of the day at the middle of Page 2
```

                                                        Page 109