# EXHIBIT 1

No. 84-1325
United States Court of Appeals, Fifth Circuit

# United States v. Jon-T Chemicals, Inc.

768 F.2d 686 (5th Cir. 1985)
Decided Aug 16, 1985

No. 84-1325.

687 August 16, 1985. *687

Brantly Harris, Houston, Tex., for defendants-appellants.

William French Smith, Atty. Gen., William S. Liebman, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Appeal from the United States District Court for the Northern District of Texas.

Before GOLDBERG, POLITZ, and WILLIAMS, Circuit Judges.

688 *688

GOLDBERG, Circuit Judge:

This is the latest installment in a series of cases that threatens to become, in its own small way, a latter-day *Jarndyce and Jarndyce.* [1] The cases arose as a result of fraudulent misrepresentations by John H. Thomas, Lonnie D. Clark, and Jon-T Farms, Inc., to obtain agricultural subsidies under the Upland Cotton Program.[2] Initially, the government sought and obtained criminal convictions against these defendants, which we subsequently affirmed on appeal. *United States v. Thomas,* 593 F.2d 615 ( *"Thomas I"*) (affirming in part and remanding in part), *modified on rehearing,* 604 F.2d 450 (1979) (per curiam), *aff'd after remand,* 617 F.2d 436 (5th Cir.), *cert. denied,* 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980); *United States v. Clark,* 546 F.2d 1130 (5th Cir. 1977). The government then brought a civil action to recover the erroneously-paid subsidies, obtaining a summary judgment against Thomas, Clark, and Jon-T Farms based on the collateral 689 estoppel effect of their criminal convictions. *689 *United States v. Thomas,* 709 F.2d 968 (5th Cir. 1983) ( *"Thomas II"*) (affirming lower court decision). Now, the government seeks to hold liable the parent company of Jon-T Farms — Jon-T Chemicals — on the ground that Farms was its alter ego or agent.

[1] C. Dickens, *Bleak House* (1853).

[2] The Upland Cotton Price Support Program was authorized by §§ 601-610 of the Agricultural Act of 1970, Pub.L. No. 91-524, 84 Stat. 1358 (codified at 7 U.S.C. § 1444(e)), and was administered by the Commodity Credit Corporation and the Agricultural Stabilization and Conservation Service of the Department of Agriculture. The Program is fully described in *United States v. Batson,* 706 F.2d 657, 659-66 (5th Cir. 1983), and *United States v. Clark,* 546 F.2d 1130, 1132 (5th Cir. 1977).

The district court, sitting without a jury, found that Jon-T Chemicals exercised total domination and control over Jon-T Farms and that consequently Farms was the alter ego of Chemicals. On this basis, it entered judgment against Chemicals in the amount of $4,787,604.20. Because the district court applied the correct legal standard and made findings of fact that are not clearly erroneous, we affirm.

I

Jon-T Chemicals, an Oklahoma corporation, was incorporated in 1969 as a fertilizer and chemicals business. The following year, John H. Thomas became its majority shareholder as well as its president and board chairman, positions which he retained throughout the 1970 to 1973 period.

In April 1971, Chemicals incorporated Jon-T Farms as a wholly-owned subsidiary to engage in the farming and land-leasing business. Chemicals initially invested $1,000 to establish Farms, but later raised this investment to $10,000. All of the directors and officers of Farms were directors and officers of Chemicals, and Thomas served as the president and chairman of both corporations. In addition, Farms used the offices, computer, and accountant of Chemicals without paying any fee; Chemicals paid the salary of Farms's only regular employee; and Chemicals made ongoing, informal advances to Farms to pay Farms's expenses, reaching $1.8 million by the end of 1973 and $7.1 million in January 1975.

In 1972 and 1973, Thomas, along with other business associates (including a number of directors, officers, and employees of Chemicals and Farms), formed two cotton farming joint ventures. The ventures leased land from Farms and employed a custom farmer. On behalf of the ventures, Thomas and Farms submitted fraudulent applications for agricultural subsidies under the Upland Cotton Program. As a result of these applications, the Commodity Credit Corporation ("CCC") paid the joint ventures $2,263,601.15 in subsidies in the form of forty-two sight drafts. In addition, Thomas and Farms converted the proceeds of five other CCC sight drafts totalling $269,901.90.

After obtaining criminal convictions against Thomas and Farms, the Government commenced this civil action against Thomas, Farms, and Chemicals in June 1978, alleging violations of the False Claims Act, 31 U.S.C. §§ 231-235 (current version at 31 U.S.C. §§ 3729- 3731 (1982)), and common law conversion.[3] Initially, the district court granted partial summary judgment against Thomas and Farms, finding them jointly and severally liable for the false representations and conversions. Before the district court awarded damages, however, Farms went into bankruptcy, and further proceedings against it were stayed pursuant to 11 U.S.C. § 362 (1982). The district court therefore entered final judgment only against Thomas, finding him liable in the amount of $4,787,604.20. This judgment against Thomas has been affirmed on appeal. *Thomas II,* 709 F.2d 968.

> [3] The Government also named another individual in the suit, Lonnie Clark, and obtained a judgment against him, which we subsequently affirmed. *Thomas II,* 709 F.2d 968. The government, however, does not seek to hold Chemicals liable for the judgment against Clark.

Presumably because both Thomas and Farms were insolvent, the Government proceeded to press its claims against Chemicals.[4] The district court found that Farms was a mere appendage of Chemicals and that therefore Chemicals was liable for the illegal acts of Farms. Accordingly, it entered *690 final judgment against Chemicals, holding it jointly and severally liable with Thomas for the $4,787,604.20. After the district court denied several post-trial motions by Chemicals, Chemicals brought this appeal.

> [4] These claims had earlier been severed by the district court from the Government's claims against Thomas and Farms.

II

Although Chemicals raises nine issues on appeal, these all boil down to a single question: Did the district court err in finding that Farms was the alter ego of Chemicals?[5] If Farms was the alter ego of Chemicals, then Chemicals is liable for torts committed by Farms, as the district court held. In reviewing the court's alter ego finding, we first consider whether the court applied the correct legal standard[6] and then examine its factual findings.

5  In addition to attacking the district court's alter ego finding, Chemicals also challenges two subsidiary factual findings relating to the alter ego question, three findings relating to Chemicals' actual participation in the fraudulent misrepresentations and conversions, and the denial by the district court of Chemicals' three post-trial motions. Because we uphold the district court's alter ego finding, we need not consider the court's findings regarding Chemicals' actual participation in Farms's illegal acts. Nor need we consider separately the denial of the post-trial motions, since these depended on the court's alter ego finding, which we affirm.

6  Because the present case involves "rights of the United States arising under nationwide federal programs," federal law governs. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979); *see also Clearfield Trust Co. v. United States,* 318 U.S. 363, 366-67, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943). The more difficult problem is to determine the appropriate rule of decision. In *Kimbell Foods,* the Supreme Court elaborated a three-part test to determine whether courts should adopt a uniform federal rule of decision or follow state law when resolving controversies affecting the operations of federal programs. 440 U.S. at 728-29, 99 S.Ct. at 1458-59. Under this test, we must examine (1) the need for a uniform federal rule; (2) the degree to which "application of state law would frustrate specific objectives of the federal program;" and (3) "the extent to which application of a federal rule would disrupt commercial relationships predicated on state law." *Id.*

In a related context, the Third Circuit held that, under the *Kimbell Foods* test, a uniform federal alter ego test should be used to determine when to allow the government to pierce the corporate veil in order to obtain Medicare reimbursements. *United States v. Pisani,* 646 F.2d 83, 86-87 (3rd Cir. 1981); *see also Audit Services, Inc. v. Rolfson,* 641 F.2d 757, 764 (9th Cir. 1981) (applying federal alter ego standard in federal labor law case). Here, we find no need to determine whether a uniform federal alter ego rule is required, since the federal and state alter ego tests are essentially the same. Our non-diversity alter ego cases have rarely stated whether they were applying a federal or state standard, and have cited federal and state cases interchangeably. *See, e.g., Talen's Landing, Inc. v. M/V Venture,* 656 F.2d 1157, 1160-62 (5th Cir. 1981) (admiralty case); *Baker v. Raymond Int'l,* 656 F.2d 173, 179-81 (5th Cir. 1981) (Jones Act and admiralty case), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1982); *National Marine Service, Inc. v. C.J. Thibodeaux Co.,* 501 F.2d 940, 942-43 (5th Cir. 1974) (contract and admiralty case). *Pisani* itself, one of the few circuit court opinions applying an explicitly federal rule of decision, adopted the test enunciated in *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681 (4th Cir. 1976), a case involving South Carolina law. *Pisani,* 646 F.2d at 88; *see also Carpenters Health Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 284 (3d Cir. 1983) (following *Pisani* and *DeWitt*); *Valley Finance, Inc. v. United States,* 629 F.2d 162, 171-72 (D.C. Cir. 1980) (citing *DeWitt*), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981). Without deciding whether the federal and Texas alter ego doctrines are equivalent in all respects, we believe that they overlap at least with regard to the principles involved in the present case. *Compare Baker,* 656 F.2d at 180-81 (applying federal law); *Pisani,* 646 F.2d at 88 (same); *Valley Finance,* 629 F.2d at 172 (same) *with Nelson v. International Paint Co.,* 734 F.2d

1084, 1092-93 (5th Cir. 1984) (applying Texas law); *Miles v. AT T,* 703 F.2d 193, 195-96 (5th Cir. 1983) (same).

## A

Under the doctrine of limited liability, the owner of a corporation is not liable for the corporation's debts. Creditors of the corporation have recourse only against the corporation itself, not against its parent company or shareholders. *See Baker v. Raymond International,* 656 F.2d 173, 179 (5th Cir. 1981), *cert. denied,* 456 U.S. 983, 102 S.Ct. 2256, 72 L.Ed.2d 861 (1982). It is on this assumption that "large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Anderson v. Abbott,* *691 321 U.S. 349, 362, 64 S.Ct. 531, 537-38, 88 L.Ed. 793 (1944).

691

While limited liability remains the norm in American corporation law, certain equitable exceptions to the doctrine have developed. The most common exception is for fraud. If, for example, a corporation is established for a fraudulent purpose or is used to commit an illegal act, or if its shareholders drain the corporation's assets, limited liability may not apply. Another exception arises where, as here, a parent company totally dominates and controls its subsidiary, operating the subsidiary as its business conduit or agent. *See Nelson v. International Paint Co.,* 734 F.2d 1084, 1091-93 (5th Cir. 1984) (applying Texas law); *Edwards Co. v. Monogram Industries,* 730 F.2d 977, 980-82 (5th Cir. 1984) (en banc) (same); *Miles v. AT T,* 703 F.2d 193, 195 (5th Cir. 1983) (same); *Baker,* 656 F.2d at 179-81 (applying Jones Act and admiralty law).

[T]he control required for liability under the `instrumentality' rule amounts to total domination of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation. As Professor Fletcher states:

> The control necessary to invoke what is sometimes called the "instrumentality rule" is not mere majority or complete stock control but such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal.

1 W. Fletcher, [Cyclopedia of the Law of Private Corporations] § 43 at 204-05 [rev.perm.ed. 1963].

*Krivo Industrial Supply Co. v. National Distillers Chemical Corp.,* 483 F.2d 1098, 1106 (5th Cir. 1973) (applying Alabama law). In such cases, the subsidiary is considered the "alter ego," "agent," or "instrumentality" of the parent company, and the district court, acting in its equitable capacity, is entitled to pierce the corporate veil.

The complementary theories of limited liability and piercing the corporate veil have provoked consternation among courts and legal scholars alike. They have been variously described as a "legal quagmire," Ballantine, *Separate Entity of Parent and Subsidiary Corporations,* 14 Calif.L.Rev. 12, 15 (1925), and as being "enveloped in the mists of metaphor," *Berkey v. Third Avenue Ry.,* 244 N.Y. 84, 155 N.E. 58, 61 (1926) (Cardozo, J.); *see Krivo,* 483 F.2d at 1103 (quoting Ballantine and Cardozo). Nowhere is this more true than in the case of the alter ego doctrine. In some sense, every subsidiary is the alter ego of its parent company. Where the subsidiary is wholly-owned by the parent and has the same directors and officers, operating the subsidiary

independently of the parent company not only has little practical meaning, it would also constitute a breach both of the subsidiary's duty to further the interests of its owner, and of the directors' and officers' duty towards the parent company. Nevertheless, our cases are clear that one-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil. *Nelson,* 734 F.2d at 1092; *Miles,* 703 F.2d at 195. Instead, we maintain the fiction that an officer or director of both corporations can change hats and represent the two corporations separately, despite their common ownership.

In lieu of articulating a coherent doctrinal basis for the alter ego theory, we have instead developed a laundry list of factors to be used in determining whether a subsidiary is the alter ego of its parent. These include whether:

(1) the parent and the subsidiary have common stock ownership;

(2) the parent and the subsidiary have common directors or officers;

(3) the parent and the subsidiary have common business departments;

692 *692

(4) the parent and the subsidiary file consolidated financial statements and tax returns;

(5) the parent finances the subsidiary;

(6) the parent caused the incorporation of the subsidiary;

(7) the subsidiary operates with grossly inadequate capital;

(8) the parent pays the salaries and other expenses of the subsidiary;

(9) the subsidiary receives no business except that given to it by the parent;

(10) the parent uses the subsidiary's property as its own;

(11) the daily operations of the two corporations are not kept separate; and

(12) the subsidiary does not observe the basic corporate formalities, such as keeping separate books and records and holding shareholder and board meetings.

*Nelson,* 734 F.2d at 1093; *Miles,* 703 F.2d at 195-96; *Baker,* 656 F.2d at 180. *See generally* Douglas Shanks, *Insulation from Liability Through Subsidiary Corporations,* 39 Yale L.J. 193 (1929). Additional factors that are sometimes mentioned are (1) "[w]hether the directors and officers of [the subsidiary] act independently in the interest of that company, or whether they take their orders from the [parent] and act in the [parent's] interest," *Baker,* 656 F.2d at 180; and (2) the "connection of [the] parent's employee, officer or director to [the] subsidiary's tort or contract giving rise to [the] suit," *Miles,* 703 F.2d at 196. Analytically, however, these last two factors are on a different plane from the other factors. The first is, in essence, the conclusion that we reach through our alter ego analysis and thus depends on the preceding factors. When the directors and officers of the subsidiary are also directors and officers of the parent, it makes little sense to ask whether they take orders from the parent since they themselves constitute the parent's decision-making body and are duty-bound to act in the parent's interest. The second factor relates more to the involvement of the parent itself in the acts giving rise to the suit than to its vicarious liability for the subsidiary's acts in general.

In the present case, there is no doubt that the district court applied the proper legal standard. While recognizing that limited liability represents the general rule, the court noted that, under certain circumstances, courts may pierce the corporate veil — including where a subsidiary is completely dominated by its parent. As the court understood, the alter ego question depends upon the totality of

the facts. The court listed ten factors that are indicative of total domination, following the test elaborated in *Baker,* 656 F.2d at 180, and *Bay Sound Transportation Co. v. United States,* 350 F. Supp. 420, 426 (S.D.Tex. 1972), *aff'd,* 474 F.2d 1397 (5th Cir. 1973), *cert. denied,* 415 U.S. 916, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974), and concluded, after considering these factors, that Farms was the alter ego of Chemicals.

Although Chemicals does not directly challenge the legal standard applied by the court below, it implicitly raises two objections. First, Chemicals contends that a finding of fraud is an essential element of any alter ego determination. According to Chemicals, unless a parent intentionally misleads outsiders, uses the corporate form for fraudulent purposes, or milks the subsidiary's assets, then it is entitled to hide behind the corporate veil of its subsidiary. Chemicals argues that since Farms was established for a proper business purpose — i.e., tax advantages — and since neither Chemicals nor Farms misled outsiders regarding their relationship and finances, the district court erred in piercing the corporate veil.

We disagree. Recently, we held that, in contract cases, fraud is an essential element of an alter ego finding. *Edwards,* 730 F.2d at 980-81. However, we do not require a finding of fraud in tort cases, *id.* at 982; *accord Bucyrus-Erie Co. v. General Products Corp.,* 643 F.2d 413, 419 (6th Cir. 1981) (applying Ohio law); *Valley Finance, Inc. v. United States,* 629 F.2d 162, 172 (D.C. Cir. 1980) 693 (applying federal common *693 law), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981), particularly where the subsidiary is undercapitalized, *Nelson,* 734 F.2d at 1092; *cf. Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793 (1944) ("The cases of fraud make up part of that exception [to limited liability]. But they do not exhaust it. An obvious inadequacy of capital . . . has frequently been an important factor in cases denying stockholders their defense of limited liability."); *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 684 (4th Cir. 1976) (contract case applying South Carolina law and holding that fraud is not a necessary element of alter ego finding). The reason for this distinction is clear. In a contract case, the creditor has willingly transacted business with the subsidiary. If the creditor wants to be able to hold the parent liable for the subsidiary's debts, it can contract for this. Unless the subsidiary misrepresents its financial condition to the creditor, the creditor should be bound by its decision to deal with the subsidiary; it should not be able to complain later that the subsidiary is unsound. In a tort case, by contrast, the creditor has not voluntarily chosen to deal with the subsidiary; instead, the creditor relationship is forced upon it. Thus, the question of whether the creditor relied on misrepresentations by the subsidiary is irrelevant. Where a parent establishes a subsidiary, undercapitalizes it, and dominates it to such an extent that the subsidiary is a mere conduit for the parent's business, then the parent should not be able to shift the risk of loss due to the subsidiary's tortious acts to innocent third parties. *See Nelson,* 734 F.2d at 1092; *Edwards,* 730 F.2d at 982; *Miles,* 703 F.2d at 195.

Here, the Government's claims for fraudulent misrepresentation and conversion sound in tort rather than contract.[7] Moreover, the Government did not voluntarily enter into the relationship with Farms. It did not have the option of granting or not granting the subsidies to the joint ventures. Under the Upland Cotton Program, it was obligated to subsidize applicants who purportedly qualified. 7 U.S.C. § 1444(e). The fact that the Government did not rely on any misrepresentations regarding Farms's financial condition or its relationship with Chemicals is thus wholly irrelevant to the question whether Chemicals should be held liable for Farms's misconduct. Unlike the ordinary contracting party, the Government was not dilatory in any duty to investigate Farms's

finances, since it had no such duty. As long as Chemicals exercised total domination and control over Farms, it was liable for Farms's acts.

> 7 Chemicals' reliance on a number of contract cases applying Texas law — among them, *Bell Oil Gas Co. v. Allied Chem. Corp.,* 431 S.W.2d 336 (Tex. 1968), and *Atomic Fuel Extraction Corp. v. Slick's Estate,* 386 S.W.2d 180 (Tex.Civ.App. 1964) — is therefore misplaced.

Chemicals also contends that the district court gave insufficient weight to the fact that Farms observed all of the formalities required by corporation law, including keeping separate books and records and holding regular meetings of shareholders and of the board of directors. According to Chemicals, as long as corporate forms were observed by the subsidiary, then the corporate form must also be observed by the courts.

Our only reply is that Chemicals puts form ahead of substance. We agree with the view expressed by the Fourth Circuit that "in applying the `instrumentality' or `alter ego' doctrine, the courts are concerned with reality and not form, with how the corporation operated and the individual defendant's relationship to that operation." *DeWitt Truck Brokers,* 540 F.2d at 685. "[T]he subsidiary must be more than a corporate charter embellished by a few formal niceties. We cannot, as in the case of the Emperor's new clothes, pretend to see something which does not exist." *Edwards Co. v. Monogram Industries,* 700 F.2d 994, 1002, *vacated,* 715 F.2d 157 (1983), *reversed,* 730 F.2d 977 (5th Cir. 1984) (en banc). In determining whether a subsidiary is the alter ego of its parent, we apply a multifactor test. One of these factors is whether the corporate formalities *694 were observed — but this is only one of several factors; it is not determinative.[8] Thus, Chemicals' argument that Farms observed the corporate formalities goes merely to the weight of the evidence, not to the correctness of the legal standard applied by the district court.

> 8 Although the district court did not explicitly list "observation of corporate formalities" as one of the factors in its analysis, it correctly noted that an alter ego finding depends on the totality of the circumstances, and recognized that its list of factors was illustrative rather than exhaustive. We do not require a district court to list and expressly consider every factor that might be relevant to an ultimate factual issue. This would convert even a simple issue into a lengthy ordeal and would virtually ensure that a district judge would hear only a handful of cases in his or her lifetime. Previously, we have held that the illustrative factors listed by the district court are adequate when contained in a jury instruction regarding the alter ego question, *Baker,* 656 F.2d at 181 n. 7, and can properly be relied on by the factfinder in a bench trial, *Bay Sound Transp.,* 474 F.2d at 1398. We therefore fail to perceive any error in the district court's failure to include "observation of corporate formalities" in its illustrative list of the factors that determine a corporation's alter ego status.

## B

As we have noted, there is no litmus test for determining whether a subsidiary is the alter ego of its parent. Instead, we must look to the totality of the circumstances. Resolution of the alter ego issue is heavily fact-specific and, as such, is peculiarly within the province of the trial court. Consequently, in reviewing the district court's finding, we apply the clearly erroneous standard of review. *Talen's Landing, Inc. v. M/V Venture,* 656 F.2d 1157, 1159-60 (5th Cir. 1981); *George W. Bennett Bryson Co. v. Norton Lilly Co.,* 498 F.2d 328, 329, *reh'g denied,* 502 F.2d 1045, 1049 (5th Cir. 1974); *accord Valley Finance, Inc. v. United States,* 629 F.2d 162, 172 (D.C. Cir. 1980), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981); *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.,* 540 F.2d 681, 684 (4th Cir. 1976); *cf. Pullman-Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 1789, 72 L.Ed.2d

66 (1982) (clearly erroneous rule applies to ultimate findings of fact as well as to subsidiary findings of fact). We will reverse only if, after reviewing the evidence as a whole, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Here, the district court based its ultimate alter ego finding on a number of subsidiary findings. These subsidiary factual findings, like the ultimate finding, "come here well armed with the buckler and shield of Fed.R.Civ.P. 52(a)." *Horton v. United States Steel Corp.,* 286 F.2d 710, 713 (5th Cir. 1961). We consider them first and then turn to the court's ultimate finding regarding Farms's alter ego status.

First, Chemicals challenges the district court's finding that Farms "operated with a grossly inadequate capital." Memorandum Opinion at 4, Finding of Fact 5. Chemicals claims that although Farms initially had only $10,000 in capital, it subsequently received millions of dollars in advances for working capital from Chemicals. According to Chemicals, Farms could not have been undercapitalized since it had "virtually unlimited access to credit in the form of loans from its parent, Chemicals." Reply Brief of Appellants at 9. Our short answer to this is that if Farms had unlimited access to the coffers of Chemicals, this access should have been sufficient to pay involuntary creditors who were prejudiced by the limited funds in Farms's own coffers. In our view, Chemicals' argument misses the point. The underlying question is whether Farms was an economically viable, independent entity or whether it operated merely as the adjunct or alter ego of Chemicals. The fact that Farms continually had net operating losses and survived due to massive and ongoing transfusions from Chemicals does not indicate that Farms ever stood on its own two feet. Quite the contrary; it reinforces the district court's conclusion that Farms did not have any separate financial existence. As *695 the 695 district court properly concluded, Farms operated primarily on the capital of Chemicals rather than on its own capital.

Chemicals also claims that the district court erred in finding that Chemicals and Farms jointly used and owned property, Memorandum Opinion at 4, Finding of Fact 7, and that they commingled their assets, *id.* at 7. In regard to the joint use of property, it is undisputed that Farms used the offices and computer of Chemicals. It is also undisputed, as the district court found, that Chemicals paid the expenses of several tractors used by Farms. Although Chemicals claims that these expenses were carried on its books as loans to Farms, given the pervasive interconnections between Farms and Chemicals, we do not regard the district court's finding regarding the joint ownership of property to be clearly erroneous.

The district court's finding that there was a commingling of the corporate funds of Chemicals and Farms is similarly supported by the record. It is undisputed that Chemicals made ongoing advances to Farms. Basically, whenever Farms could not pay its bills, Chemicals did so by writing a check. These intercorporate loans were handled informally, without any corporate resolutions authorizing them. Chemicals' accounting department, which also served as the accountant for Farms and for the joint ventures, would prepare daily account balances reflecting the daily balances of Chemicals, Farms, the joint ventures, and Chemicals' other subsidiaries. On the basis of these statements, funds were transferred between the different accounts in order to cover deficiencies. *Id.* at 5, Finding of Fact 10.

Although Chemicals claims that there was no commingling of funds because records were kept of each advance made by Chemicals to Farms, we agree with the district court that these records did not reflect the true economic realities and that the officers and directors treated the two corporations as one corporate enterprise. *Id.* Chemicals admits that no collateral was posted for the "loans" it

made to Farms and does not contest that Farms paid no interest on the loans. While we do not denigrate careful recordkeeping of corporate transactions, we do not regard mere records as a philosophers' stone capable of transmuting alter egos into distinct corporations. Records are primarily a memorialization of economic reality, not constitutive of that reality.

Having found the district court's subsidiary findings to be supported by the record, we have little trouble in affirming the court's ultimate finding that Farms is the alter ego of Chemicals. Indeed, Chemicals, while disputing that it exercised day-to-day control over Farms or participated in Farms's crimes, admits that "[t]he evidence in this case is mainly to the effect that Chemicals controlled or dominated Farms." Brief of Appellants at 36. To mention just some of the evidence supporting the district court's alter ego holding, all of the directors and officers of Farms served as directors and officers of Chemicals; Farms was wholly owned by Chemicals; Chemicals paid many of the bills, invoices, and expenses of Farms; it covered Farms's overdrafts; it made substantial loans to Farms (at one time amounting to $7 million) without corporate resolutions authorizing the loans and without demanding any collateral or interest; Chemicals and Farms filed consolidated financial statements and tax returns; Farms used the offices and computer of Chemicals without paying any rent; the salary of Farms's one regular employee was paid by Chemicals; and employees of Chemicals performed services for Farms without charging for their time. Chemicals also advanced money and provided services on an informal basis to the joint ventures. Although the evidence in the record does not all point in one direction — the fact, for example, that Farms observed corporate formalities supports its separate corporate existence — it *696 was for the factfinder (in this case the district court) to weigh the evidence and to determine, based on the totality of the evidence, whether an alter ego relationship existed.[9]

696

9  In *Edwards Co. v. Monogram Industries,* 730 F.2d 977 (5th Cir. 1984) (en banc), on similar facts, we reversed a panel opinion that held as a matter of law that a subsidiary was the alter ego of its parent. 700 F.2d 994 (5th Cir. 1983). We did not indicate, however, that a district court finding of alter ego status would have been clearly erroneous in that case. Nor were the facts of *Edwards* identical to the facts at issue here. We therefore do not regard *Edwards* as controlling.

Finally, Chemicals argues that the Government never proved that Chemicals participated in the joint ventures, and, in particular, in the wrongdoing resulting in the improper subsidy payments. According to Chemicals, it cannot be held responsible because it did not engage in any wrongdoing. This argument, however, begs the alter ego question. The purpose of the alter ego analysis is to determine whether Chemicals is vicariously liable for Farms's actions — that is, whether actions by Farms are considered to be actions by Chemicals. Thus, even if Chemicals were correct that Thomas filed the false forms and improperly converted the five sight drafts in his capacity as president of Farms rather than of Chemicals, this is irrelevant given the district court's ultimate finding, based on a consideration of the evidence as a whole, that Farms was the alter ego of Chemicals.

III

A corporation, unlike Proteus, cannot assume a new form at will. While we generally recognize a corporation's attempt to assume the guise of a subsidiary, even this expedition into fantasyland has its bounds. Here, as in *National Marine Service, Inc. v. C.J. Thibodeaux Co.,* 501 F.2d 940 (5th Cir. 1974), "[t]he corporate veil with which appellants would enrobe [the subsidiary] to give it the semblance of being attired in corporate clothing was so diaphanous that the district court was well able to see through it." *Id.* at 943.

AFFIRMED.

