**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| JUAN LOZADA-LEONI | § | |
| | § | |
| Plaintiff, | § | |
| | § | Case No. 4:20-cv-00068-RWS-CMC |
| v. | § | |
| | § | |
| MONEYGRAM INTERNATIONAL, INC. and | § | |
| MONEYGRAM PAYMENT SYSTEMS, INC. | § | |
| | § | |
| Defendants. | § | |

---

**LOZADA'S SURREPLY TO MONEYGRAM INTERNATIONAL, INC.'S REPLY TO**
**LOZADA'S RESPONSE TO MGI'S MOTION FOR SUMMARY JUDGMENT**

---

Now Comes Plaintiff, Juan Lozada-Leoni, and files his Surreply as permitted by this

Court's Order on 9/24/2020,ECF 114, in support of which would respectfully show the Court the

following:

The question is simply whether an employee of a subsidiary is also an employee of the

parent company for purposes of SOX protection.    The answer in this case is a very clear "yes."

Mr. Lozada was an employee of both the subsidiary, MoneyGram Payment Systems, Inc. (MPSI)

and the parent, MoneyGram International, Inc. (MGI).

This Surreply is supported by the exhibits in the Appendix accompanying the Plaintiff's

Response [ECF 89] as well as the following Appendix to this Surreply:

| | |
|---|---|
| Excerpts from the deposition of Craig Bernier | Appx. 1-36 |
| Excerpts from the deposition of Derya White | Appx. 37-55 |
| Excerpts from the deposition of Fredy Morales | Appx. 56-75 |
| Excerpts from the deposition of Silvia Gil | Appx.  76-102 |
| DOJ Website Information | Appx. 103-106 |

I.       LEGAL AUTHORITY

Cases holding that a parent corporation can be sued under SOX for the conduct of a subsidiary in firing an employee have arrived at that conclusion in several ways, including an analysis of the definition of "employee" in the Act itself, the agency relationships between parent and subsidiary companies and the arguably incontrovertible analysis set forth by *In the Matter of Morefield v. Exelon Services, Inc.*, 2004 WL at *2 5030303 (U.S. Dept. of Labor SAROX):

"Considered in context, it seems clear that Congress intended the term 'employees of publicly traded companies' in *Section 806* to include the employees of the subsidiaries of publicly traded companies." *Morefield* at *2.  The *Morefield* opinion explains that subsidiaries of publicly traded companies are not *just* agents.  Rather, they are an "integral part" of the publicly traded company, "inseparable from it for purposes of evaluating the integrity of its financial formation, and they must be treated as such."  *Id*.  The rationale of the opinion is impossible to contradict:

> "The publicly traded entity is not a free-floating apex. When its value and performance is based, in part, on the value and performance of component entities within its organization, the statute ensures that those entities are subject to internal controls applicable throughout the corporate structure, that they are subject to the oversight responsibility of the audit committee, and that the officers who sign the financials are aware of material information relating to the subsidiaries. A publicly traded corporation is, for Sarbanes-Oxley purposes, the sum of its constituent units; and Congress insisted upon accuracy and integrity in financial reporting at all levels of the corporate structure, including the non-publicly traded subsidiaries. In this context, the law recognizes as an obstacle no internal corporate barriers to the remedies Congress deemed necessary. It imposed reforms upon the publicly traded company, and through it, to its entire corporate organization.  Under these circumstances, the scope of Sarbanes-Oxley whistleblower protection tracks the flow of financial and accounting information throughout the corporate structure and remains as permeable to the internal "corporate veils" as the financial information itself." *Id. at *3—4*.

In *Carnero v. Boston Scientific,* 433 F.3d 1, 6 (1st Cir.2006), which dealt with issues of extra-territorial application of *Section 806*, the court assumed, "without deciding," that an

employee of foreign subsidiaries of a publicly traded U.S. company was a covered employee of the public company. Neither party contested that the plaintiff was a covered employee, but the court noted that **the plaintiff, "by virtue either of his own asserted contacts with [the parent] or his direct employment by its subsidiaries, or both, may well be an 'employee' of [the parent] for purposes of seeking whistleblower relief under Sarbanes–Oxley,"** citing *Morefield, supra* and *Collins v. Beazer Homes USA, Inc.,* 334 F.Supp.2d 1365, 1373 n. 7 (N.D.Ga.2004) (holding that employee of subsidiary is covered "employee" within meaning of 18 U.S.C. § 1514A where officers of publicly traded parent company have authority to affect employment of subsidiary's employees).  *Carnero* focuses on the definition of "employee" in *29 C.F.R. § 1980.101 (2005)* as including "a contractor...or agent of a company" and the agency relationship between the subsidiary and the parent.  433 F.3d at 6.

*29 C.F.R. § 1980.101:*

> f) Covered person means any company, including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or any nationally recognized statistical rating organization, or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization.
> (g) Employee means an individual presently or formerly working for a covered person, an individual applying to work for a covered person, or an individual whose employment could be affected by a covered person.

The *Carnero* opinion explains that "the statute can be read to embrace an agent-subsidiary's retaliation against a protected employee. As [the plaintiff] may be an 'employee' of [the parent corporation], his alleged retaliatory discharge by its subsidiaries for reasons forbidden in the Act could (putting aside any question of extraterritorial application) violate the terms of the whistleblower protection provision of the Sarbanes–Oxley Act." *Id*.

In *Ciavarra v. BMC Software, Inc.*, No. CIV. A. H-07-0413, 2008 WL 352273, at *3 (S.D. Tex. Feb. 7, 2008), the Southern District of Texas determined that "an employee of a

subsidiary is a covered employee for *§ 1514A* purposes where the officers of the publicly-traded parent company have the authority to affect the employment of the subsidiaries' personnel" citing *Carnero, supra.*    The court determined that there was a genuine issue of material fact regarding whether a supervisor of the parent company possessed such authority.

MGI's insistence that *Lawson v. FMR LLC*, 571 U.S. 429, 456–57, 134 S. Ct. 1158, 1175, 188 L. Ed. 2d 158 (2014) is controlling is curious.  *Lawson* involved the question of whether SOX covered claims of an employee of a contractor (not a subsidiary) of a publicly traded company when the contractor company was not itself publicly traded.  The Court held that such claims are, indeed, covered.  While *Lawson* does hold that an employee must sue her "employer," it should be noted that the plaintiffs in *Lawson* were employed by the subsidiaries of the defendant (FMR, LLC) and the Court allowed the claims to proceed against the parent company who contracted with the publicly traded company.  In fact, the Court expressly noted Congress' intent in "extending protection comprehensively to corporate whistleblowers." *Id*. at 456—57.  ("Lawson was employed by Fidelity Brokerage Services, LLC, a subsidiary of FMR Corp., which was succeeded by FMR LLC. Zang was employed by a different FMR LLC subsidiary, Fidelity Management & Research Co., and later by one of that company's subsidiaries, FMR Co., Inc. For convenience, we refer to respondents collectively as FMR."). *Id*. at 437—38.

II.    APPLICATION TO FACTS

MGI represents to the federal government, its investors and the world at large that MGI is one and the same with its subsidiaries.  In its SEC filings, it begins with an explanation that "MoneyGram International, Inc. (together with our subsidiaries, 'MoneyGram,' the 'Company,' 'we,' 'us' and 'our') is a global provider of innovative money transfer services and is recognized

worldwide as a financial connection to friends and family." (Plaintiff's Response, Ex. 5, p. 4 [ECF 89-5]). While MPSI is the legal entity that conducts the operations, MGI represents in its annual SEC filings that they are one and the same. *Id*. As in *Morefield, supra*, the wholly owned subsidiary, MPSI, is not a "free floating apex." Its financials are controlled by MGI and presented in MGI's annual reports in combination with all "MoneyGram" entities. *Id*. Just as represented by MGI in its annual reports, employees and agents of MPSI do not distinguish between MPSI and MGI—it's just "MoneyGram."

In 2012, the Board of Directors of MGI agreed with the DOJ in a Deferred Prosecution Agreement (DPA) that the MGI Board would create a committee "with direct oversight of the Chief Compliance Officer and the Compliance Program." (DPA, Plaintiff's Response, Ex. 13, p. 6 [ECF 89-13]). Since the Compliance Program was part of the MPSI operations, and Mr. Lozada was employed in MPSI Compliance, this is just one example of direct and clear evidence of oversight and authority by MGI over MPSI. While the DPA was stated to be between "United States of America v. Moneygram International, Inc.," the agreement addressed specifically the MPSI operations, including compliance operations. *Id.*

In the 2012 DPA, MGI "admits, accepts and acknowledges that it is responsible for the acts of its officers, directors and employees as charged in the Information, and as set forth in the Statement of Facts..." ((DPA, Plaintiff's Response, Ex. 13, p. 6, par. 2 [ECF 89-13]). Plaintiff contends that this a judicial admission on the part of MGI.[1] The Statement of Facts for which MGI acknowledged it was responsible sets forth the compliance functions performed by MPSI.

---

[1] "To qualify as a judicial admission, the statement must be (1) made in a judicial proceeding; (2) contrary to a fact essential to the theory of recovery; (3) deliberate, clear, and unequivocal; (4) such that giving it conclusive effect meets with public policy; and (5) about a fact on which a judgment for the opposing party can be based." *Heritage Bank v. Redcom Labs., Inc.,* 250 F.3d 319, 329 (5th Cir.2001) (citing *Griffin v. Superior Ins. Co.,* 161 Tex. 195, 338 S.W.2d 415, 419 (1960)).

Subsequent to the previously filed Response to MGI's Motion for Summary Judgment, this Court permitted Plaintiff to take the depositions of Craig Bernier (head of MoneyGram's Anti-Money Laundering, Counter Financing of Terrorism Division [AML CFT], previously head of Financial Intelligence Unit) (Appx. 2-4); Sylvia Gil (MoneyGram Regional Compliance Officer—RCO) (Appx. 77]; Fredy Morales (previously MoneyGram Regional Compliance Officer and then Supervisor in Global Back Office) (Appx. 58); and Derya White (previously MoneyGram Senior Regional Compliance Officer) (Appx. 43).   Each of these witnesses described the details of their roles in Compliance for MoneyGram.  (Bernier: Appx. 4, 11, 12   Gil: Appx. 77-79, 86  Morales: Appx. 57, 60-61, 63    White: Appx. 38, 41). MGI would have this Court believe that these individuals were employees only of MPSI and not of MGI.  This assertion completely ignores the reality of the relationship between MGI and MPSI, as well as the control of MGI and the comingling of MGI/MPSI executive authority and finances.  While Plaintiff asserts that MGI's SEC filing in and of itself establishes sufficient nexus between MPSI employees and MGI to establish MGI's SOX liability, this is bolstered by the testimony of the Compliance employees.

The DPA that is attached as an exhibit to Plaintiff's Response is between MGI and the federal government.  MPSI employees were required to sign an acknowledgement that they had received a copy (Appx. 7-8); (Appx. 68); (Appx. 87-89); (Appx. 46).  Even far beyond receiving and reviewing the DPA, the Compliance employees each confirmed that they were informed that they were bound by the DPA and trained/instructed that their jobs encompassed addressing the deficiencies found by the DOJ against MGI:

Bernier (who testified that he was employed by MPSI (Appx. 2)

 Q.  I want you to -- let me ask you this:  As a MoneyGram manager -- you're a senior manager, aren't you?

 A.  Yes.  Yes.
 Q.  As a senior MoneyGram manager, do you have any responsibility for complying with this [DPA] agreement?
 A.  Yes, I do.
(Appx. 14-15)

 Q.  I'm asking you specifically about MoneyGram's agreement with the federal government. You understand that you are bound by this agreement?  You, in your role as the head of Anti-Money Laundering and Counter Financing of Terrorism, are bound by this agreement?
 A.  I understand the company is bound by it.  I work for the company.  I've signed that I acknowledged it, and, yes, my job is to make some of the issues that were identified in the Deferred Prosecution Agreement better and not have the same challenges that the company was fined for in the past.
(Appx. 16)

 Q.  What's your understanding of why MoneyGram required you to read the federal injunction and the prosecution agreement from the Department of Justice?
 A.  As I recall, the company was required to have everyone read and acknowledge the Deferred Prosecution Agreement.
(Appx. 22)

Sylvia Gil, RCO,  also explained in her deposition that when MGI received the new DPA,

the Company sent it to all MPSI employees, required them to read it and subsequently held

meetings placing "mitigation actions."  (Appx. 87-88].

Mr. Bernier further confirmed that MoneyGram also conducted training of MPSI

employees on the continuing obligations of MoneyGram to the Injunction of the Federal Trade

Commission against MGI.  (Appx. 33).  Significantly, Mr. Bernier acknowledges that there were

no lines drawn between MGI and MPSI with respect to the application of, or consequences of,

the DPA/FTC:

 Q.  I'm asking you if anyone with MoneyGram has ever addressed with you who could potentially suffer the consequences if the DPA was violated?
 A.  So we do have annual training within the company that does articulate the consequences of noncompliance.  As I recall, jail is mentioned for noncompliance as one of the measures that -- one of the consequences that could happen, along with fines.  I don't recall if it specifically says a position or a person that would be subject to that. In my mind, compliance is everyone's responsibility, so I think everyone should take that training with all seriousness, that, you know, anybody can be responsible for wrongdoing within the company and should be and is.

Beyond that, I'm aware that the prior Chief Compliance Officer for MoneyGram before I worked for MoneyGram was personally fined, so I know that has happened.[2]  So in terms of exactly who, I can't say that I recall any specific person saying, this person will go to jail, but I do recall that it is part of our training that jail is consequence --could be a consequence for noncompliance.
(Appx. 29).

It should be noted that while Bernier states that he is employed by MPSI (Appx. 2), the DOJ states that Bernier's predecessor, as Chief of Compliance, was employed by MGI and he was sanctioned in that capacity.   (Appx. 103-105).   Regarding Bernier's predecessor, the government announced in 2017 "that the United States Department of the Treasury (the 'Treasury Department') has settled its claims under the Currency and Foreign Transactions Reporting Act of 1970 ('Bank Secrecy Act' or 'BSA') against THOMAS E. HAIDER ('HAIDER'), the former chief compliance officer of **MoneyGram International, Inc.** ('MoneyGram') (emphasis supplied). During the relevant time period, MoneyGram operated a money transfer service that enabled its customers to transfer money from one MoneyGram outlet to another.  In the settlement – which resolves claims that HAIDER is liable under the BSA for failing to ensure that MoneyGram implemented and maintained an effective anti-money laundering ('AML') program and filed timely suspicious activity reports ('SARs') with FinCEN, HAIDER has agreed to a three-year injunction barring him from performing a compliance function for any money transmitter. HAIDER has also agreed to pay $250,000, and has admitted, acknowledged, and accepted responsibility for" a laundry list of activity resulting in fraud to consumers.  Appx. 103-105.   This sanction further explicitly acknowledges that:  1. Haider, as Chief Compliance Officer (the same position Bernier now holds) accepted responsibility as a

---

[2] Plaintiff asks the Court to take Judicial Notice of Appx. 103-106 from the DOJ acc reflecting that the former Chief Compliance Officer that was fined worked for "MoneyGram International, Inc." and was sanctioned in that capacity. Courts can take judicial notice of information from a government website. *United States v. Flores*, 730 F. App'x 216, 220 (5th Cir. 2018)

MGI representative; 2. There is effectively no difference between MGI and MPSI;  3. MGI officers and employers have authority and oversight over MPSI Compliance; and 4. Even MPSI employees (and the federal government) acknowledge that MGI and MPSI operations (including Compliance) are one and the same.[3]  *Id*.

III.     CONCLUSION

As noted in the *Morefield* opinion, there is no question that a parent corporation should face SOX consequences for termination of a subsidiary employee when the parent's value and performance is based on the value and performance of subsidiaries within its organization.   A publicly traded corporation is, for Sarbanes-Oxley purposes, the sum of its constituent units; and Congress insisted upon accuracy and integrity in financial reporting at all levels of the corporate structure, including the non-publicly traded subsidiaries. "In this context, the law recognizes as an obstacle no internal corporate barriers to the remedies Congress deemed necessary. It imposed reforms upon the publicly traded company, and through it, to its entire corporate organization." MGI has represented to investors, the government and the public that MPSI employees are its employees.  Nowhere does MGI take the position that MPSI employees are not its employees EXCEPT in this lawsuit in order to avoid liability (and perhaps other litigation)—one of the very things that SOX is designed to fix.  Plaintiff Juan Lozada was an employee of MPSI and of MGI for purposes of SOX liability.

FOR THE REASONS STATED, Plaintiff prays that MGI's Motion for Summary Judgment be denied and for such further relief as justice may require.

---

[3] MGI attempts to make an argument that Plaintiff did not "plead" it as an employer.  However, Plaintiff's Second Amended Complaint repeatedly refers to MGI as a liable SOX entity.

Respectfully submitted,


/s/Susan E. Hutchison
Texas Bar No. 10354100
sehservice@hsjustice.com

Hutchison & Stoy, PLLC
505 Pecan St., Ste. 101
Fort Worth, Texas 76102
Phone:  817-820-0100
Fax:    817-820-0111

S. Rafe Foreman
Texas Bar No. 10354100
srfservice@hsjustice.com

Hutchison & Stoy, PLLC
1312 Texas Ave., #101
Lubbock, TX  79401
(806) 491-4911

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

This is to certify that on October 1, 2020, a true and correct copy of the above and foregoing document was served on the following attorneys of record by delivery to each of them via facsimile transmission:

John M. Barcus, Gary D. Eisenstat
Ogletree, Deakins
john.barcus@ogletree.com
rroeser@haltomdoan.com

J. Randall Roeser, Darby V. Doan
Haltom & Doan
rroeser@haltomdoan.com
ddoan@haltomdoan.com


s/Susan E. Hutchison
Susan E. Hutchison