CRAIG BERNIER

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

JUAN LOZADA-LEONI,           )
                             )
     Plaintiff,              )
                             )
VS.                          ) Case No.
                             ) 4:20-cv-00068-RWS-CMC
                             )
MONEYGRAM INTERNATIONAL,     )
INC. and MONEYGRAM PAYMENT   )
SYSTEMS, INC.,               )
                             )
     Defendants.            )

**************************************************
                    VOLUME 1
              ORAL DEPOSITION OF
                  CRAIG BERNIER
                 JUNE 26, 2020
            (REPORTED REMOTELY VIA ZOOM)
**************************************************

     ORAL DEPOSITION OF CRAIG BERNIER, produced as a

witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and numbered

cause on the 26th day of June, 2020, at 9:33 a.m. to

4:37 p.m., before Laurie Purdy, CSR, in and for the

State of Texas, reported remotely by machine

shorthand, with the witness located in The Colony,

State of Texas, pursuant to the Federal Rules of

Civil Procedure, the Twelfth Emergency Order

Regarding the COVID-19 State of Disaster, and the

provisions stated on the record or attached hereto.

LAURIE PURDY REPORTING SERVICE, INC.

CRAIG BERNIER

```
 1                    CRAIG BERNIER,
 2   having been first duly sworn, testified as follows:
 3                      EXAMINATION
 4   BY MS. HUTCHISON:
 5        Q.   Mr. Bernier, would you state your full
 6   name, please?
 7        A.   Sure.  It's Craig Jacob Bernier.
 8        Q.   And you are currently employed by
 9   MoneyGram?
10        A.   MPSI, yes.  MoneyGram Payments, (sic) Inc.,
11   MPSI.
12        Q.   Okay.
13        A.   Yes.
14        Q.   And what position do you hold?
15        A.   I'm the head of AML CFT --
16        Q.   So --
17        A.   -- head of compliance.
18        Q.   -- MoneyGram is the corporation of
19   acronyms, I have learned.  So I'm trying to learn all
20   of it.  AML I know is anti-money laundering, right?
21        A.   Yes.  Counter financing of terrorism.
22        Q.   Counter financing of terrorism?
23        A.   Yes.
24        Q.   So counter financing of terrorism is a
25   department of its own within MoneyGram?
```

CRAIG BERNIER

1    A.   It's part of our -- our compliance
2  strategy, our bigger compliance department, yes.
3  It's -- it has multiple layers.  Counter financing of
4  terrorism is -- really touches multiple pieces of the
5  company, so various different controls are utilized
6  to counter the financing of terrorism, so on a global
7  scale I kind of head up the efforts for that.
8    Q.   Okay.  And so you have oversight of a team
9  of compliance people who investigate fraud, money
10  laundering, and terrorist activities?
11    A.   Yes, that's correct.  Suspicious activities
12  of consumers.
13    Q.   And you have a background in intelligence,
14  don't you?
15    A.   Yes.  I was former military intelligence.
16    Q.   So you worked for the government?
17    A.   I did.
18    Q.   How long did you work for the government?
19    A.   I was in the US Army from June of 2008 in
20  active duty, in active reserve status until June of
21  2015.  And then from June of 2015 until June of 2017,
22  I was in inactive status.
23    Q.   How long have you been the head of
24  anti-money laundering, counter financing of
25  terrorism?

CRAIG BERNIER

```
 1        A.   This -- that particular title since July of
 2   2019.
 3        Q.   So what did you do before July of 2019?
 4        A.   For MoneyGram?
 5        Q.   Yes, sir.
 6        A.   So prior to being head of AML CFT, I was
 7   the head of the Financial Intelligence Unit for
 8   MoneyGram, which is the vast majority still of my
 9   current work.  So and that's -- and that was that.
10   And then prior to head of FIU, I was manager within
11   the Financial Intelligence Unit, and prior to that I
12   was an analyst within the Financial Intelligence
13   Unit.  Excuse me, correction.  I was a supervisor,
14   and then prior to that I was an analyst.
15        Q.   So how long have you worked for MoneyGram
16   altogether?
17        A.   I started working for MoneyGram in
18   December -- sorry -- November of 2013.
19        Q.   So is the AML CFT department, does that
20   encompass FIU?
21        A.   Yes, it does.
22        Q.   And you are, I guess, ACAMS certified?
23        A.   Yes, I am.
24        Q.   And that's the -- another acronym, the
25   Association of Certified Anti-Money Laundering
```

CRAIG BERNIER

```
1   into the financial industry"?
2        A.   Visibility into other avenues of compliance
3   within the financial industry.  So, for example, when
4   you work at an MSB, which handles person-to-person
5   wire transfer which is different from maybe some of
6   the compliance scenarios that would occur at a bank
7   with a (audio cuts out), so this gives some exposure
8   to how other companies may address issues or forms
9   where they're giving trainings or briefings, et
10  cetera.
11       Q.   And MSB being a money services business?
12       A.   Yes.
13       Q.   And both the MSBs, the money services
14  business, is like MoneyGram -- MoneyGram is an MSB,
15  right?
16       A.   Correct.  MoneyGram is in money services.
17       Q.   And so both MSBs and banking institutions
18  and other institutions like that are regulated by the
19  federal government, right?
20       A.   Yes.
21       Q.   And that's part of what you learn about
22  when you get ACAMS certified, is what regulations
23  govern those industries, right?
24       A.   Correct.
25       Q.   You learn about the Banking Services Act --
```

CRAIG BERNIER

1  or Secrecy Act?  I want to call it "Services Act,"

2  but it's another -- it's the BSA, which is the

3  Banking Secrecy Act, right?

4      A.   Correct.

5      Q.   And the BSA, the Business Secrecy Act,

6  governs both banks and money service businesses,

7  right?

8              MR. EISENSTAT:  Objection, form.

9      A.   So it governs financial --

10             THE WITNESS:  Oh, I'm sorry.  Go

11  ahead.

12             MR. EISENSTAT:  That's all right.  I

13  just made an objection.  You can answer.

14     A.   Correct.  So the BSA will govern financial

15  institutions that fall under the definition of how

16  the BSA defines it, so I wouldn't be able to speak to

17  specifically which exact institutions that applies

18  to.  It depends on how they're classified.

19     Q.   (By Ms. Hutchison)  I guess my point,

20  really, is that it covers MoneyGram.

21     A.   Correct, yeah, as defined as a financial

22  institution.

23     Q.   Right.  So the Banking Secrecy Act -- so

24  MoneyGram is required, to your understanding and what

25  you've learned to become ACAMS certified, to comply

LAURIE PURDY REPORTING SERVICE, INC.

CRAIG BERNIER

1   FinCEN.

2        Q.    Right.  And you are -- you're also required

3   to comply with the Deferred Prosecution Agreement and

4   the Federal Trade Commission's injunction, aren't

5   you?

6        A.    Yes, that is correct.

7        Q.    And so in order to do that, you have to

8   have an understanding of what's in them, don't you?

9        A.    I do need to have an understanding of what

10  is in there, and then I can also rely on our internal

11  legal counsel for interpretations when things may not

12  be clear in those -- in those particular

13  requirements.

14       Q.    Sure.  And if you have a question, you can

15  certainly go to legal.  But separate and apart from

16  that, you are required to have an understanding of

17  the concepts and the issues and the problems and the

18  solutions that are contained within those documents,

19  right?

20                   MR. EISENSTAT:  Objection, form.

21       A.    Yes.  It is very important -- it is

22  important for me to have an understanding of the

23  requirements to perform my job functions, yes.

24       Q.    (By Ms. Hutchison)  And you have to even

25  sign something saying that you had received a copy

CRAIG BERNIER

1   and read the federal injunction, didn't you?

2        A.   I do recall having to sign an

3   acknowledgment that I have received those -- that,

4   yes.

5        Q.   And what was your understanding of why you

6   had to do that?

7        A.   I do not understand why I had to sign

8   that.  I believe it was a requirement within the --

9   within the order itself, if I recall.

10       Q.   You don't know why?

11       A.   Well, I just said I believe it was a

12   requirement within the order itself, but I --

13       Q.   Right.  But you don't know why that

14   requirement was in the order?

15            MR. EISENSTAT:  Objection, form.

16       A.   I'm not sure why they put that requirement

17   in the order, ma'am, no.

18       Q.   (By Ms. Hutchison)  Did you ask anybody?

19       A.   I don't recall asking anybody why that

20   requirement was in the order.

21       Q.   Did you know that the requirement in the

22   injunction order stated that it was -- that it had to

23   be given to every single employee and agent of

24   MoneyGram?

25            MR. EISENSTAT:  Objection, form.

CRAIG BERNIER

1          MR. EISENSTAT:  Objection, form.

2     A.   So, again, I don't know why someone else

3 decided to put that in there.  I can say that from my

4 personal view, it would be in there to -- so that

5 employees are aware that it exists and the

6 requirements that are held within it.

7     Q.   (By Ms. Hutchison)  How many employees do

8 you supervise?

9     A.   I supervise -- directly I have four people

10 reporting directly to me, and then the entire

11 organization underneath it is currently 200 and about

12 50.

13    Q.   So you --

14    A.   During the -- go ahead.

15    Q.   No, I didn't want to cut you off.  I

16 thought you were done.

17    A.   That's in -- that's in my current role.

18    Q.   Okay.  So you supervise directly and

19 indirectly 250 employees, and you don't know why

20 they're supposed to get copies of this order?

21         MR. EISENSTAT:  Objection, form.

22    A.   I think I -- I think I answered that I

23 understand from my personal belief that they need to

24 have a good understanding of what the requirements in

25 the order is and understand what the order -- that

CRAIG BERNIER

```
 1              MR. EISENSTAT:  Objection, form.
 2       A.   I think that's an opinion.  I think every
 3  financial institution could be susceptible to
 4  criminal activity.
 5       Q.   (By Ms. Hutchison)  Okay.  So you don't
 6  have the opinion that -- that money services
 7  businesses are particularly susceptible to money
 8  laundering and terrorist financing?
 9       A.   I have the opinion that all financial
10  institutions need to have the appropriate controls to
11  find and mitigate and report suspicious activity
12  within their company.  I don't think that I can
13  personally say that one particular portion of the
14  financial industry is more susceptible than the
15  other.
16       Q.   Well, you will agree that, obviously, you
17  can't catch the criminals, the terrorists, and the
18  drug dealers if you don't watch out for them or
19  monitor for them, right?
20       A.   No, I would not agree with that.  I think
21  law enforcement can capture criminals.  They don't
22  always need information from financial institutions.
23  If you're speaking in general, criminals are caught
24  every day without --
25       Q.   I'm not speaking in general.  I'm speaking
```

CRAIG BERNIER

1   about MoneyGram.  Isn't your job to try to prevent
2   criminal activity?
3        A.   My job is to monitor and identify
4   potentially suspicious activity within our systems
5   and then report it through -- through a SARs filing
6   to the regulatory authorities, but it's not
7   necessarily to define criminal activity within our
8   system.
9        Q.   Potentially suspicious for criminal
10  activity, right?  I mean, you're not going to --
11  you're not going to do a report on being suspicious
12  of somebody for something that's not a crime, are
13  you?
14            MR. EISENSTAT:  Objection, form.
15       A.   So MoneyGram and me or anybody, we're not
16  judges and juries, so I cannot -- the requirements
17  are to find -- the requirements are to find
18  suspicious activity.  So I can't tell you what crime
19  may be specifically occurring when you see suspicious
20  patterns in money transfers.
21       Q.   (By Ms. Hutchison)  Isn't the whole point
22  of looking for suspicious patterns --
23            MR. EISENSTAT:  I think you
24  interrupted -- I think you interrupted him, Counsel.
25            MS. HUTCHISON:  If he's going to

CRAIG BERNIER

```
 1   financing of -- counter financing of terrorism;
 2   however, I can't label that activity as that because
 3   we identify suspicious activity and report it.
 4   That's our -- that's our mandate.
 5        Q.   I'm not asking you to label it.
 6        A.   And identifying that suspicious activity is
 7   intended to assist law enforcement and report so
 8   that -- so that, yes, criminal activity can be
 9   prevented.
10        Q.   Right.  Thank you.  And you have to stay on
11   guard and be vigilant, don't you, in your monitoring
12   to prevent money laundering and financing of
13   terrorist activities?
14        A.   What do you mean by "staying on guard and
15   vigilant"?  I mean, we have to have the appropriate
16   program implemented.  We have to -- we have to make
17   sure that we're reviewing our programs and policies
18   and making sure that we're implementing the right
19   controls.
20        Q.   And using those four pillars of compliance,
21   right?
22        A.   Correct.
23        Q.   I mean, the safety of the public, of
24   MoneyGram's consumers, is one of your primary
25   responsibilities, isn't it?  Isn't that the point of
```

CRAIG BERNIER

```
 1  there was a Deferred Prosecution Agreement that was
 2  entered.  And you're familiar with that, right?
 3      A.   I'm aware that it exists, yes.
 4      Q.   Okay.  And it's, again, the federal
 5  government against MoneyGram International,
 6  Incorporated, right?
 7      A.   That's what it says, yes.
 8      Q.   Okay.  Well, you have an understanding that
 9  that's -- that that happened and it was the
10  government against MoneyGram, right?
11      A.   Yes.
12      Q.   And attached to this Deferred Prosecution
13  Agreement is what's called a Statement of Facts.
14  Have you ever read the Statement of Facts that was
15  attached to the agreement?
16      A.   I have read the Statement of Facts, yes.
17      Q.   Okay.  And that's Attachment A.  And so the
18  Statement of Facts includes a finding that there was
19  laundering of fraud proceeds using MoneyGram's money
20  transfer system, correct?
21            MR. EISENSTAT:  Objection, form.
22      A.   Where does it say that?  You're referring
23  to this page, right?
24      Q.   (By Ms. Hutchison)  Wait a minute.  That's
25  not what I want.
```

LAURIE PURDY REPORTING SERVICE, INC.

CRAIG BERNIER

```
1        A.   Could you repeat the question again?  Am I
2   aware -- I know you asked if I'm aware.
3        Q.   Well, you know what?  Let me back up a
4   minute.  So first of all, there was a finding that
5   from 2004 to 2009 the reported fraud from MoneyGram
6   agents was over $75 million in losses to the victims,
7   right?
8                  MR. EISENSTAT:  Objection, form.
9        A.   Yes, that's what that says.  That's what
10   the statement says right here that you have in front
11   of me, yes.
12        Q.   (By Ms. Hutchison)  Okay.  And do you have
13   an understanding what the government meant by "losses
14   to victims"?
15                  MR. EISENSTAT:  Objection, form.
16        A.   Again, this particular document was before
17   my time, and so, you know, I can't speculate what
18   they actually want it to mean.  I can see what the
19   document says in the order.  I can see specifically
20   in this statement what it says, but I don't -- I
21   mean, how do you want me to interpret that?  I
22   don't --
23        Q.   (By Ms. Hutchison)  I want you to -- let me
24   ask you this:  As a MoneyGram manager -- you're a
25   senior manager, aren't you?
```

LAURIE PURDY REPORTING SERVICE, INC.

CRAIG BERNIER

```
 1        A.    Yes.   Yes.
 2        Q.    As a senior MoneyGram manager, do you have
 3   any responsibility for complying with this agreement?
 4        A.    Yes, I do.
 5        Q.    Okay.  And in order to comply with the
 6   agreement, you have to understand it, don't you?
 7                    MR. EISENSTAT:   Objection, form.
 8        A.    I would say I have to understand it to do
 9   the sections that apply to my job functions, yes.
10        Q.    (By Ms. Hutchison)  Okay.  So you only have
11   to understand certain parts of it, not all of it?
12                    MR. EISENSTAT:   Objection, form.
13        A.    Yeah, I don't know how to answer that,
14   because I mentioned earlier, obviously, I'm not an
15   attorney.  This is a legal document, so you're asking
16   if I need to understand this document, and I think
17   there are levels of understanding.  So when you're
18   asking that question -- I've never been in a
19   deposition before, so I don't know how this is
20   supposed to go.  So just to be completely
21   transparent, if you're asking me do I understand the
22   document, I can answer that I have a general
23   understanding of it.  I don't know that I can say I
24   have a legal understanding of it because I'm not a
25   lawyer.  So I want -- when I'm answering your
```

CRAIG BERNIER

1   can be improved and continue those -- those

2   enhancements and improvements over time.  I don't

3   think that -- compliance never stops.  So I don't

4   think improving upon our controls and our systems

5   ever -- ever slows down or stops.

6        Q.   I'm asking you specifically about

7   MoneyGram's agreement with the federal government.

8   You understand that you are bound by this agreement?

9   You, in your role as the head of anti-money

10  laundering and counter financing of terrorism, are

11  bound by this agreement?

12       A.   I understand the company is bound by it.  I

13  work for the company.  I've signed that I

14  acknowledged it, and, yes, my job is to make some of

15  the issues that were identified in the Deferred

16  Prosecution Agreement better and not have the same

17  challenges that the company was fined for in the

18  past.

19       Q.   Okay.  So with that in mind -- I mean,

20  obviously, that means you've read the Deferred

21  Prosecution Agreement, right?

22       A.   I have read the Deferred Prosecution

23  Agreement, yes.

24       Q.   Was there anything that you recall not

25  understanding, saying, I don't get this; I don't know

CRAIG BERNIER

```
 1              MR. EISENSTAT:  Yeah, there you go.
 2       A.    That helps.
 3       Q.    (By Ms. Hutchison)  Okay.
 4       A.    So that -- I'm aware that, yes, this says
 5  that we need to have policies and procedures that
 6  govern how we terminate agents.
 7       Q.    Okay.
 8       A.    Yes.
 9       Q.    And it goes through -- I'm not going to go
10  through the whole laundry list that the government
11  has on here, but just generally speaking, you know,
12  it includes problems with SARs, right, Suspicious
13  Activity Reports?
14       A.    I see Line B discusses SARs, yes.
15       Q.    And C discusses SARs?
16       A.    Yes, I see C mentions SARs as well.
17       Q.    Okay.  And another problem that it lists
18  under D -- and I'll blow that up -- it says,
19  "MoneyGram failed to sufficiently resource and staff
20  its AML program," right?
21       A.    That's what it says, yes.
22       Q.    Okay.  And AML is anti-money laundering,
23  right?
24       A.    Correct.
25       Q.    And you're over anti-money laundering,
```

CRAIG BERNIER

1  right?

2      A.   As of July of 2019, yes.

3      Q.   Okay.  Who was over anti-money laundering

4  before you?

5      A.   Directly before me there was an individual,

6  his name was Rob Stapleton.

7      Q.   If you look at -- there's a part in here

8  about due diligence in signing up agents.  It's G.

9  Here it is.  So it says that "MoneyGram failed to

10 conduct adequate due diligence on prospective

11 MoneyGram agents and signed up agents without

12 visiting the locations," et cetera, right?

13     A.   That's what it says, yes.

14     Q.   Okay.  And so is there a due diligence

15 requirement that you're aware of with respect to

16 verifying who the agents are and whether they're, I

17 guess, legitimate?

18          MR. EISENSTAT:  Objection, form.

19     A.   MoneyGram has a due diligence process for

20 onboarding agents, yes.

21     Q.   (By Ms. Hutchison)  Okay.  And is that

22 important for -- also for the counter financing of

23 terrorism aspect of your job, to make sure that the

24 agents that are being signed up are not run by any

25 terrorists organizations?

CRAIG BERNIER

1   influencing compliance?

2           MR. EISENSTAT:   Objection, form.

3       A.   Well, I -- so, again, first deposition.   I

4   don't know what you mean by "improper."   What I do

5   know is that what you have in front of me, what the

6   company was -- what this statement says about sales

7   influencing compliance.   But in my world, I have not

8   personally experienced someone trying to

9   inappropriately influence or affect anything from a

10  sales side in my world.

11      Q.   (By Ms. Hutchison)   And you're not aware of

12  that occurring at MoneyGram?

13      A.   I'm aware of this in -- I'm aware of this

14  in the DPA.   And I would say in a general sense

15  that -- I'm not aware of a compliance action not

16  being taken because of sales.   I can't recall any

17  compliance action being missed or not taken because

18  of something that sales did or said.

19      Q.   As a senior manager of MoneyGram, did you

20  get copies of the Monitor Reports?

21      A.   I've received copies of the Monitor Reports

22  for the last couple of years.   I may not have always

23  had visibility into all of the Monitor Reports based

24  on the level that I had at the company at the time --

25  depending on what time frame you're talking about.

CRAIG BERNIER

1    Q.    What about in 2016?  Would you have gotten
2  a copy of the Monitor report in 2016?
3    A.    I do not recall getting a full copy of the
4  Monitor report in 2016; although, I do believe that I
5  got sections that were pertaining to my area.
6    Q.    And what was your role in 2016?
7    A.    In the -- from January until July -- mid
8  July of 2016, I was a manager in the Financial
9  Intelligence Unit.  And then in July of 2016 after
10  the director at the time left, I was named director
11  of the FIU, which is now called the head of the FIU.
12            THE REPORTER:  I'm sorry.  Can you say
13  that one more time?  Head of what?
14            THE WITNESS:  Head of the Financial
15  Intelligence Unit.
16    Q.    (By Ms. Hutchison)  And you were referred
17  to --
18    A.    The position was -- the position was called
19  director at the time, director of --
20    Q.    And you were --
21    A.    -- financial.  I'm sorry.
22    Q.    I was just trying to clarify for the court
23  reporter that you referred to it as the FIU.
24    A.    Yes.
25    Q.    I just don't think she heard the "FIU."

CRAIG BERNIER

1      Q.   (By Ms. Hutchison)  Mr. Bernier, my
2  question is specific.  I'm not asking you if you've
3  read Paragraph 2.  I'm asking you -- the question is,
4  do you have an understanding based upon your reading
5  of this document and the fact that you were required
6  to read, understand, and acknowledge it, that
7  MoneyGram has admitted that it has engaged in fraud?
8  And that's a yes or no question.
9           MR. EISENSTAT:  You can answer this
10  question for the last time.
11      Q.   (By Ms. Hutchison)  It's yes or no.
12      A.   The document speaks for itself, and I have
13  already admitted that I have read and understood the
14  document.
15      Q.   And you read and understood all the facts
16  that were attached that describe in great detail all
17  of the fraud that occurred, right?
18      A.   I would not state that I understand every
19  detail of the legal verbiage used in the -- in the
20  specific -- in the DPA.  But as I mentioned earlier,
21  that I do have access to our internal legal counsel,
22  so if I had a question or if something was unclear I
23  could ask them.
24      Q.   And I'm not asking you about the legal
25  verbiage.  I'm asking you did you read the statement

CRAIG BERNIER

1  of facts that talk about the factual basis for the

2  fraud findings?

3      A.   Which specific facts are you referring to

4  and I can let you know if I'm aware of them?  If

5  you'd like to walk through every fact in the entire

6  document, I'm happy to say what I recall and what I

7  don't.  If that's what you would like to do, I will

8  do that.

9      Q.   I want to know if you read the factual

10  statement that describes all the fraudulent

11  activities.

12      A.   I believe that I did say that I have read

13  the Deferred Prosecution Agreement, yes.

14      Q.   Okay.

15      A.   If you're asking if I recall every

16  statement in the entirety of the document, I do not.

17      Q.   What's your understanding of why MoneyGram

18  required you to read the federal injunction and the

19  prosecution agreement from the Department of Justice?

20      A.   As I recall, the company was required to

21  have everyone read and acknowledge the Deferred

22  Prosecution Agreement.

23      Q.   And what's your understanding of why the

24  government wanted MoneyGram to have its senior

25  management and its employees and its agents read

CRAIG BERNIER

```
 1              MS. HUTCHISON:  -- whole suit is
 2  about.
 3              MR. EISENSTAT:  Susan, I've made my
 4  position known to you, so I suggest --
 5              MS. HUTCHISON:  It's very wrong.
 6              MR. EISENSTAT:  -- that you ask
 7  another question.
 8              MS. HUTCHISON:  I'll show you why it's
 9  relevant.
10              MR. EISENSTAT:  Great.  That would be
11  nice to see.
12              MS. HUTCHISON:  I will absolutely do
13  that.  But I just want to make sure the record is
14  clear that Mr. Bernier is testifying that as a senior
15  management he has no clue as to why he was supposed
16  to read that document.
17      Q.  (By Ms. Hutchison)  Is that accurate?
18      A.  I am not testifying to that, no.  That is
19  not accurate.
20      Q.  So what's the clue -- what's your -- what's
21  your understanding, your opinion or belief as a
22  senior manager as to why you should read those
23  documents?
24      A.  Now, that's a better question because I can
25  give you my opinion.  My opinion on why we should be
```

CRAIG BERNIER

1   reading those documents is because it's important to

2   understand the history of what the company has been

3   through so that we can understand where the company

4   has made mistakes in the past so that we can create a

5   better environment now and in the future to combat

6   fraud and anti-money laundering initiatives.  So I

7   think it's important to know history of the company

8   so that we know where we need to aim to be in the

9   future.

10       Q.   And the Deferred Prosecution Agreement is

11  still in effect, right?

12       A.   There's an extension to the Deferred

13  Prosecution Agreement, yes.

14       Q.   It's still in effect?

15       A.   Yes.

16       Q.   Okay.  And so it applies to MoneyGram today

17  as we sit here, right?

18       A.   Yes.

19       Q.   Okay.  And as a matter of fact, if you look

20  at the extension that's still in effect today --

21  we'll look at Page 11.  It says, "As a result of

22  MoneyGram's conduct including why" --

23                 MR. EISENSTAT:  Susan --

24                 MS. HUTCHISON:  It's not on there?

25                 MR. EISENSTAT:  No, not yet.

CRAIG BERNIER

```
 1        Q.   It says that in 2018 -- November 2018,
 2   right?
 3        A.   Page 15 says November 2018 signed by the
 4   CEO, yes.
 5        Q.   Right.  "In 2018 the company had to forfeit
 6   $125 million," right?
 7        A.   I believe that's when the -- I see the
 8   sentence, so, yes, I see what the document says.
 9        Q.   All right.
10              MR. EISENSTAT:  But just so you're
11   clear, it does say 2015, so let's not be misleading
12   with the record.
13              MS. HUTCHISON:  It says that -- it
14   says that "conduct related to the implementation of
15   an ineffective fraud interdiction system in 2015."
16              MR. EISENSTAT:  In 2015.
17              MS. HUTCHISON:  Correct.  However, the
18   DPA is continuing.  It's still in effect.  It's 2018
19   when they had to pay the $125 million.
20              MR. EISENSTAT:  I'm not arguing with
21   you, Counsel.  I'm just wanting to make sure that
22   you're not trying to make an incorrect record here by
23   being quick with dates that aren't what the document
24   says.
25        Q.   (By Ms. Hutchison)  All I'm saying is the
```

CRAIG BERNIER

1  document is in effect five years after you got

2  there.  For that whole five-year period of time, this

3  Prosecution Agreement was in effect, right?

4      A.   Correct.  The company has been in a DPA

5  since I started working for the company.

6      Q.   The entire period of time you've been

7  employed, the company has been in a DPA, right?

8      A.   That is correct.

9      Q.   And part of the reason that prosecution

10 against the company is deferred is to try to get

11 MoneyGram to fix the problems that are listed in the

12 DPA, right?

13     A.   Could you say that one more time?

14     Q.   Yes.  The agreement is, We, the government,

15 will defer prosecuting criminally you, MoneyGram, and

16 your officers and managers if you'll fix the

17 problems, right?

18          MR. EISENSTAT:  Objection, form.

19     A.   I'm trying to see where it says that in the

20 document, "we, the government."

21     Q.   (By Ms. Hutchison)  I'm paraphrasing it,

22 sir.  But is that your understanding of it or not?

23     A.   Again, if you ask me a question, I will

24 answer it exactly to what's in the document, but I

25 don't think that I can presume based on a paraphrase

CRAIG BERNIER

```
 1  what the document is supposed to imply.  I can only
 2  go by exactly what it says.
 3      Q.   Well, I'm asking you for what you
 4  understand it says.  You have to have some kind of
 5  understanding of what the consequences are of this
 6  document, don't you?
 7      A.   Are you asking me if I have a personal
 8  opinion about the document, or are you asking me how
 9  deep I understand it from a legal perspective?
10  Because I've --
11      Q.   I'm not --
12      A.   -- already mentioned that I cannot
13  interpret the document from a legal perspective.  I
14  can only interpret the document --
15      Q.   How many times, Mr. Bernier, do I have to
16  tell you I'm not asking you for a legal opinion?
17      A.   I understand, but you asked me how I
18  understand it, so --
19      Q.   No.
20      A.   -- there's level of understanding for a
21  document like this.
22      Q.   I'm asking you as the head of the entire
23  anti-money laundering, counter financing of terrorism
24  supervising 250 people, don't you have to have an
25  understanding of the consequences of this agreement
```

CRAIG BERNIER

```
 1  that is still in effect?
 2        A.   I -- yes.  I understand that there are --
 3             MR. EISENSTAT:  Objection, form.
 4        A.   -- consequences for not adhering to the
 5  Deferred Prosecution Agreement.
 6        Q.   (By Ms. Hutchison)  And what are the
 7  consequences for not adhering to this agreement that
 8  remains in effect?
 9             MR. EISENSTAT:  Objection, form.
10        A.   Are the consequences specifically laid out
11  in the document?  Because if they're not, I don't
12  know precisely what consequences may incur based on
13  which part of the document are not adhered to.  So
14  it's difficult for me to answer that.  I do know that
15  there are consequences for not adhering to
16  compliance.  I do know that we need to resolve the
17  issues that were listed within the DPA, but I don't
18  know specifically exactly what's going to happen to
19  the company if we do A, B, and C right and then D
20  wrong, for example.
21        Q.   (By Ms. Hutchison)  Okay.  So that's not
22  something that has been addressed with you as to what
23  the consequences would be for any particular action
24  with respect to the DTPA -- I mean, the DPA?
25             MR. EISENSTAT:  Objection, form.
```

CRAIG BERNIER

1      Q.   (By Ms. Hutchison)  Sure.  I'm asking you
2   if anyone with MoneyGram has ever addressed with you
3   who could potentially suffer the consequences if the
4   DPA was violated?
5      A.   So we do have annual training within the
6   company that does articulate the consequences of
7   noncompliance.  As I recall, jail is mentioned for
8   noncompliance as one of the measures that -- one of
9   the consequences that could happen, along with
10  fines.  I don't recall if it specifically says a
11  position or a person that would be subject to that.
12  In my mind, compliance is everyone's responsibility,
13  so I think everyone should take that training with
14  all seriousness, that, you know, anybody can be
15  responsible for wrongdoing within the company and
16  should be and is.
17              Beyond that, I'm aware that the prior
18  chief compliance officer for MoneyGram before I
19  worked for MoneyGram was personally fined, so I know
20  that has happened.  So in terms of exactly who, I
21  can't say that I recall any specific person saying,
22  This person will go to jail, but I do recall that it
23  is part of our training that jail is consequence --
24  could be a consequence for noncompliance.
25              MS. HUTCHISON:  Okay.  We can take a

CRAIG BERNIER

```
 1        A.    Yeah.

 2        Q.    -- right?

 3        A.    Okay.  Well, there you go.  Yeah, it's the

 4   e-mail.  I see it.

 5        Q.    Okay.  And this e-mail is where Mr. Lozada

 6   is talking to somebody on the monitor team, right?

 7   Do you know who Phil Underwood is?

 8        A.    Yes.  I know Phil Underwood from

 9   FreshFields.

10        Q.    Okay.  And that's the monitor team, right?

11        A.    That is the prior monitor team, yes, in

12   2017.

13        Q.    Okay.  Has MoneyGram terminated its monitor

14   relationship with FreshFields?

15        A.    I don't know the appropriate terminology.

16   I am -- we do have a different monitor currently

17   that, I believe, was selected by the Department of

18   Justice.

19        Q.    Okay.  Do you know why the Department of

20   Justice selected a different monitor?

21        A.    I do not have any personal knowledge why

22   the Department of Justice changed monitors.

23        Q.    Okay.  In any event, so Mr. Lozada is

24   saying, "Phil, another message for your Supervalu

25   folder.  It illustrates the process that compliance
```

CRAIG BERNIER

```
 1   asked you to show it to him so that he can look at
 2   it.  If you don't want to do that, then don't do it.
 3                 MS. HUTCHISON:  Fine.  I just told you
 4   my exhibits rearranged themselves.  I'm looking for
 5   it.  But it's hard for me to believe that the head of
 6   the anti-money laundering department doesn't know
 7   whether the DPA requires him to discipline an agent.
 8                 MR. EISENSTAT:  What you believe is
 9   not relevant.  Okay?  Whether you believe it or not
10   believe, doesn't matter.  He's asked to see it.  And
11   you're either able to show it to him right now or
12   not.  If you have a computer glitch, that's fine.  I
13   understand.
14                 MS. HUTCHISON:  Just, Gary, let me ask
15   my questions, please.
16        Q.   (By Ms. Hutchison)  Mr. Bernier, you
17   don't -- I'm asking you as the head of the
18   department.  Do you know one way or the other whether
19   there is an obligation on the part of MoneyGram to
20   discipline agents who won't remediate under those --
21   under the requirements of the federal government?
22                 MR. EISENSTAT:  Objection, form.
23        A.   I'm not aware of what the specific verbiage
24   that the DPA says in terms of the requirement, but
25   our process is that we do execute, does have a
```

CRAIG BERNIER

```
1   mechanism for us to review, investigate, and take the
2   appropriate disciplinary actions when required with
3   agents.  So it's not as if I'm not saying that we
4   don't take disciplinary actions.  I am agreeing that
5   disciplinary actions occur and that we have a process
6   to remediate disciplinary actions or take actions
7   with agents when they're in noncompliance or if their
8   compliance is not satisfactory.  What I'm not able to
9   answer to you is specifically exactly what the DPA is
10  saying in how you're phrasing your question.
11            MS. HUTCHISON:  I object as
12  nonresponsive.
13       Q.   (By Ms. Hutchison)  I'm just asking you
14  broadly, as broadly as I can possibly think of
15  without using any specific verbiage or specific
16  language or specific terminology.  Just if the DPA
17  puts an obligation on MoneyGram and its managers to
18  discipline noncompliant agents.
19            MR. EISENSTAT:  Susan, we've been
20  through this.
21       Q.   (By Ms. Hutchison)  If you don't know, you
22  don't know.
23            MR. EISENSTAT:  We've been through
24  this multiple times, and he's answered it every
25  single time.  You just don't like his answer.  You're
```

CRAIG BERNIER

1   you're probably wanting to show me.

2        Q.   So you don't get -- when you get training

3   with respect to the effects of the DPA and the

4   injunction, they don't train you what MoneyGram's

5   continuing obligations are?

6        A.   I don't recall every element specifically

7   of the training in terms of the terminology and how

8   they refer to every piece of that.

9        Q.   My question was, do you get training on

10  what MoneyGram's obligations are under the DPA and

11  the injunction?

12       A.   The company does have annual training, yes.

13       Q.   Okay.  And does that training include what

14  MoneyGram's obligations are continuing under both of

15  those agreements?

16       A.   As I recall, there is some training on the

17  continued obligations under the FTC order, yes.

18       Q.   Does any of that training address a failure

19  to suspend an agent under certain noncompliant

20  conditions?

21       A.   I don't recall specifically if the training

22  says that or not, but I do recall that, as it says

23  there, it talks about suspending agents at

24  MoneyGram's locations on Page 19.

25       Q.   Okay.

CRAIG BERNIER

```
 1                UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3  JUAN LOZADA-LEONI,           )
                                 )
 4        Plaintiff,             )
                                 )
 5  VS.                          ) Case No.
                                 ) 4:20-cv-00068-RWS-CMC
 6                               )
    MONEYGRAM INTERNATIONAL,     )
 7  INC. and MONEYGRAM PAYMENT   )
    SYSTEMS, INC.,               )
 8                               )
          Defendants.            )
 9
                   REPORTER'S CERTIFICATION
10
                    ORAL DEPOSITION OF
11
                      CRAIG BERNIER
12
                     JUNE 26, 2020
13
                        VOLUME 1
14            (REPORTED REMOTELY VIA ZOOM)

15       I, Laurie Purdy, CSR, in and for the State of

16  Texas, hereby certify to the following:

17       That the witness, CRAIG BERNIER, was duly sworn

18  by the officer and that the transcript of the oral

19  deposition is a true record of the testimony given by

20  the witness;

21       That the deposition transcript was submitted on

22  August 5, 2020, to Mr. Gary Eisenstat, Attorney for

23  the Witness, for the review and signature by the

24  witness, to be returned to the reporter within 30

25  days;
```

CASE 4:20-cv-00068-RWS-CMC   Document 118-2   Filed 10/01/20   Page 35 of 36 PageID #: 2819

CRAIG BERNIER

```
 1        That the amount of time used by each party at

 2   the deposition is as follows:

 3             Ms. Hutchison:  5:43

 4             Mr. Eisenstat:  00:00

 5        That pursuant to information given to the

 6   deposition officer at the time said testimony was

 7   taken, the following includes counsel for all parties

 8   of record:

 9

10   FOR THE PLAINTIFF APPEARING REMOTELY:
          MS. SUSAN E. HUTCHISON
11        Hutchison & Stoy, PLLC
          505 Pecan Street, Suite 101
12        Fort Worth, Texas 76102
          T 817-820-0100
13        F 817-820-0111
          hutch@hsjustice.com
14
     FOR THE DEFENDANT APPEARING REMOTELY:
15        MR. GARY EISENSTAT
          Ogletree, Deakins
16        8117 Preston Road, Suite 500
          Dallas, Texas 75225
17        T 214-987-3800
          gary.eisenstat@ogletree.com
18
     FOR THE DEFENDANT APPEARING REMOTELY:
19        MR. J. RANDALL ROESER
          Haltom &  Doan
20        6500 Summerhill Road, Suite 100
          Texarkana, Texas 75503
21        T 903-255-1000
          rroeser@haltomdoan.com
22

23

24        That $1,441.50 is the deposition officer's

25   charges to the Plaintiff for preparing the original
```

CRAIG BERNIER

1   deposition transcript and any copies of exhibits;

2       I further certify that I am neither counsel for,

3   related to, nor employed by any of the parties or

4   attorneys in the action in which proceeding was

5   taken, and further that I am not financially or

6   otherwise interested in the outcome of the action.

7

8       Certified to by me this 2nd day of August,

9   2020.

10

11

12

13   _____
     LAURIE PURDY, CSR 5933
14   Certification Expires: 1-31-2021
     Laurie Purdy Reporting Service, Inc.
15   2212 Wood Cliff Court
     Arlington, Texas 76012
16   T 817-988-4348
     Firm ID Number:  582
17

18

19

20

21

22

23

24

25