# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **JUAN LOZADA-LEONI** | § | |
| | § | |
| **V.** | § | **No.  4:20CV68-RWS-CMC** |
| | § | |
| **MONEYGRAM INTERNATIONAL,** | § | |
| **INC. and MONEYGRAM PAYMENT** | § | |
| **SYSTEMS, INC.** | § | |

---

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

---

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636.  Before the Court are the following pending motions:

> **Defendant MoneyGram International, Inc.'s Motion for Summary Judgment, and Brief in Support (Docket Entry # 83); and**

> **Defendants' Motion for Summary Judgment, and Brief in Support (Docket Entry # 109).**

The Court, having reviewed the relevant briefing, recommends Defendants' motions for summary judgment be **DENIED**.

### Table of Contents

I.      Factual Background………………………………………………………...........4

II.     Summary Judgment Motions.................................................................................7

III.    Legal Standard........................................………………………….......…...........7

IV.     Summary Judgment Evidence .............................................................................9

        A.      The evidence and objections thereto.........................................................9

1.        MGI's motion for summary judgment.................................................9
       a.      MGI's evidence.................................................9
       b.      Plaintiff's response.................................................9
       c.      MGI's objections to statements in Plaintiff's declaration.............10
       d.      Supplemental briefing.................................................12

2.        Defendants' combined motion for summary judgment............................13

B.       Material facts.................................................14

       1.      Relevant orders regarding MoneyGram prior to Plaintiff's employment..14

       2.      Plaintiff's employment with MoneyGram..................................16

       3.      Administrative proceedings.........................................20

       4.      Relevant orders regarding MoneyGram after Plaintiff's employment.......23

C.       Procedural background in federal court....................................24

D.       Evidence regarding MoneyGram entities.................................28

       1.      MGI's motion for summary judgment.........................................28

       2.      Plaintiff's response.................................................28

       3.      Plaintiff's surreply.................................................29

V.      Applicable Law..............................................................33

     A.       Statutory overview, generally.................................................33

     B.       Anti-retaliation provision of Sarbanes-Oxley........................................35

VI.     Whether Plaintiff May Proceed Against Both MPSI and MGI.....................38

     A.       Parties' assertions.................................................38

     B.       Theories by which a parent can be held liable for the acts of a subsidiary...........40

       1.      Application of state law or federal common law......................................40

       2.      Federal common law theories.................................................42

    a. "Pierce the corporate veil" theories.................................................43
    b. Vicarious liability based on general agency principles.................47
    c. Direct liability where the parent directly participated in the complained-of wrong.........................................................47

   3. What theories have been sufficiently raised by Plaintiff............................54

 C. Sarbanes-Oxley Section 806 (codified at 18 U.S.C. § 1514A)............................63

   1. Interpretations of § 1514A prior to Dodd-Frank........................................63
    a. Administrative proceedings...........................................................65
    b. Federal court decisions..................................................................75

   2. *Lawson* opinions.........................................................................................77
    a. *Lawson I*......................................................................................78
    b. *Lawson II*.....................................................................................81
    c. *Lawson III*...................................................................................81

   3. Interpretations of § 1514A following Dodd-Frank....................................83
    a. Administrative proceeding............................................................85
    b. Federal court decisions..................................................................86

 D. Discussion.............................................................................................................101

VII. Whether Plaintiff is Barred From Litigating his SOX Claims in this Court Because the Initial OSHA Complaint Was Factually Insufficient......................................................117

 A. Applicable law, generally.....................................................................................117

 B. Summary judgment evidence.................................................................................118

 C. Parties' assertions.................................................................................................121

 D. Discussion ............................................................................................................123

VIII. Recommendation..........................................................................................................137
   Objections....................................................................................................................137

# I.  FACTUAL BACKGROUND

In his original complaint and First Amended Complaint, Plaintiff Juan Lozada-Leoni ("Plaintiff") sued MoneyGram International, Inc. ("MGI"), as well as Juan Manuel Gonzalez and Christopher Ponder, pursuant to the whistleblower provision of the Corporate and Criminal Fraud Accountability Act of 2002, also known as the Sarbanes-Oxley Act ("SOX"), codified at 18 U.S.C. § 1514A(a),[1] as amended by Section 929A of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010. On May 16, 2019, Plaintiff filed his Second Amended Complaint ("SAC"), dismissing the individual defendants and adding MoneyGram Payments Systems, Inc. ("MPSI") as a defendant, along with MGI (collectively, "Defendants").  *See* Docket Entry # 21. MPSI is a subsidiary of parent company MGI, a publicly-traded money transfer company; MPSI's financial information is included in the consolidated financial statements of MGI. *Id*., ¶¶ 5-7.

According to the SAC, on October 21, 2009, MGI entered a Stipulated Order with the Federal Trade Commission ("2009 FTC Order"), which enjoined MGI from, among other things, failing to establish, implement, and maintain a comprehensive anti-fraud program that was reasonably designed to protect United States and Canadian consumers. *Id*., ¶ 11. On November 9, 2012, MGI entered a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice ("DOJ"). *Id*., ¶ 12. In the DPA, MGI admitted to criminally aiding and abetting wire fraud and failing to maintain an effective anti-money laundering program. *Id.*  According to a DOJ November 9, 2012 press release ("DOJ 2012 Press Release"), MGI was involved in mass marketing and consumer fraud phishing schemes, perpetrated by corrupt MGI agents and others, that defrauded tens of thousands of victims in the United States. MGI also failed to maintain an effective anti-money laundering

---

[1] Cases addressing this statute refer to this section alternatively as "Section 806" or "Section 1514A."

program in violation of the Bank Secrecy Act. *Id.*

On November 8, 2018, the DOJ levied a substantial fine against MGI and entered into an Amendment and Extension of Deferred Prosecution Agreement ("Amended DPA") with MGI. *Id.*, ¶ 14. The Amended DPA extended the DPA entered on November 9, 2012. *Id.* Under the terms of the Amended DPA, the DOJ agreed to continue to defer prosecution for a period of thirty months. *Id.*, ¶ 16.

In a related case, MGI agreed to settle allegations made by the FTC alleging MGI violated the 2009 FTC Order. *Id.*, ¶ 17. The Stipulated Order for Compensatory Relief and Modified Order for Permanent Injunction ("Modified FTC Order") required that MGI block money transfers of known perpetrators of fraud schemes and provide refunds to fraud victims and enhanced diligence, investigative and disciplinary requirements. *Id.*, ¶ 21. According to the SAC,

> [w]hile the Amended DPA and the Modified FTC Order did not single out any one of MGI's agents, they identified a wide range of systemic, illegal conduct that forms the basis for the Amended DPA. This was the same conduct that Plaintiff began complaining about almost immediately after he was hired at MGI, e.g., insufficient transaction analysis; insufficient suspicious activity reports ('SARs'); insufficient oversight of minority owned stores; failure to conduct independent reviews, and breakdown of the fraud interdiction system, specifically the Individual Watch List ('IWL') program.

*Id.*, ¶ 22. Plaintiff alleges this "illegal conduct by MGI continued during Plaintiff's tenure at MPSI." *Id.*, ¶ 23.

Plaintiff began work as a Senior Manager for the U.S. Regional Compliance Team for MPSI in mid-October 2016. *Id.*, ¶ 24. Plaintiff was responsible for supervising MGI's regional compliance officers ("RCOs"), senior regional compliance officers ("Sr. RCOs"), and managers on the United States team. *Id.* Plaintiff also was responsible for monitoring MGI's agents' implementation of

MGI's Global Partner Compliance Policy, which contained MGI's anti-fraud and anti-money laundering policies and procedures. *Id*., ¶ 26. Plaintiff worked under the direction of Juan Manuel Gonzalez. *Id*., ¶ 27. During Plaintiff's entire tenure at MPSI, MGI was operating under the requirements of the Amended DPA and the Modified FTC Order. *Id*., ¶ 28.

Plaintiff alleges that during his tenure at MPSI, "MGI had knowledge of, yet ignored, suspicious activities of several of its largest agents, including Wal-Mart, Schnucks, SuperValu, RaceTrac, Valero and CVS." *Id*., ¶ 29. Plaintiff alleges that as he learned "more about the intricacies of his position, Plaintiff noticed some significant discrepancies between the image that MGI presented to its external stake-holders about the effectiveness of its compliance program and the reality on the ground." *Id*., ¶ 42. According to Plaintiff, the technology MGI was using was so outdated that it was becoming increasingly clear to Plaintiff that MGI "simply did not have the technology to run an effective compliance program as required by the DPA and 2009 FTC Order." *Id.*, ¶ 43.

In or about 2017, Plaintiff shadowed Pablo Rivera, MGI's Senior RCO in charge of the CVS account. Rivera knew firsthand the irregularities that occurred at CVS stores because of a lack of proper reporting. *Id.*, ¶ 50. Rivera and Plaintiff attended meetings where MGI sales managers would talk CVS representatives out of implementing measures that would lower fraud. *Id.*, ¶ 53. Plaintiff alleges he notified MGI management of its compliance infractions, "but to no avail." *Id*. at pp. 12-19.

Plaintiff alleges he was retaliated against for his complaints about MGI's illegal conduct. *Id*. at p. 19. Plaintiff asserts Defendants violated Section 806, the SOX whistleblower provision, by taking adverse employment actions against him, including, but not limited to, termination and other

6

forms of retaliation, because of his protected conduct under 18 U.S.C. § 1514A. *Id.* at p. 22. According to Plaintiff, approximately eighteen months after he was terminated, MGI was found to have violated the 2009 FTC Order and "was hit with massive new fines and sanctions, along with the brand-new Amended DPA." *Id.*, ¶ 86.

## II. SUMMARY JUDGMENT MOTIONS

On April 15, 2020, MGI filed a motion for summary judgment regarding the sole issue of whether Plaintiff may assert a SOX retaliation claim against parent company MGI, in addition to the SOX retaliation claim asserted against MPI's subsidiary, MPSI. According to MGI, Plaintiff's former employer was MPSI, not MGI. In its reply, MGI acknowledges that because MPSI is a subsidiary of MGI, whose financial information is included in publicly traded parent company MGI's financial statements, MPSI is subject to SOX. However, MGI asserts Plaintiff's additional SOX retaliation claim against MGI should be dismissed because Plaintiff has not sufficiently shown (or even sufficiently alleged) MGI can also be considered Plaintiff's employer for purposes of his § 1514A claims.

On August 12, 2020, Defendants filed a combined motion for summary judgment, asserting the sole issue of whether Plaintiff is barred from litigating his claims in this Court based on the "bare-bones complaint [Plaintiff] filed with the Department of Labor – which then determined that it was barred from investigating that complaint because [Plaintiff] failed to articulate a *prima facie* case." Docket Entry # 109 at p. 1.

## III. LEGAL STANDARD

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Summary judgment is proper

if the pleadings, the discovery and disclosure materials on file, and any affidavits "[show] that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The trial court must resolve all reasonable doubts in favor of the party opposing the motion for summary judgment. *Casey Enters., Inc. v. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981) (citations omitted). The substantive law identifies which facts are material. *Anderson*, 477 U.S. at 248.

The party moving for summary judgment has the burden to show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 247. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). Where the nonmovant bears the burden of proof, the movant may discharge its burden by showing there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325; *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 424 (5th Cir. 2000). Once the movant has carried its burden, the nonmovant must "respond to the motion for summary judgment by setting forth particular facts indicating there is a genuine issue for trial." *Byers*, 209 F.3d at 424 (citing *Anderson*, 477 U.S. at 248-49). The nonmovant must adduce affirmative evidence. *Anderson*, 477 U.S. at 257. No "mere denial of material facts nor…unsworn allegations [nor] arguments and assertions in briefs or legal memoranda" will suffice to carry this burden. *Moayedi v. Compaq Computer Corp.*, 98 Fed. Appx. 335, 338 (5th Cir. 2004). Rather, the court requires "significant probative evidence" from the

nonmovant in order to dismiss a request for summary judgment supported appropriately by the movant. *United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001). The court must consider all of the evidence, but must refrain from making any credibility determinations or weighing the evidence. *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

## IV. SUMMARY JUDGMENT EVIDENCE[2]

**A.      The evidence and objections thereto**

**1.      MGI's motion for summary judgment**

**a.      MGI's evidence**

MGI attached the following to its motion for summary judgment: (1) excerpts from Plaintiff's Second Amended Complaint; (2) excerpts from Plaintiff's Unopposed Motion for Leave to File a Second Amended Complaint "to add MPSI as a Defendant in this matter;" (3) excerpts from Plaintiff's Response in Opposition to All Defendants' Jurisdictional Motions; (4) Declaration of Elizabeth Weathers-Nguyen ("Weathers-Nguyen Decl."), with attached offer letter from MPSI; (5) excerpts from the deposition of Juan Lozada-Leoni ("Plaintiff Dep."); and (6) excerpts from deposition of Juan Manuel Gonzalez ("Gonzalez Dep.").

**b.      Plaintiff's response**

Plaintiff attached the following evidence to his response: (1) Declaration of Theodore Garber ("Garber Decl."); (2) Second Amended Docket Control Order; (3) MGI's 2017 10-K ("Ex. 5"); (4) Declaration of Juan Antonio Lozada ("Lozada Decl."), with attachments; (5) MGI's Motion for Summary Judgment and Brief in Support; (6) MoneyGram Global Partner Compliance Policy ("Ex.

---

[2] The Court has considered the entire admissible record in this case, including the evidence attached by the parties to other filings. *See* FED. R. CIV. P. 56 (c)(3) ("*Materials Not Cited*. The court need consider only the cited materials [filed with a motion for summary judgment or response], but it may consider other materials in the record.").

8"); (7) excerpts from Plaintiff's deposition; (8) Plaintiff's Second Amended Complaint; (9) MGI's

Original Answer; (10) Deferred Prosecution Agreement ("Ex. 13"); (11) 2014 SuperValu Review

Worksheet ("Ex. 14"); (12) 2016 SuperValu Review Worksheet ("Ex. 15"); (13) excerpts from

Gonzalez's deposition; (14) excerpts from emails from MGI's Senior Recruiter ("Ex. 17"); (15)

excerpts from emails from Gonzalez ("Ex. 18"); and (16) email regarding Plaintiff's onsite interview

with MGI ("Ex. 19").

### c.      MGI's objections to statements in Plaintiff's declaration

In its reply, MGI objects to the following statements contained in Plaintiff's declaration:

- "I never made a distinction between MoneyGram Payment Systems, Inc. and Money Gram International because we always referred to ourselves as being employees of MoneyGram[.]"
- "*For operating purposes MoneyGram was a single company, not two companies.*"
- "I always made decisions premised on the fact that I was an employee of a company called MoneyGram International, Inc."
- "*MGI uses MPSI's property as its own.*"
- "*The daily operations of MGI and MPSI are not kept separate. MGI uses MPSI to provide money transfer services. The directors and officers of MPSI take their orders from MGI and act in MGI's interests. MPSI makes decisions with the sole purpose of benefitting MGI.*"

Docket Entry # 92 at p. 2. MGI asserts the italicized portions are conclusory, lack foundation, and

are insufficient to either support or defeat a motion for summary judgment. MGI moves to strike the

remaining statements under the sham affidavit doctrine, asserting the statements contradict Plaintiff's

deposition testimony and other statements in his declaration that he was employed by MPSI and that

MPSI fired him. *Id.* at pp. 2-3.

MGI also objects to the following portions of Plaintiff's declaration, asserting they are

conclusory and unsubstantiated and are barred by the best evidence rule:

- "The signature block of the Sr. Director, AML/CTF Compliance – Americas, Juan

10

> Manuel Gonzalez, stated that he worked for MoneyGram International."
>
> - "My direct supervisor, Juan Manuel Gonzalez, sent an email to every member of the compliance department at MoneyGram on October 7, 2016, announcing that I had been hired to lead the US Regional Compliance Team and never referred to MoneyGram Payment Systems as the company he or anyone else in the message was working for."
> - "All the materials that we gave our agents said MoneyGram, the policies that we drafted were MoneyGram policies."
> - "When we visited agents, we showed them a MoneyGram International issued badge that identified us as employees of MoneyGram International, not MoneyGram Payment Systems."
> - "[W]e were told that our bosses were Andres Villareal, the Chief Compliance Officer for MoneyGram and Alex Holmes, the CEO of MoneyGram International, Inc."

Docket Entry # 92 at pp. 3-4.

Self-serving affidavits may serve as competent summary judgment evidence. *See United States v. Carter*, 737 Fed. Appx. 687, 691 (5th Cir. 2018); *see also C.R. Pittman Constr. Co. v. Nat'l Fire Ins. Co.*, 453 Fed. Appx. 439, 443 (5th Cir. 2011) (per curiam) (unpublished) ("[A]n affidavit based on personal knowledge and containing factual assertions suffices to create a fact issue, even if the affidavit is arguably self-serving."). Statements setting forth conclusory or ultimate facts or asserting conclusions of law are insufficient evidence on a motion for summary judgment. *See Clark v. America's Favorite Chicken Company,* 110 F.3d 295, 297 (5th Cir.1997).

While parts of Plaintiff's declaration may be conclusory, the Court will give it the weight it deserves in considering the motion for summary judgment. *See, e.g. Bianco v. Globus Med., Inc.*, 30 F. Supp. 3d 565 (E.D. Tex. 2014) (declining to strike any portion of a declaration containing impermissible legal opinions but noting the court would disregard those legal conclusions in ruling on the correction of inventorship issue which was tried to the court). It is true a party may not overcome a motion for summary judgment with an "affidavit that impeaches, without explanation, sworn testimony." *Vianet Grp. PLC v. Tap Acquisition, Inc.*, No. 3:14-CV-3601-B, 2016 WL

11

4368302, at *15 (N.D. Tex. Aug. 16, 2016) (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)). But courts may consider an affidavit that supplements rather than contradicts prior deposition testimony. *See id.* at 496. An affidavit supplements if it clarifies or amplifies the facts by "giving greater detail or additional facts not previously provided;" whereas it contradicts when it "tells the same story differently." *See id.*

Moreover, the Fifth Circuit has declined to strike a party's affidavit "even if it conflicts with earlier testimony in the party's deposition." *Suncoast Post-Tension, Ltd. v. Scoppa*, No. 4:13-CV-3125, 2015 WL 12762260, at *3 (S.D. Tex. Sept. 2, 2015) (citing *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 893 (5th Cir. 1980)).  In *Kennett-Murray*, the Fifth Circuit stated a district court, in considering a motion for summary judgment, "must consider all the evidence before it and  cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier deposition," noting the "two in conjunction may disclose an issue of credibility." *Kennett-Murray*, 622 F.2d at 893. "Thus, a genuine issue can exist by virtue of a party's affidavit even if it conflicts with earlier testimony in the party's deposition." *Id.* Any inconsistencies between Plaintiff's declaration and his prior testimony are appropriately treated as impeachment evidence but not as a basis for striking the affidavit.  *See Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 639 n. 32 (S.D. Tex. 2010).

For these reasons, the Court overrules MGI's objections to Plaintiff's declaration.

### d.   Supplemental briefing

As allowed by the Court in its September 24, 2020 Order, Plaintiff attached to his surreply excerpts from the depositions of Craig Bernier, Sylvia Gil, Derya White, and Fredy Morales, which were taken after Plaintiff filed his response. Plaintiff also attached to his surreply a copy of a May

4, 2017 press release from the DOJ entitled "Acting Manhattan U.S. Attorney Announces Settlement Of Bank Secrecy Act Suit Against Former Chief Compliance Officer At Moneygram For Failure to Implement And Maintain An Effective Anti-Money Laundering Program and File Timely SARS."

**2.      Defendants' combined motion for summary judgment**

Defendants attached the following evidence to their combined motion for summary judgment: (1) excerpts from Plaintiff's deposition; (2) Plaintiff's September 28, 2017 Complaint under Section 806 of SOX filed with the Occupational Safety & Health Administration ("OSHA") ("OSHA complaint"); and (3) OSHA's October 12, 2017 determination letter ("Determination letter"). Defendants attached to their reply a copy of the OSHA complaint in *Wallace v. Tesoro Corp.*, Civil Action No. 5:11-CV-00099, in the United States District Court for the Western District of Texas, San Antonio Division ("*Wallace* OSHA Complaint").

In his response, Plaintiff objects to Exhibit 1 to Defendants' motion, which are excerpts from Plaintiff's deposition in which he describes his background as an attorney. In their reply, Defendants state their purpose in introducing this evidence is to demonstrate Plaintiff's "obvious awareness of the importance of following all applicable rules and regulations (such as the exhaustion requirement at issue)." Docket Entry # 113 at p. 3. Even though Plaintiff attached the OSHA Determination letter to his response in opposition to MPSI's motion to dismiss (*see* Docket Entry # 23-3), Plaintiff also objects to Exhibit 3 attached in support of Defendants' motion for summary judgment. Both objections are based upon relevance. *See* Docket Entry # 110 at p. 1. According to Plaintiff, "[n]either exhibit possesses any probative value in addressing the sweep of [Plaintiff's] OSHA complaint." *Id.* The Court overrules Plaintiff's objections and will give each exhibit the weight it deserves in considering Defendants' motion for summary judgment.

**B.**     **Material facts**[3]

**1.**     **Relevant orders regarding MoneyGram prior to Plaintiff's employment**

On October 21, 2009, MGI and the FTC stipulated to the entry of a Stipulated Order for

Compensatory Relief and Modified Order for Permanent Injunction, resolving allegations in the

FTC's complaint charging MGI with engaging in unfair or deceptive acts or practices in the course

of providing money transfer services to consumers in the United States through its worldwide money

transfer network. *See* Docket Entry # 34-2, Ex. B at pp. 1-2. The 2009 FTC Order enjoined MGI

from, among other things, failing to: establish, implement, and maintain a comprehensive anti-fraud

program that was reasonably designed to protect US and Canadian consumers; conduct thorough due

diligence on prospective agents and ensure its written agreements require agents to have effective

anti-fraud policies and procedures in place; and adequately monitor its agents by, among other

things, providing appropriate and ongoing training, recording all complaints, reviewing transaction

activity, investigating agents, taking disciplinary actions against problematic agents, and ensuring

that its agents were aware of their obligations to detect and prevent fraud and comply with MGI's

policies and procedures. *Id*. at p. 2.

On November 9, 2012, MGI entered the Deferred Prosecution Agreement ("DPA") with the

United States Department of Justice ("DOJ"). Docket Entry # 89, Ex. 13; *see also* Docket Entry #

34, Ex. C. In the DPA, MGI admitted to criminally aiding and abetting wire fraud and failing to

implement an effective anti-money laundering program and acknowledged it was responsible for the

---

[3] The material facts set forth in this section represent the facts as discerned by the Court from the pleadings and the parties' respective evidentiary submissions, in light of the relevant summary judgment standard requiring the record be viewed in the light most favorable to the nonmoving party. Accordingly, these are the "facts" for purposes of summary judgment only; they may not be the actual facts. *See Willmore-Cochran v. Wal-Mart Assocs., Inc.*, 919 F. Supp. 2d 1222, 1228 (N.D. Ala. 2013).

acts of its officers, directors, and employees as charged in the Information, and as set forth in the Statement of Facts and incorporated by reference into the agreement.[4] *Id*. at pp. 1-2. The DPA was "effective for a period beginning on the date on which the Information [was] filed and ending five (5) years from that date (the 'Term')." *Id.* at p. 2.

In return for the full cooperation of the Company, and its compliance with the other terms and conditions of the DPA, the DOJ agreed, subject to certain paragraphs, "not to use any information related to the conduct described in the attached Statement of Facts against the Company in any criminal or civil case, except: (a) in a prosecution for perjury or obstruction of justice; or (b) in a prosecution for making a false statement." *Id.* at p. 6. The DOJ also agreed, except as provided therein, not to bring any criminal case against the Company "or any of its wholly owned or controlled subsidiaries related to the conduct of the present and former officers, directors, employees, agents, agent employees and consultants. . . or relating to the information that the Company disclosed to the Department prior to the date on which this Agreement was signed." *Id*. at pp. 6-7.

The Company represented it had or would undertake, in addition to the enhancements it had already made to its anti-fraud and anti-money laundering programs, the enhanced compliance obligations described in Attachment C to the DPA and also retain an independent compliance monitor "(Monitor)." *Id*. at p. 7. According to Attachment C, the Company would create an Independent Compliance and Ethics Committee of Board of Directors "with direct oversight of the Chief Compliance Officer and the Compliance Program." *Id.*, Att. C. Attachment C further provided "[t]he Company will require all MoneyGram Agents around the world, regardless of their location,

---

[4] In his surreply, Plaintiff argues this is a judicial admission on the part of MGI, asserting the Statement of Facts for which MGI acknowledged it was responsible sets forth the compliance functions performed by MPSI. Docket Entry # 118 at p. 5.

to adhere to either the anti-fraud and anti-money laundering standards as defined by the FATF interpretive guidelines for Money Services Businesses or the U.S. anti-fraud and anti-money laundering standards, whichever is stricter. This new policy will ensure that all MoneyGram Agents throughout the world will, at a minimum, be required to adhere to U.S. anti-fraud and anti-money laundering standards." *Id.*

**2.     Plaintiff's employment with MoneyGram**

Plaintiff began working for MPSI in October 2016 as a Senior Manager for the U.S. Regional Compliance Team. SAC, ¶¶ 4, 24. In his declaration, Plaintiff states he learned through LinkedIn about a job opening in MoneyGram's compliance department in late August 2016; he visited the MoneyGram website posting the job vacancy and applied for the position; and he never visited a website or applied for any jobs listed by "MoneyGram Payment Systems." Plaintiff's Decl., p. 1.

Thereafter, Plaintiff received several emails from Alan Brooks. *Id.* at pp. 1-2. On August 19, 2016, Brooks wrote Plaintiff an email in which Brooks stated the following: "Thank you for applying to MoneyGram International. I would love to arrange a phone interview to discuss your background, and the Regional Compliance Manager position, located in our Miami Office." Docket Entry # 89, Ex. 17. The email identified Brooks as the Senior Recruiter for MGI. *Id.* Brooks' email was listed as abrooks@moneygram.com. *Id.*; *see also* Plaintiff's Decl., p. 2.

According to Plaintiff, the "first face to face interview took place at the offices of MoneyGram located at 5201 Blue Lagoon Drive, Suite 500, Miami, FL, 33126." *Id.* On September 6, 2016, Brooks emailed Plaintiff, cc'ing Juan Manuel Gonzalez (JMGonzalez@moneygram.com), regarding the agenda for Plaintiff's interview with the team in Miami. Docket Entry # 89, Ex. 19.The

email regarding the panel interview provided as follows: "Friday September 9th: Onsite interview with MoneyGram International." *Id.* Plaintiff states he was offered a position shortly after that interview. Plaintiff's Decl., p. 2.

On September 26, 2016, Brooks sent Plaintiff a letter containing a formal offer with "MoneyGram Payments Systems, Inc. 'MoneyGram'." Weathers-Nguyen Decl., ¶ 4, and Ex. 1. On October 7, 2016, Plaintiff's direct supervisor, Juan Manuel Gonzalez, sent an email to members of the Americas Regional Compliance Team announcing Plaintiff would be joining MoneyGram October 17 and would be assuming the leadership role for the U.S. Regional Compliance Team. *See* Docket Entry # 89, Ex. 18. The signature block on the email indicated Gonzalez was the Sr. Director, AML/CTF Compliance – Americas for MoneyGram International. *Id.*

Plaintiff began working as a Senior Manager for the U.S. Regional Compliance Team for MoneyGram on October 18, 2016. Plaintiff's Decl., p. 2. Plaintiff has alleged that, during the course of his employment, he complained about what he believed were alleged improprieties in MGI's business operations. SAC, ¶¶ 54-61. In particular, Plaintiff alleges he complained to Christopher Ponder and Plaintiff's supervisor Gonzalez. *Id.*, ¶¶ 27, 54-55.

According to Plaintiff, he never made a distinction between MPSI and MGI because "we always referred to ourselves as being employees of MoneyGram, we were told that our bosses were Andres Villarreal, the Chief Compliance Officer for MoneyGram and Alex Holmes, the CEO of MoneyGram International, Inc." *Id.*, pp. 2-3. Plaintiff states all the materials they gave their agents "said MoneyGram, the policies that [they] drafted were MoneyGram policies;" and he showed his agents a MGI-issued badge that identified him as an employee of MGI, not MPSI. *Id.*, p. 3.

17

Plaintiff further states "[w]e enforced MoneyGram's International Global Partner Compliance Policy," which implied MoneyGram was one company. *Id.* According to Plaintiff, MoneyGram's Compliance Policy provides that MoneyGram can suspend agents who violate the policy. *Id.* According to the 2016 Global Partner Compliance Policy, the purpose of the policy was as follows:

> MoneyGram Agents and other non-agent distribution channels are important partners in offering MoneyGram money transfers and other services and products to our valued customers. Because MoneyGram and its partners are required to comply with various laws and governmental regulations worldwide, MoneyGram has issued this *Global Partner Compliance Policy* ('Policy').

> Agents and their employees are part of the first line of defense in protecting consumers and preventing criminal abuse and exploitation of MoneyGram products and services. The Policy outlines the responsibilities of Agents globally to comply with applicable laws and regulations, with MoneyGram's policies and procedures, and the required actions for effective implementation of strict anti-money laundering and anti-fraud standards.

> This Policy also reinforces MoneyGram's commitment to protecting its consumers and to preventing the use of its products and services by anyone for fraudulent purposes, money laundering, terrorist financing, or other illegal activities. MoneyGram requires the same commitment from its Agents and their owners, shareholders, governing authorities, management, and employees. Agents are responsible for implementing this Policy. To carry out this Policy, MoneyGram has incorporated the key requirements that govern the relationship between MoneyGram and its Agents.

> MoneyGram continues to update its Anti-Money Laundering and Anti-Fraud Compliance Programs ('Programs') to review and respond to issues related to the implementation of this Policy. MoneyGram encourages its Agents to contact the MoneyGram Regional Compliance Officer or other compliance contact assigned to the Agent regarding questions about this Policy.

Docket Entry # 89, Ex. 8 at p. 2. The definition of "Agent" includes "any party entering into a contractual relationship with MoneyGram or its subsidiaries and affiliates for the purposes of

providing MoneyGram's products and services to consumers" and "also includes all Subagents of an Agent." *Id*. at n. 1.

In his declaration, Plaintiff states Derya White is a regional compliance officer for MoneyGram; Dana Johnson is the "regulator and compliance manager for SuperValu, an agent of MoneyGram;" and Dayna Karel was a sales manager for MoneyGram. Plaintiff's Decl., pp. 3-4. Plaintiff states MoneyGram ensures its agents are following the MoneyGram Global Partner Compliance Policy through Headquarters Reviews.[5] *Id*., p. 4.

According to Plaintiff, in March 2017, he and Derya White assisted the quarterly business review that Dayna Karel was facilitating at SuperValu. *Id*.; *see also* Gonzalez Dep. at 43:7-17 (testifying regional compliance officer White, who was under Plaintiff as a senior manager, was instructed to assist the quarterly business review that Karel was facilitating). In his declaration, Plaintiff states during the SuperValu meeting he "learned that we did not know the owners of 13 SuperValu stores," which was a violation of MoneyGram's Compliance Policy, which provides that "Agents shall provide accurate and complete information to MoneyGram when there are any material change(s) in the ownership of the Agent." Plaintiff's Decl., p. 4. After the meeting, Plaintiff told his boss Gonzalez that MoneyGram should suspend the thirteen stores. *Id.* According to Plaintiff, Gonzalez removed Plaintiff from the SuperValu account, which was a demotion. Plaintiff was fired in April 2017. *Id.*

Elizabeth Weathers-Nguyen is employed by MPSI as an Associate General Counsel.

---

[5] Plaintiff attached documentation to his response indicating Derya White conducted a headquarters review of SuperValu on April 6, 2014, and Dana Johnson represented SuperValu at that meeting. Docket Entry # 89, Ex. 14. On December 19, 2016, Derya White conducted another headquarters review of SuperValu, and Dana Johnson represented SuperValu at that meeting as well. Docket Entry # 89, Ex. 15.

Weathers-Nguyen Decl., ¶ 2. In her declaration, Weathers-Nguyen states Plaintiff worked for MPSI from approximately October 2016 until April 2017, when MPSI terminated his employment. *Id*., ¶ 4. According to Weathers-Nguyen, Plaintiff was never employed by MGI. *Id*., ¶ 5.

Weathers-Nguyen states Ponder is MPSI's Head HR Partner in Frisco, Texas, and Gonzalez is MPSI's Head of Regional Compliance and Strategic Projects in Miami, Florida. *Id*.; *see also* Gonzalez Dep. at 6:4-10 (stating his current employer is "MoneyGram Payment Systems"). According to Weathers-Nguyen, MPSI employed Ponder and Gonzalez, and neither Ponder nor Gonzalez has ever been employed by MGI. *Id.* In previous briefing, Plaintiff attached an excerpt of the October 18, 2018 deposition of Chris Ponder, wherein he stated he worked for "MoneyGram." Docket Entry # 34-7 at 23:24-25.

In his deposition in this case, Gonzalez testified he is the individual who decided to terminate Plaintiff's employment, though he partnered with his H.R. business partner Ponder in that decision. Gonzalez Dep. at 89:9-24. Gonzalez testified they also partnered with "internal labor counsel to discuss the circumstances of the case, and everybody agreed that we were ready to move forward." *Id.* at 89:24-90:14 (also testifying they shared information with Peter Green and the company's chief compliance officer, Andy Villareal).

**3.     Administrative proceedings**

On September 28, 2017, Plaintiff (through counsel) filed a formal complaint under Section 806 of the Sarbanes-Oxley Act of 2002 with OSHA, identifying MGI as the respondent. OSHA complaint. Plaintiff's OSHA complaint first stated Section 806 protects employees of publicly traded companies (and subsidiaries of same) from retaliation when they complain and "reasonably believe"

(that the complained-of conduct) constitutes a violation of one of six federal laws, e.g., Sections

1341, 1343, 1344, or 1348, any rule or regulation of the SEC, or any provision of federal law relating

to fraud against shareholders. Docket Entry # 109, Ex. 2 at p. 1. Under "facts," Plaintiff stated he was

hired on October 18, 2016, and had the job title of Manager, AML/CTF Regional Compliance USA.

*Id.* at pp. 1-2. Plaintiff further stated as follows:

> Two of his essential responsibilities were (1) compliance with anti-money laundering rules and regulations; and (2) compliance with a consent decree that required, *inter alia,* compliance with anti-money laundering rules and regulations.
>
> In a scenario that is becoming increasingly predictable, his efforts to achieve compliance were met with (1) resistance; (2) outright hostility, and (3) finally resulted in his termination on April 4, 2017.

*Id.* at p. 2.

> Under "[p]rotected conduct," Plaintiff stated as follows:

> This is essentially a *Sharkey v. JP Morgan Chase* case, with one additional twist: on top of violating the underlying anti-money laundering laws, the employer here violated an existing consent decree that prohibited future violations of the underlying anti-money laundering laws.

*Id.* According to Plaintiff, in addition to "on-the-job harassment, verbal abuse, isolation, and

marginalization," Plaintiff was terminated on April 4, 2017. *Id.*

OSHA issued a determination letter on October 12, 2017. Determination letter at p. 1. The

letter advised as follows:

> Following an investigation by a duly-authorized Investigator, the Secretary of Labor, acting through his agent, the Acting Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region VI, finds there is insufficient evidence to prove the complaint has merit.

*Id.* The letter further stated Plaintiff "did not present a prima facie showing." *Id.* Because OSHA did not have reasonable cause to believe a violation of SOX occurred, the complaint was dismissed. *Id.* at p. 2. The letter advised Plaintiff he had "30 days from the receipt of these Findings to file objections and to request a hearing before an Administrative Law Judge." *Id.*

Plaintiff lodged objections on November 13, 2017, requesting a hearing in front of an Administrative Law Judge ("ALJ"). Docket Entry # 23-4.Thereafter, the Department of Labor opened Case Number 2018-SOX-00004, which it styled Juan Lozada-Leoni v. MoneyGram International. The case was assigned to ALJ Tracy A. Daly. *See* Docket Entry # 23, Exs. 5 and 6. Plaintiff filed his Original [Administrative] Complaint on March 5, 2018. Docket Entry # 23-8. Plaintiff filed his First Amended [Administrative] Complaint on March 26, 2018. Docket Entry # 23-9.

MPSI responded to Plaintiff's First Amended [Administrative] Complaint on April 6, 2018. Docket Entry # 23-10. In particular, MPSI filed the Response as "Respondent MoneyGram Payment Systems, Inc., improperly named herein as MoneyGram International." *Id.* at p. 1. In answering Plaintiff's allegation that MGI employed him, "MoneyGram state[d] that Complainant was employed by MoneyGram Payment Systems, Inc. rather than by MoneyGram International[.]" *Id.* at § II, ¶ 1. Among other things, MPSI admitted MoneyGram is a party to a 2012 Deferred Prosecution Agreement; that it paid a fine in 2009 as part of an agreement with the Federal Trade Commission; that it terminated Plaintiff's employment; and that Gonzalez told Plaintiff he was not a good fit. *Id.*, ¶¶ 28, 37, 156.

MPSI, as Respondent, further stated on behalf of MoneyGram that Plaintiff's claims were

barred, in whole or in part, by Plaintiff's failure to exhaust his administrative remedies. *Id.*, ¶ 225. According to MPSI, "in his September 28, 2017, initial complaint presented to [OSHA], [Plaintiff] alleged only that his 'protected conduct' included 'efforts to achieve compliance' with 'anti-money laundering laws,' and with the DPA that 'prohibited future violations of the underlying anti-money laundering law.'" *Id.* MPSI asserted Plaintiff's allegations in the amended complaint were "far broader than those [Plaintiff] presented to OSHA for investigation, and all such claims are barred." *Id.*

Plaintiff gave deposition testimony on May 23, 2018. Docket Entry # 23-11. Ponder was deposed on October 18, 2018 (Docket Entry # 34-7), and Gonzalez was deposed on December 5, 2018 (Docket Entry # 34-6).

On December 19, 2018, Judge Daly set the ALJ proceeding for a bifurcated final hearing, beginning on January 16, 2019. Docket Entry # 23-12. However, on December 21, 2018, counsel for Plaintiff "informally notified" Judge Daly's office of his client's intention to "exercise his right under 29 C.F.R. 1980.114 to bring this matter in a U.S. District Court." Docket Entry # 23-13. Specifically, Plaintiff's counsel advised that "next week we will be filing the formal removal notice under Section 1980.114." *Id.* Judge Daly entered an order suspending the existing filing deadlines until January 4, 2019 and directing Plaintiff to provide a copy of the federal complaint within seven days after filing in federal court. *Id.*

### 4.    Relevant orders regarding MoneyGram after Plaintiff's employment

Meanwhile, on November 8, 2018, the DOJ levied a substantial fine against MGI and entered into an Amendment and Extension of Deferred Prosecution Agreement ("Amended DPA") with

MGI, based on the Company's failure, despite some progress during the original term of the DPA, to successfully complete the implementation of the enhanced compliance undertakings as required by the DPA. Docket Entry # 34, Ex. D-1. The Amended DPA extended the term of the DPA entered on November 9, 2012, until May 10, 2021. *Id.* Under the terms of the Amended DPA, Attachment C was amended to require reporting to the DOJ on a monthly basis. *Id.* at pp. 7-9. In consideration of the Company's ongoing and future cooperation, payment of the additional forfeiture amount, implementation of remedial measures described in the amendment, and the Company's agreement to undertake further anti-fraud compliance measures, the DOJ agreed to continue to defer prosecution for the extended term. *Id*. at p. 14.

On November 13, 2018, MGI agreed to settle allegations made by the FTC alleging MGI violated the 2009 FTC Order. Docket Entry # 34, Ex. B. The Stipulated Order for Compensatory Relief and Modified Order for Permanent Injunction ("Modified FTC Order") required that MGI block money transfers of known perpetrators of fraud schemes and provide refunds to fraud victims and enhanced diligence, investigative and disciplinary requirements. For purposes of the Order, "Defendant" meant MoneyGram International, Inc., its subsidiaries and affiliates, and its successors and assigns. *Id.* at p. 3.

**C.      Procedural background in federal court**

Plaintiff filed his original complaint in the Texarkana Division of the Eastern District of Texas on January 23, 2019, naming MGI, Gonzalez, and Ponder as defendants.[6]  Docket Entry # 1.

---

[6] On January 24, 2019, Judge Daly issued an Order of Dismissal, acknowledging what he believed to be a complaint that had been filed in the Northern District of Texas, Dallas Division, and ordering that "the complaint filed in this matter under the Sarbanes-Oxley Act is DISMISSED with prejudice." Docket Entry # 23-16.

On April 11, 2019, along with two motions to dismiss filed by Gonzalez and Ponder, MGI filed its motion to dismiss for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure, or in the alternative, motion to transfer venue under 28 U.S.C. § 1406(a) to the Northern District of Texas, Dallas Division. Docket Entry # 5. On May 16, 2019, Plaintiff filed his Response in Opposition to All Defendants' Jurisdictional Motions and his Second Amended Complaint, wherein Plaintiff dismissed Gonzalez and Ponder and added a single cause of action against MPSI for unlawful retaliation in violation of SOX. SAC, ¶¶ 88-90.

Thereafter, MPSI filed its motion to dismiss, or alternatively, motion to transfer venue. Docket Entry # 23. Because Plaintiff did not name MPSI as a respondent in his administrative complaint filed with the Department of Labor and only sought relief against MGI, MPSI moved to dismiss pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction and/or pursuant to Rule 12(b)(6) for failure to state a claim against MPSI upon which relief may be granted. *Id.* at p. 2. Alternatively, MPSI moved the Court to transfer this case to the Dallas Division of the Northern District of Texas, or the Sherman Division of the Eastern District of Texas, pursuant to 28 U.S.C. § 1404. *Id.*

On November 25, 2019, the undersigned issued a Report and Recommendation regarding proposed findings of fact and recommendations that Defendants' motions to dismiss and § 1406(a) motion to transfer venue be denied and that Defendants' alternative § 1404(a) motions to transfer venue be granted. Docket Entry # 48. In considering Defendants' motions to dismiss and specifically whether Plaintiff was required to name MPSI in his administrative complaint, the Court noted Plaintiff referred to an integrated enterprise (or single employer) test and provided evidence indicating MGI and MPSI are substantially identical entities for purposes of notice of the underlying

25

charges. *Lozada-Leoni v. MoneyGram Int'l, Inc.*, No. 5:19CV11-RWS-CMC, 2019 WL 7875058, at *11-12 (E.D. Tex. Nov. 25, 2019), *report and recommendation adopted*, No. 5:19CV11-RWS-CMC, 2020 WL 428080 (E.D. Tex. Jan. 28, 2020) (citation omitted)). Noting it had not located any cases on point within the Fifth Circuit applying the single employer test in a SOX case, the Court stated it did not need to rely on any such test in order to find in Plaintiff's favor. *Id.* at *12.

The Court stated "Defendants correctly note a SOX-retaliation claim requires exhaustion of administrative remedies, but they go too far in arguing a party must be specifically named as a respondent in the administrative action." *Id.* After discussing the cases relied upon by Defendants, the Court discussed a case from within the Fifth Circuit wherein the court "rejected an overly formulaic exhaustion requirement." *Id.* at *13 (citing *Buchanan v. Sterling Constr. Co., Inc.*, Civil Action No. H-16-3429, 2017 WL 6888308 (S.D. Tex. July 26, 2017)). The Court noted that in the Fifth Circuit "[t]he scope of a judicial complaint is limited to the sweep of the OSHA investigation that can reasonably be expected to ensue from the administrative complaint." *Id.* (quoting *Buchanan*, 2017 WL 6888308, at *3 (citing *Wallace v. Tesoro Corp.*, 796 F.3d 468, 476 (5th Cir. 2015)).

According to the undersigned, the evidence showed MPSI was included in the underlying administrative action. *Id.* The Court further stated as follows:

> MPSI's Associate General Counsel Weathers-Nguyen received notification of the filings and actively participated in the administrative action. MPSI employees, Gonzalez and Ponder, were referenced throughout both administrative complaints and were both deposed. However, at their depositions, they indicated they were employed by MGI. Importantly, MPSI filed the answer to Plaintiff's amended administrative complaint, and it did not raise the improper entity issue in its failure to exhaust arguments.

*Id.* "Considering the unique facts of this case," the undersigned found Plaintiff's claims against

MPSI can reasonably be expected to grow out of the administrative complaints against MGI. *Id.* Accordingly, the undersigned concluded Plaintiff exhausted his administrative remedies as to the SOX retaliation claim against MPSI and recommended MPSI's motion to dismiss for lack of jurisdiction be denied. *Id.* Because the undersigned recommended MPSI's motion to dismiss be denied, the undersigned did not need to consider MGI's motion to dismiss under Rule 12(b)(3) and alternative § 1406(a) motion to transfer to the Northern District of Texas. *Id.* at *13, n. 6.

The undersigned then considered Defendants' alternative § 1404(a) motions to transfer venue, and after discussing each private and public interest factor, found that, on balance, such factors weighed in favor of transfer. The undersigned recommended Defendants' alternative motions to transfer pursuant to § 1404(a), on an intra-district basis, be granted. *Id*. at *19.

No objections were filed to the findings and conclusions contained in the Report and Recommendation. On January 28, 2020, District Judge Schroeder adopted the Report and Recommendation as the findings and conclusions of the Court and transferred the case to the Sherman Division of the Eastern District of Texas. Docket Entry # 53.

Defendants together have filed a motion for summary judgment regarding the sufficiency of the initial complaint presented to OSHA. MGI has also filed a separate motion for summary judgment regarding the issue of whether it may be considered Plaintiff's employer, along with MPSI, for purposes of Plaintiff's SOX retaliation claims. The parties have filed the following evidence regarding the MoneyGram entities.

27

**D.      Evidence regarding MoneyGram entities**

**1.      MGI's motion for summary judgment**

In her declaration, Weathers-Nguyen states as follows. MPSI is a subsidiary of MGI, a Delaware corporation who has maintained its principal place of business at 2828 N. Harwood Street in Dallas, Texas since 2010.  Weathers-Nguyen Decl., ¶ 2.  "MPSI is likewise headquartered at 2828 N. Harwood Street in Dallas, Texas" and maintains its personnel records for all U.S. offices in Dallas.  *Id.*, ¶ 3. Plaintiff worked for MPSI at MPSI's office in Frisco, Texas. *Id.*, ¶ 4. That office space is leased by MPSI, not MGI, and MGI does not transact business in MPSI's Frisco, Texas office. *Id*.

**2.      Plaintiff's response**

In the SAC, Plaintiff alleges MPSI is a subsidiary of parent company MGI, a publicly-traded money transfer company, and MPSI's financial information is included in the consolidated financial statements of MGI. SAC, ¶¶ 5-7. In its answers, MGI admitted this allegation. Docket Entry # 89, Ex. 11, ¶¶ 5-7.

In its 2017 Form 10-K, MGI states under "Overview" that "MoneyGram International, Inc. (together with our subsidiaries, 'MoneyGram,' the 'Company,' 'we,' 'us,' and 'our') is a global provider of innovative money transfer services and is recognized worldwide as a financial connection to friends and family." Docket Entry # 89, Ex. 5 at p. 3. MGI further stated as follows: "We conduct our business primarily through our wholly-owned subsidiary, MoneyGram Payment Systems, Inc. ('MPSI'), under the MoneyGram brand." *Id*. According to the 2017 Form 10-K, W. Alexander Holmes has served as the Chief Executive Officer since January 2016. *Id.* at p. 10. The form also

lists Andres Villareal as a member of its executive leadership team and states Villareal has been MGI's Chief Compliance Officer since March 2016. *Id.* at pp. 10-11.

### 3.  Plaintiff's surreply

Subsequent to the filing of Plaintiff's response, the Court permitted Plaintiff to take the depositions of Craig Bernier (head of MoneyGram's Anti-Money Laundering, Counter Financing of Terrorism Division, previously head of Financial Intelligence Unit); Sylvia Gil (MoneyGram Regional Compliance Officer); Fredy Morales (previously MoneyGram Regional Compliance Officer and then Supervisor in Global Back Office); and Derya White (previously MoneyGram Senior Regional Compliance Officer). While Plaintiff asserts "MGI's SEC filing in and of itself establishes sufficient nexus between MPSI employees and MGI to establish MGI's SOX liability," in his surreply, Plaintiff asserts "this is bolstered by the testimony of the Compliance employees." Docket Entry # 118 at p. 6.

In his deposition, Bernier testified he is employed by MPSI in the position of head of anti-money laundering and counter financing of terrorism (AML CFT), which is the "biggest compliance department" within MoneyGram. Bernier Dep. at 5:8-6:7. According to Bernier, he has "oversight of a team of compliance people who investigate fraud, money laundering, and terrorist activities." *Id*. at 6:8-12. Prior to being head of AML CFT, Bernier was the head of the Financial Intelligence Unit for MoneyGram, "which is the vast majority still of [his] current work." *Id*. at 7:3-9.  Bernier has worked for MoneyGram since November 2013. *Id*. at 7:9-18.

Bernier stated he is required to comply with the DPA and the FTC's injunction, and that in order to do that, he needs "to have an understanding of what is in there, and then [he] can also rely

on our internal legal counsel for interpretations when things may not be clear . . . in those particular requirements." *Id*. at 13:2-23 (further stating it is "very important for me to have an understanding of the requirements to perform my job functions"). Bernier testified he signed an acknowledgment that he received a copy of the federal injunction. *Id*. at 13:24-14:9.When asked about the DPA entered against MGI, Bernier testified as follows:

> Q.  I want you to -- let me ask you this:   As a MoneyGram manager -- you're a senior manager, aren't you?
>
> A.   Yes.   Yes.
>
> Q.   As a senior MoneyGram manager, do you have any responsibility for complying with this [DPA] agreement?
>
> A.   Yes, I do.

*Id.* at 48:23-49:4; *see also id.* at 47:1-7.

> Q. I'm asking you specifically about MoneyGram's agreement with the federal government. You understand that you are bound by this agreement? You, in your role as the head of Anti-Money Laundering and Counter Financing of Terrorism, are bound by this agreement?
>
> A. I understand the company is bound by it.  I work for the company.  I've signed that I acknowledged it, and, yes, my job is to make some of the issues that were identified in the Deferred Prosecution Agreement better and not have the same challenges that the company was fined for in the past.

*Id.* at 51:6-18.

> Q.· What's your understanding of why MoneyGram required you to read the federal injunction and the prosecution agreement from the Department of Justice?
>
> A.· As I recall, the company was required to have everyone read and acknowledge

30

the Deferred Prosecution Agreement.

*Id.* at 170:17-22.

When asked if he received training on what MoneyGram's obligations are under the DPA and the injunction, Bernier testified that the company conducts annual training, including some training on the continuing obligations under the FTC order against MGI. *Id.* at 226:9-17. Bernier further testified as follows:

> Q.  I'm asking you if anyone with MoneyGram has ever addressed with you who could potentially suffer the consequences if the DPA was violated?

> A. So we do have annual training within the company that does articulate the consequences of noncompliance.  As I recall, jail is mentioned for noncompliance as one of the measures that – one of the consequences that could happen, along with fines.   I don't recall if it specifically says a position or a person that would be subject to that. In my mind, compliance is everyone's responsibility, so I think everyone should take that training with all seriousness, that, you know, anybody can be responsible for wrongdoing within the company and should be and is.

> Beyond that, I'm aware that the prior chief compliance officer for MoneyGram before I worked for MoneyGram was personally fined, so I know that has happened.   So in terms of exactly who, I can't say that I recall any specific person saying, this person will go to jail, but I do recall that it is part of our training that jail is consequence – could be a consequence for noncompliance.[7]

---

[7] According to Plaintiff, although Bernier testified he is employed by MPSI, the May 4, 2017 press release from the DOJ states that Bernier's predecessor, Thomas E. Haider, the former chief compliance officer, was employed by MGI. Docket Entry # 118, Appx. 103-105. Regarding Bernier's predecessor, the government announced "that the United States Department of the Treasury (the 'Treasury Department') has settled its claims under the Currency and Foreign Transactions Reporting Act of 1970 ('Bank Secrecy Act' or 'BSA') against THOMAS E. HAIDER ('HAIDER'), the former chief compliance officer of **MoneyGram International, Inc.** ('MoneyGram')." *Id.* at Appx. 103 (emphasis added by Plaintiff). The press release further provides as follows:

> During the relevant time period, MoneyGram operated a money transfer service that enabled its customers to transfer money from one MoneyGram outlet to another. In the settlement – which resolves claims that HAIDER is liable under the BSA for failing to ensure that MoneyGram implemented and maintained an effective anti-money laundering ('AML') program and filed timely suspicious activity reports ('SARs') with FinCEN, HAIDER has agreed to a three-year injunction barring him from performing a compliance function for any money transmitter. HAIDER has also agreed to pay $250,000, and has admitted, acknowledged, and accepted responsibility for [a laundry list of activity resulting in fraud to consumers].

*Id.* at 182:1-24.

In her deposition, Derya White acknowledged the injunction's reference to "defendants, officers, agents, employees, attorneys" included White, Gonzalez, and Plaintiff "in that . . . we were all employees of MoneyGram." White Dep. at 91:4-94:24. Fredy Morales worked for MoneyGram from December 2013 to April 2019, first as a compliance officer 1, then as a regional compliance officer, and finally as a supervisor in the "global back office as leading the agent disciplinary actions team." Morales Dep. at 7:17-8:18. When he first began working in compliance for MoneyGram, Morales was told about the 2009 FTC injunction, and he reviewed the injunction as part of his responsibilities as a regional compliance officer. *Id.* at 23:7-21. Morales testified everybody in compliance at MoneyGram received the same training, which included reading the DPA. *Id.* at 26:18-27:19.

In her deposition, Sylvia Gil-Wallin testified she has been employed with MoneyGram as a regional compliance officer since April 2014. Gil Dep. at 5:3-19.  According to Gil, when she joined the company in 2014, she was asked to read the 2012 DPA between MoneyGram and the government. *Id.* at 17:2-16 (stating "they ask you to read it when . . . they send you the offer letter"). Regarding the Amended DPA, Gil testified the company sent it to MoneyGram employees to read and they subsequently held meetings placing "mitigation actions." *Id.* at 67:20-68:6; *see also id.* at 69:2-16.

Based on this evidence, Plaintiff asserts there is effectively no difference between MGI and

---

*Id.* at Appx. 103-104. According to the press release, Haider, as "MoneyGram's chief compliance officer," was the most senior MoneyGram employee with direct oversight over MoneyGram's Fraud Department and AML Compliance Department. *Id*. at Appx. 105.

MPSI, pointing out MGI officers and employers have authority and oversight over MPSI compliance. According to Plaintiff, even MPSI employees (and the federal government) acknowledge that MGI and MPSI operations (including compliance) are "one and the same." Docket Entry # 118 at p. 9.

Before addressing MGI's motion, the Court sets forth the applicable law.

## V. APPLICABLE LAW

### A.    Statutory overview, generally

Persons who report certain violations of the securities laws are protected from retaliation under (at least) two federal statutes: "Sarbanes–Oxley protects employees who blow a whistle to management or to regulatory agencies; Dodd–Frank protects 'whistleblowers,' defined as persons who report violations 'to the Commission.'" *Berman v. Neo@Ogilvy L.L.C.*, 801 F.3d 145, 156 (2d Cir. 2015) (Jacobs, J., dissenting), *abrogated by Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 200 L. Ed. 2d 15 (2018) (quoting15 U.S.C. § 78u–6(a)(6)). The Sarbanes-Oxley Act of 2002, referred to herein as SOX or Sarbanes-Oxley, was enacted after the collapse of Enron Corporation to "safeguard investors in public companies and restore trust in the financial markets." *Moody v. Am. Nat'l Ins. Co.*, No. 3:19-CV-00206, 2020 WL 3128259, at *2 (S.D. Tex. June 12, 2020) (quoting *Lawson v. FMR L.L.C.*, 571 U.S. 429, 432, 134 S.Ct. 1158, 188 L.Ed.2d 158 (2014) ("*Lawson III*")).

The whistleblower provision provides federal protection to employees of publicly traded companies who provide evidence of fraud to federal governmental authorities or their supervisor or who participate in a proceeding relating to a violation of antifraud laws or Securities and Exchange Commission rules.[8] *See* Brent B. Nicholson, The Perils of Parenthood and Other Dangerous

---

[8] What became Title VIII of the Sarbanes-Oxley Act of 2002 started out as Section 806 of the Corporate and Criminal Fraud Accountability Act of 2002 ("CCFAA"), introduced by Senator Patrick Leahy on March 12, 2002. *See*

Relationships Under the Whistleblower Protection Provision of the Sarbanes-Oxley Act of 2002, 2

Entrepreneurial Bus. L.J. 415, 416 (2007) (citing 18 U.S.C. § 1514A(a) (2006)). Specifically, 18

U.S.C. § 1514A, established a private right of action for employees of certain companies who are

discharged for, among other things, "provid[ing] information . . . regarding any conduct which the

employee reasonably believes constitutes a violation of [specified securities laws] . . . to . . . a person

with supervisory authority over the employee." *Daly v. Citigroup Inc*., 939 F.3d 415, 422 (2d Cir.

2019) (quoting 18 U.S.C. § 1514A(a)(1)(C)). Protected activity is defined as:

> any lawful act done by the employee to provide information, cause information to be
> provided, or otherwise assist in an investigation regarding any conduct which the
> employee reasonably believes constitutes a violation of section 1341 [mail fraud],
> 1343 [wire fraud], 1344 [bank fraud], or 1348 [securities fraud], any rule or
> regulation of the Securities and Exchange Commission, or any provision of Federal
> law relating to fraud against shareholders. . . .

*Wallace v. Tesoro Corp*., 796 F.3d 468, 474 (5th Cir. 2015) (quoting 18 U.S.C. § 1514A(a)).

"Essentially, the employee has to provide information or assist in an investigation that he reasonably

believes relates to one or more of six categories of laws and regulations: four specific types of fraud,

a federal offense that relates to fraud against shareholders, or a rule or regulation of the SEC."

*Wallace*, 796 F.3d at 474.

Following the financial crisis of 2007-08, Congress passed the Dodd-Frank Wall Street

Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-

Frank"), which amended a variety of federal statutory provisions that had been designed to regulate

the financial industry. *Daly*, 939 F.3d at 422. Dodd-Frank amended the Securities Exchange Act of

---

Brent B. Nicholson, The Perils of Parenthood and Other Dangerous Relationships Under the Whistleblower Protection
Provision of the Sarbanes-Oxley Act of 2002, 2 Entrepreneurial Bus. L.J. 415, 417 (2007). Federal whistleblower
protection was written into Section 806 of CCFAA, later to become Title VIII of SOX and codified at 18 U.S.C. §1514A.
*Id.*

1934 ("Exchange Act") to create a private right of action against an employer who retaliates against a whistleblower for engaging in one or more of three categories of protected activity including "making disclosures that are required or protected under [SOX]." *Id*. (quoting 15 U.S.C. § 78u-6(h)(1)(A)(iii)).

## B.     Anti-retaliation provision of Sarbanes-Oxley

Plaintiff brings his claims under the anti-retaliation provision of SOX, codified at 18 U.S.C. § 1514A(a), as amended by Section 929A of Dodd-Frank. "The amended provision extends § 1514A's protection to employees of public company subsidiaries and nationally recognized statistical rating organizations (NRSROs)." *Lawson III*, 571 U.S. at 455. Recently, the Supreme Court, in comparing this provision with the "core objective" of Dodd–Frank's robust whistleblower program, stated Congress had a "more far-reaching objective" when enacting Sarbanes–Oxley's whistleblower regime: It sought to disturb the "corporate code of silence" that "discourage[d] employees from reporting fraudulent behavior not only to the proper authorities, such as the FBI and the SEC, but even internally." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 777-78, 200 L. Ed. 2d 15 (2018) (quoting *Lawson III*, 571 U.S., at ——, 134 S.Ct., at 1162 (internal quotation marks omitted in *Somers*)). Accordingly, the Sarbanes–Oxley anti-retaliation provision covers employees who report fraud not only to the SEC, but also to any other federal agency, Congress, or an internal supervisor. *Id.* at 778.

A SOX retaliation claim requires exhaustion of administrative remedies prior to filing suit.[9]

---

[9] "Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims." *Erhart v. BofI Holding, Inc*., No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *5 (S.D. Cal. Mar. 31, 2020) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). The "law does this by requiring proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" *Id.* (quoting

*Buchanan v. Sterling Constr. Co., Inc.*, Civil Action No. H-16-3429, 2017 WL 6888308, at *3 (S.D. Tex. July 26, 2017) (citing *Wallace*, 796 F.3d at 475-76 (holding SOX retaliation suits are limited by the scope of the administrative complaint)). To pursue a whistleblower retaliation claim under SOX, a plaintiff must first initiate an administrative action by filing a complaint with the Secretary of Labor. *Erhart v. BofI Holding, Inc.*, No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *6 (S.D. Cal. Mar. 31, 2020) (citing 18 U.S.C. § 1514A(b)(1)(A)).

The Department of Labor ("DOL") has delegated the responsibility for investigating and initially adjudicating the complaint to the Occupational Safety and Health Administration ("OSHA"). *Villanueva v. U.S. Dep't of Labor*, 743 F.3d 103, 106 (5th Cir. 2014) (citing 77 Fed. Reg. 3912; also citing 29 C.F.R. § 1980.104(a)). The claimant may appeal OSHA's determination to an ALJ and ultimately the DOL's Administrative Review Board ("ARB"). *Erhart*, 2020 WL 1550207, at *6 (citing *Lawson III*, 571 U.S. at 436–37 (citing 29 CFR §§ 1980.104 to 1980.110)). "[T]he ARB's determination on a § 1514A claim constitutes the agency's final decision and is reviewable in federal court under the standards stated in the Administrative Procedure Act, 5 U.S.C. § 706." *Id.* (quoting *Lawson III*, 571 U.S. at 437). "If, however, the ARB does not issue a final decision within 180 days of the filing of the complaint, and the delay is not due to bad faith on the claimant's part, the claimant may proceed to federal district court for de novo review." *Id.* (quoting *Lawson III*, 571 U.S. at 437 (citing 18 U.S.C. § 1514A(b))).

The requirements for a *prima facie* case are articulated in the DOL regulations. *Day v. Staples, Inc.*, 555 F.3d 42, 53 (1st Cir. 2009). To make out a *prima facie* case for retaliation under

---

*Woodford*, 548 U.S. at 90 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002))).

§ 1514A(a), an employee must show "by a preponderance of the evidence, that (1) he engaged in protected whistleblowing activity, (2) the employer knew that he engaged in the protected activity, (3) he suffered an 'adverse action,' and (4) the protected activity was a 'contributing factor' in the 'adverse action.'" *Wallace v. Andeavor Corp.*, 916 F.3d 423, 426 (5th Cir.), *cert. denied*, 140 S. Ct. 206 (2019) (quoting *Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 259 (5th Cir. 2014) (footnote omitted) (quoting *Allen v. Admin. Review. Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008))). An employee's reasonable belief that conduct violates one of those six categories must be evaluated under both an objective and a subjective standard. *Wallace*, 796 F.3d at 474 (citing *Allen*, 514 F.3d at 477). The objective standard examines whether the belief would be held by "a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee." *Wallace*, 796 F.3d at 474-75 (quoting *Allen*, 514 F.3d at 477).

Then, "[i]f the employee establishes these four elements, the employer may avoid liability if it can prove by clear and convincing evidence that it would have taken the same unfavorable personnel action in the absence of that protected behavior." *Hemphill v. Celanese Corp.*, 430 Fed. Appx. 341, 344 (5th Cir. 2011) (quoting *Allen*, 514 F.3d at 476 (internal quotations and citations omitted in *Hemphill*)). This "independent burden-shifting framework" is distinct from the *McDonnell Douglas* burden-shifting framework applicable to Title VII claims. *Allen*, 514 F.3d at 476 (citing *Williams v. Admin. Review Bd.*, 376 F.3d 471, 476 (5th Cir.2004) (ERA case); also citing *Trimmer v. U.S. Dep't of Labor*, 174 F.3d 1098, 1101 (10th Cir.1999) (ERA case)).

It is now well accepted that courts should construe Section 806 broadly. *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 440–41 (S.D. N.Y. 2013) ("*Leshinsky II*") (citing *Mahony v. KeySpan Corp.*, No. 04 Civ. 554(SJ), 2007 WL 805813, at *5 (E.D. N.Y. Mar. 12, 2007) ("The law

was intentionally written to sweep broadly, protecting any employee of a publicly traded company who took such reasonable action to try to protect investors and the market." (citing 149 Cong. Rec. S1725–01, S1725, 2003 WL 193278 (Jan. 29, 2003))). At the summary judgment stage, a plaintiff need only demonstrate that a rational factfinder could determine that the plaintiff has made his *prima facie* case. *Id.* at 441. Assuming a plaintiff does so, summary judgment is appropriate only when, construing all of the facts in the employee's favor, there is no genuine dispute that the record clearly and convincingly demonstrates that the adverse action would have been taken in the absence of the protected behavior. *Id.* "Thus, the defendant's burden under Section 806 is notably more than under other federal employee protection statutes, thereby making summary judgment against plaintiffs in Sarbanes–Oxley retaliation cases a more difficult proposition." *Id.* (citing *Delville v. Firmenich, Inc.*, No. 08 Civ. 10891, 920 F.Supp.2d 446, 458–59, 2013 WL 363391, at *9 (S.D. N.Y. Jan. 31, 2013) (laying out a defendant's burden under both Title VII and Age Discrimination in Employment Act)).

With this general law in mind, the Court now considers MGI's motion for summary judgment, and specifically whether Plaintiff may assert retaliation claims under § 1514A against both MPSI and MGI as defendant-employers.

## VI. WHETHER PLAINTIFF MAY PROCEED AGAINST BOTH MPSI AND MGI

### A.    Parties' assertions

In its motion, MGI relies on *Lawson III* for the proposition that a retaliation plaintiff must be an employee of the defendant, whether that defendant-employer is the public company itself or one of its subsidiaries. In his surreply, Plaintiff asserts, among other things, MGI's insistence that *Lawson III* "is controlling is curious." Docket Entry # 118 at p. 4. According to Plaintiff, *Lawson*

38

involved the question of whether SOX covered claims of an employee of a contractor (not a subsidiary) of a publicly traded company when the contractor company was not itself publicly traded, and the Supreme Court held that such claims are covered. *Id.* Plaintiff further points out as follows:

> While *Lawson* does hold that an employee must sue her 'employer,' it should be noted that the plaintiffs in *Lawson* were employed by the subsidiaries of the defendant (FMR, LLC) and the Court allowed the claims to proceed against the parent company who contracted with the publicly traded company. In fact, the Court expressly noted Congress' intent in 'extending protection comprehensively to corporate whistleblowers.' *Id*. at 456—57. ('Lawson was employed by Fidelity Brokerage Services, LLC, a subsidiary of FMR Corp., which was succeeded by FMR LLC. Zang was employed by a different FMR LLC subsidiary, Fidelity Management & Research Co., and later by one of that company's subsidiaries, FMR Co., Inc. For convenience, we refer to respondents collectively as FMR.'). *Id*. at 437—38.

*Id.*

Even though the facts of *Lawson* (which the Court sets out in detail below) may cut against MGI's argument, the Court notes there is no indication in the *Lawson* opinions that the precise issue before the Court was raised there. Here, although there is no dispute that Plaintiff was employed by MPSI or that MPSI is covered by SOX's whistleblowing statute as amended by Dodd-Frank, there is a dispute as to whether Plaintiff also has a cause of action, either under an indirect or direct theory of liability, against MGI as his employer.

As discussed in detail below, not only are there various legal theories available by which a parent can be liable for the acts of its subsidiaries, but there is also great discrepancy in the case law as to how, or under what theory, a court should best consider the issue raised in MGI's motion. To aid in the Court's discussion of the ultimate issue raised in MGI's motion, the Court must first consider the various theories and determine which of the available theories Plaintiff has adequately raised. The Court will then consider how administrative proceedings and federal courts have

interpreted § 1514A, both before and after the enactment of Dodd-Frank, focusing on the various theories utilized in those opinions.

**B.     Theories by which a parent can be held liable for the acts of its subsidiaries**

**1.     Application of state law or federal common law**

As an initial matter, the Court must determine whether to borrow state law or to apply a federal common law of indirect liability. In a case involving the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 94 Stat. 2767, as amended, 42 U.S.C. § 9601 *et seq.*, the Supreme Court noted in a footnote that there was significant disagreement among courts and commentators over whether, in enforcing CERCLA's indirect liability, courts should borrow state law, or instead apply a federal common law of veil piercing.  *United States v. Bestfoods*, 524 U.S. 51, 63 n. 9, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998) (comparing *U.S. v. Cordova Chemical Co. of Michigan*, 113 F.3d 572, 584-85 (6th Cir. May 13, 1997) (Merritt, J., concurring in part and dissenting in part) (arguing that federal common law should apply), *Lansford–Coaldale Joint Water Auth. v. Tonolli Corp*., 4 F.3d 1209, 1225 (3d Cir. 1993) ("[G]iven the federal interest in uniformity in the application of CERCLA, it is federal common law, and not state law, which governs when corporate veil-piercing is justified under CERCLA"), and Aronovsky & Fuller, Liability of Parent Corporations for Hazardous Substance Releases under CERCLA, 24 U.S.F.L.Rev. 421, 455 (1990) ("CERCLA enforcement should not be hampered by subordination of its goals to varying state law rules of alter ego theory"), *with, e.g.*, *Cordova/Michigan*, 113 F.3d at 580 ("Whether the circumstances in this case warrant a piercing of the corporate veil will be determined by state law"), and Dennis, Liability of Officers, Directors and Stockholders under

40

CERCLA: The Case for Adopting State Law, 36 Vill.L.Rev. 1367 (1991) (arguing that state law should apply); also citing *In re Acushnet River & New Bedford Harbor Proceedings*, 675 F.Supp. 22, 33 (D. Mass.1987) (noting that, since "federal common law draws upon state law for guidance, . . . the choice between state and federal [veil-piercing law] may in many cases present questions of academic interest, but little practical significance"); also citing Note, Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law, 95 Harv.L.Rev. 853 (1982) (arguing that federal common law need not mirror state law, because "federal common law should look to federal statutory policy rather than to state corporate law when deciding whether to pierce the corporate veil")). The Supreme Court did not need to decide the question in order to rule on the issues raised in the *Bestfoods* appeal.

"The Fifth Circuit has repeatedly declined to address whether, as a matter of federal common law, courts in this Circuit should apply federal or state law when adjudicating a veil piercing claim." *United States v. Dawn Properties, Inc.*, No. 1:14CV224-LG-JCG, 2016 WL 7223398, at *2 (S.D. Miss. Dec. 13, 2016) (quoting *Port of S. La. v. Tri-Parish Indus.*, Inc., No. 11-3065, 2013 WL 2394859, at *3 (E.D. La. May 28, 2013); also citing *Bestfoods*, 524 U.S. at 64 n.9 (declining to address the issue)). In *Dawn Properties*, the plaintiff brought claims against the defendant under the Fair Housing Act ("FHA") under both theories of vicarious and direct liability. *Id.* at *1. Noting the claims were all predicated on the federal FHA, the court was of the opinion that federal common law applied to the veil piercing claim. *Id.* at *2 (citing *Melson v. Vista World Inc. & Assocs.*, No. 12-135, 2012 WL 6002680, at *4 (E.D. La. Nov. 30, 2012) (where "subject matter jurisdiction is predicated upon a federal question[,] federal common law applies")). The court also found persuasive case law from other courts applying federal common law to veil piercing claims in the context of the FHA and

other federal statutes. *Id.* (citing *Equal Rights Ctr. v. Equity Residential*, No. 06-1660, 2016 WL 1258418, at *3 (D. Md. Mar. 31, 2016) ("The court applies federal common law in deciding whether to pierce the corporate veil because that decision implicates an important federal interest: liability for violations of the FHA."); also citing *U.S. ex rel. Dekort v. Integrated Coast Guard Sys*., 705 F. Supp. 2d 519, 546 (N.D. Tex. 2010) (FCA); also citing *Shuck v. Wichita Hockey, Inc*., 356 F. Supp. 2d 1191, 1194 (D. Kan. 2005) (COBRA)).

Similarly here, the Court finds that "given the federal interest in uniformity in the application of [SOX], it is federal common law, and not state law, which governs" matters of indirect liability. *See United States v. Gen. Battery Corp*., 423 F.3d 294, 298 (3d Cir. 2005) (CERCLA case) (quoting *Lansford-Coaldale*, 4 F.3d at 1225). Having determined that federal common law applies, the Court next turns to that law itself. *Dawn Properties*, 2016 WL 7223398, at *2. However, as explained in Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law, 95 Harv. L. Rev. 853 (1982), piercing the corporate veil under federal common law has become a variant, rather than a "common," law.[10] *Id.* at 861.

## 2.    Federal common law theories

Generally speaking, a parent company cannot ordinarily be held liable for its subsidiary's conduct. However, there are three theories by which the parent can be held liable for the acts of its

---

[10] For example, labor disputes are governed by "federal law, which the courts must fashion from the policy of our national labor laws;" although state law may be adopted as the federal rule of decision, this may be done only "in order to find the rule that will best effectuate the federal policy." Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common Law, 95 Harv. L. Rev. 853, 859 (1982) (citations omitted). "Despite this importance of federal policy considerations, lower courts' treatment of alter ego questions in labor disputes has been erratic," with some courts automatically applying state law standards and other courts noting that federal law must apply, but then without further discussion applying state corporate law standards either directly or as adopted by other federal courts. *Id.* at 859-60. Inconsistency in the application of alter ego doctrines similarly plagues other areas of federal law. *Id.* at 860.

subsidiaries: (1) an alter ego theory to "pierce the corporate veil;" (2) vicarious liability based on general agency principles; or (3) direct liability where the parent directly participated in the complained-of wrong. 111 Am. Jur. Trials 205, § 4 (Originally published in 2009) (citing *Gillespie v. HSBC North America Holdings, Inc*., 2006 WL 2735135, at *5 n.5 (M.D. Fla. 2006) (citing *In re Managed Care Litigation*, 298 F.Supp.2d 1259, 1309 (S.D. Fla. 2003) (case involving RICO claims))). "The complementary theories of limited liability and piercing the corporate veil have provoked consternation among courts and legal scholars alike." *Domain Prot., L.L.C. v. Sea Wasp, L.L.C.*, No. 4:18-CV-792, 2019 WL 5189200, at *12 (E.D. Tex. Oct. 15, 2019). "They have been variously described as a 'legal quagmire,' Ballantine, Separate Entity of Parent and Subsidiary Corporations, 14 CALIF. L. REV. 12, 15 (1925), and as being 'enveloped in the mists of metaphor.' *United States v. Jon-T Chems., Inc*., 768 F.2d 686, 691–92 (5th Cir. 1985) (citing *Berkey v. Third Avenue Ry.*, 244 N.Y. 84, 155 N.E. 58, 61 (1926) (Cardozo, J.))." *Id.*

a.     **"Pierce the corporate veil" theories**

*Alter ego theory to "pierce the corporate veil"*

The tests employed to determine when circumstances justifying "veil-piercing" exist are variously referred to as the "alter ego," "instrumentality," or "identity" doctrines; the formulations are generally similar, and courts rarely distinguish them. 111 Am. Jur. Trials 205, § 4 (Originally published in 2009). Under federal common law, courts are reluctant to pierce a corporate veil and impose liability on a separate, related entity, but may do so under extraordinary circumstances. *Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, L.L.C.*, 851 F. Supp. 2d 504, 509 (S.D. N.Y. 2012) (citing *Arctic Ocean Int'l, Ltd. v. High Seas Shipping Ltd.*, 622 F.Supp.2d 46, 53 (S.D.

N.Y. 2009)). In order to "pierce the corporate veil" under the federal common law standard, a plaintiff must show that an alter ego was used to "perpetrate a fraud" or was "so dominated" and its corporate form so "disregarded" that the alter ego "primarily transacted [another entity's] business rather than [its] own corporate business." *Id.* (quoting *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir.1980)).

"Veil piercing determinations are fact specific and differ with the circumstances of each case." *Id.* (quoting *Thomson–CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d, 773, 777–78 (2d Cir.1995) (internal quotation marks and citation omitted in *Clipper*)). Thus, the alter ego determination must be made in view of "the totality of the facts." *Id.* (quoting *United States v. Funds Held in the Name or for the Benefit of Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000)). There are several factors relevant to determining whether one entity is the "alter ego" of another, and thus whether to pierce the corporate veil. These include:

> (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of business discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Id.* at 509-10 (quoting *Matter of Arbitration between Holborn Oil Trading Ltd. and Interpol Bermuda Ltd.*, 774 F.Supp. 840, 844–45 (S.D. N.Y. 1991)).

Courts in the Fifth Circuit generally limit veil piercing to situations in which the corporate subsidiary is (1) established to perpetrate a fraud (or if its shareholders drain the corporation's assets) or (2) totally dominated and controlled by the parent corporation as its business conduit, as its alter

44

ego. *United States v. Wallace*, 961 F. Supp. 969, 978 (N.D. Tex. 1996) (citing *United States v. Jon–T Chemicals, Inc.*, 768 F.2d 686, 691 (5th Cir.1985) (listing factors)). No one factor is dispositive, and courts have considered additional factors as well. *Clipper*, 851 F. Supp. 2d at 510 (citing *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 53 (2d Cir. 2008) ("Instead of a firm rule, the general principle guiding courts in determining whether to pierce the corporate veil has been that liability is imposed when doing so would achieve an equitable result." (internal quotation marks omitted in *Clipper*)); *see also Jon-T Chemicals, Inc.*, 768 F.2d at 694 ("[T]here is no litmus test for determining whether a subsidiary is the alter ego of its parent.").

### *Labor-specific veil-piercing tests*

Additionally, there is the concept of joint or multiple employers, which has long been a staple of labor relations law. *Murdock v. City of Houston*, No. 4:10-CV-00056, 2011 WL 7109286, at *3 (S.D. Tex. Sept. 21, 2011) (citing *Boire v. Greyhound Corp.*, 376 U.S. 473, 481, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); also citing *NLRB v. Pennsylvania Greyhound Lines, Inc.*, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831 (1938) ("Together, respondents [affiliated corporations] act as *employers* of those employees . . . and together actively deal with labor relations of those employees." (emphasis added in *Murdock*)); also citing *NLRB v. Condenser Corp. of America*, 128 F.2d 67, 72 (3d Cir.1942) ("It is rather a matter of determining which of two, or whether both, respondents control, in the capacity of employer, the labor relations of a given group of workers." (emphasis added in *Murdock*))). The existence of joint employer status is "essentially a factual issue," and hinges on whether the putative employer "possesse[s] sufficient control over the work of the employees to qualify as a joint employer." *Id.* (quoting *Boire*, 376 U.S. at 481).

45

The joint employers doctrine is often confused with a related, but quite distinct, legal doctrine known as the "single employer" or "integrated enterprise" theory. *Id*. at *4 (citing John E. Higgins, Jr., The Developing Labor Law, vol. II, at 2247 (5th ed. 2006)). The integrated enterprise doctrine also originated in labor relations law, primarily as a way of determining whether related business entities, such a parent and a subsidiary, should be considered together as a single statutory employer for jurisdictional purposes. *Id.* According to the Third Circuit Court of Appeals, there is the "integrated enterprise" test for the presence of a single employer, "a sort of labor-specific veil-piercing test, first developed by the National Labor Relations Board." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir. 2001).

In *Radio Union v. Broadcast Service of Mobile, Inc*., the Supreme Court upheld NLRB jurisdiction over a Mobile radio station, even though the station's gross revenues were below the Board's jurisdictional minimum of $100,000, because the station was "an integral part of a group of radio stations owned and operated by [a parent company] and . . . the annual receipts of the common enterprise are in excess of $100.000." *Murdock*, 2011 WL 7109286, at *4 (quoting *Radio Union v. Broadcast Service of Mobile, Inc*., 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965)). The Court endorsed the Board's practice of "consider[ing] several nominally separate business entities to be a single employer where they comprise an integrated enterprise," and approved the Board's four-factor test: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *Id.* (citing *Radio Union*, 380 U.S. at 256). The integrated enterprise doctrine has also been employed by the Fifth Circuit Court of Appeals in the employment discrimination context, using the same four *Radio Union* criteria. *Id.* (citing *Schweitzer v. Advanced Telemarketing Corp*., 104 F.3d 761, 764 (5th Cir.1997) (ADEA); also

46

citing *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983) (Title VII)).

"The integrated enterprise test, with its focus only on labor relations and its emphasis on economic realities as opposed to corporate formalities, *see* Phillip I. Blumberg, The Law of Corporate Groups: Problems of Parent and Subsidiary Corporations Under Statutory Law of General Application § 13.03, at 398 (1989), is demonstrably easier on plaintiffs than traditional veil piercing." *Pearson*, 247 F.3d at 486. Ultimately, "the policy underlying the single employer doctrine is the fairness of imposing liability for labor infractions where two nominally independent entities do not act under an arm's length relationship." *Id.* (quoting *Murray v. Miner*, 74 F.3d 402, 405 (2d Cir. 1996)).

**b.   Vicarious liability based on general agency principles**

The Restatement (Third) of Agency § 1.01 provides as follows:

Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

Restatement (Third) of Agency § 1.01. Agency will be further addressed in the Court's discussion below of the various administrative and federal court cases interpreting § 1514A.

**c.   Direct liability where the parent directly participated in the complained-of wrong**

Although not often employed to hold parent corporations liable for the acts of subsidiaries in the absence of other hallmarks of overall integration of the two operations, it has long been acknowledged that parents may be "directly" liable for their subsidiaries' actions when the "alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and

47

management," and the parent has interfered with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership. *Pearson*, 247 F.3d at 486–87 (citing *Bestfoods*, 524 U.S. at 64 (quoting William O. Douglas & Carrol M. Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193, 207 (1929))). In such situations, the parent has not acted on its own (in which case there would be no need even to consider the subsidiary's actions), nor has it acted in its capacity as owner of the subsidiary; rather, it has forced the subsidiary to take the complained-of action, in disregard of the subsidiary's distinct legal personality. *Id.* (citing *Esmark, Inc. v. NLRB*, 887 F.2d 739, 756–57 (7th Cir.1989)). Thus, in the labor context, "direct" liability may attach if the parent has overridden the subsidiary's ordinary decision-making process and ordered it to institute an unfair labor practice, or to create discriminatory hiring policies. *Id.* (citing *Esmark*, 887 F.2d at 757). In this way, direct liability functions essentially as a kind of "transaction-specific" alter ego theory. *Id.* (citing *Esmark*, 887 F.2d at 756).

"In order to prevent the 'direct participation' theory of liability from extinguishing the general rule of the parent corporation immunity from the obligations of a subsidiary, that theory must be carefully limited to situations in which the parent corporation's control over particular transactions is exercised in disregard of the separate corporate identity of the subsidiary." 111 Am. Jur. Trials 205, § 5 (Originally published in 2009) (quoting Weinberger, Stanley R., Parent Corporations and Their Subsidiaries' Liabilities: Guidelines, Corporate Counselor, May 2008).

The facts of *Bestfoods* are illustrative. In that case, the United States brought an action under CERCLA for the costs of cleaning up industrial waste generated by a chemical plant. *Bestfoods*, 524 U.S. at 55. CERCLA imposes liability on "any person who at the time of disposal of any hazardous

48

substance **owned or operated** any facility at which such hazardous substances were disposed of." *Nat'l Fuel Gas Midstream Corp. v. Pennsylvania Dep't of Envtl*. Prot., No. 116 C.D. 2016, 2017 WL 2391719, at \*12 (Pa. Commw. Ct. June 2, 2017) (quoting Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2) (emphasis added in *Midstream*)).

The issue before the Supreme Court was whether a parent corporation that actively participated in, and exercised control over, the operations of a subsidiary may, without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary. *Bestfoods*, 524 U.S. at 55. The Supreme Court answered "no, unless the corporate veil may be pierced." *Id.* However, the Supreme Court also clarified that a "corporate parent that actively participated in, and exercised control over, the operations of the facility itself may be held directly liable in its own right as an operator of the facility." *Id.*

The district court held that operator liability may attach to a parent corporation both directly, when the parent itself operates the facility, and indirectly, when the corporate veil can be pierced under state law. *Id.* at 58 (citing *CPC Int'l, Inc. v. Aerojet–General Corp.*, 777 F.Supp. 549, 572 (W.D. Mich.1991)). A divided panel of the Court of Appeals for the Sixth Circuit reversed in part, *United States v. Cordova/Michigan*, 59 F.3d 584, then granted rehearing en banc and vacated the panel decision, 67 F.3d 586 (1995), again reversing the district court in part, 113 F.3d 572 (1997). *Id.* at 59. According to the Supreme Court, the "majority remarked on the possibility that a parent company might be held directly liable as an operator of a facility owned by its subsidiary: 'At least conceivably, a parent might independently operate the facility in the stead of its subsidiary; or, as a sort of joint venturer, actually operate the facility alongside its subsidiary.'" *Id.* (quoting *U.S. v. Cordova Chemical Co. of Michigan*, 113 F.3d 572, 579 (6th Cir. May 13, 1997)). The Sixth Circuit

"refused to go any further and rejected the District Court's analysis with the explanation:"

> '[W]here a parent corporation is sought to be held liable as an operator pursuant to 42 U.S.C. § 9607(a)(2) based upon the extent of its control of its subsidiary which owns the facility, the parent will be liable only when the requirements necessary to pierce the corporate veil [under state law] are met. In other words, . . . whether the parent will be liable as an operator depends upon whether the degree to which it controls its subsidiary and the extent and manner of its involvement with the facility, amount to the abuse of the corporate form that will warrant piercing the corporate veil and disregarding the separate corporate entities of the parent and subsidiary.

*Id.* at 59-60 (quoting *Cordova/Michigan*, 113 F.3d at 580). Applying Michigan veil-piercing law, the Sixth Circuit "decided that neither CPC nor Aerojet was liable for controlling the actions of its subsidiaries, since the parent and subsidiary corporations maintained separate personalities and the parents did not utilize the subsidiary corporate form to perpetrate fraud or subvert justice." *Id.* at 60.

The Supreme Court granted certiorari to resolve a conflict among the circuits over the extent to which parent corporations may be held liable under CERCLA for operating facilities ostensibly under the control of their subsidiaries. *Id.* The Court vacated and remanded. *Id.*

The Supreme Court observed that "[i]t is a general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries. . . . Thus it is hornbook law that the exercise of the 'control' which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary." *Id.* at 61-62 (citations omitted). The Court then pointed out "there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on

the shareholder's behalf." *Id*. at 62.

At the outset of the discussion, the Court defined "operator" under CERCLA as "someone who directs the workings of, manages, or conducts the affairs of a facility." *United States v. Kayser-Roth Corp*., 272 F.3d 89, 98 (1st Cir. 2001) (quoting *Bestfoods*, 524 U.S. at 66). It also, however, set forth a definition more specific to pollution-related activities at the facility. *Id.* at 89-90 (citing *Bestfoods*, 524 U.S. at 66-67).   Later in the opinion, the Court also recited the broader definition of "operator," noting Congress's use of the word "to operate" means "something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 99 (quoting *Bestfoods*, 524 U.S. at 71). Applying these definitions, the Court identified two flaws with the district court's treatment of direct operator liability. *Id.*

First, the Court rejected the district court's erroneous "fusion of direct and indirect liability." *Id.* (quoting *Bestfoods*, 524 U.S. at 67). "Rather, to keep direct and derivative liability distinct, the Court focused the direct 'operator' liability inquiry not on the parent's interaction with the subsidiary, but rather on the parent's interaction with the facility: 'The question is not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary. Control of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine, not direct liability under the statutory language.'" *Id.* (quoting *Bestfoods*, 524 U.S. at 67–68 (internal quotation marks omitted in *Kayser-Roth*) (quoting Lynda J. Oswald, Bifurcation of the Owner and Operator Analysis under CERCLA, 72 Wash. U.L.Q. 223, 269 (1994))).

"Second, the *Bestfoods* Court noted that, '[i]n addition to (and perhaps as a reflection of) the erroneous focus on the [parent-subsidiary] relationship,' the district court assumed erroneously that the actions of the joint officers and directors were necessarily attributable to the parent CPC." *Id.* (quoting *Bestfoods*, 524 U.S. at 68). "In doing so, the district court failed to recognize that 'it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts.'" *Id.* (quoting *Bestfoods*, 524 U.S. at 69 (internal quotation marks omitted in *Kayser-Roth*)). The Court stated that,

> [s]ince courts generally presume that the directors are wearing their subsidiary hats and not their parent hats when acting for the subsidiary, it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility. The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as [parent] officers and directors, and not as [subsidiary] officers and directors, when they committed those acts.

*Id.* (quoting *Bestfoods*, 524 U.S. at 69–70 (internal quotation marks and citations omitted in *Kayser-Roth*)).

The Supreme Court described examples of activities that would be sufficient to find a parent directly liable as an operator of a polluting facility, including "when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of joint venture." *Id.* (quoting *Bestfoods*, 524 U.S. at 71 (citing *Cordova/Michigan*, 113 F.3d at 579)). Another occurs when a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility. *Id.* at 99-100 (citing *Bestfoods*, 524 U.S. at 71). In a third scenario, "an agent

of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility." *Id.* at 100 (quoting *Bestfoods*, 524 U.S. at 71).

To distinguish a parental officer's oversight of a subsidiary from control over the operation of the subsidiary's facility, "norms of corporate behavior (undisturbed by any CERCLA provision) are crucial reference points." *Id.* "Elaborating on the general contours of these norms, the Court noted that liability would not arise out of activities involving the facility but 'consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures.'" *Id.* (quoting *Bestfoods*, 524 U.S. at 72 (citations and internal quotation marks omitted in *Kayser-Roth*)). Thus, "[t]he critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.*

The Court found "some evidence that CPC engaged in just this type and degree of activity" at the plant in question. *Id.* Specifically, a CPC agent "played a conspicuous part in dealing with" the toxic risks emanating from the operation of the plant. *Id.* The district court found that this agent, Williams, served in the capacity of CPC's governmental and environmental affairs director and became heavily involved in environmental issues at CPC's subsidiary. "Drawing no ultimate conclusions, the Court nevertheless found these findings sufficient 'to raise an issue of CPC's operation of the facility' and therefore remanded to the district court for a 'reevaluation' of CPC agents' role in operating the facility at issue." *Id.* (quoting *Bestfoods*, 524 U.S. at 72–73).

The First Circuit Court of Appeals explained in *Kayser-Roth* it "is clear that direct operator

liability requires an ultimate finding of the parent's involvement with 'operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.'" *Id.* at 102 (quoting *Bestfoods*, 524 U.S. at 66–67). According to the First Circuit, at the end of *Bestfoods* the Court's attention to facts specific to the involvement of CPC (and its agent Williams) in its subsidiary's environmental matters indicates that the pollution-related focus is controlling. *Id.* (citing *Bestfoods*, 524 U.S. at 72–73). The First Circuit noted this reading is consistent with that of other courts interpreting CERCLA liability since *Bestfoods*. *Id.* (generally citing *Carter–Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846–47 (6th Cir.1999) (reading *Bestfoods* in arranger liability context to require "active[ ] involve[ment] in the arrangements for disposal"); also citing *United States v. Green*, 33 F.Supp.2d 203, 217 (W.D.N.Y.1998) (requiring participation in management of "facility's pollution control operations" for operator liability to attach)); *see also PPG Indus. Inc. v. United States*, 957 F.3d 395, 401 n. 5 (3d Cir. 2020) ("Under the specific facts of *Bestfoods*, there was evidence that an agent of the parent corporation 'played a conspicuous part in dealing with the toxic risks emanating from the operation of the plant.' . . . Because of the work of this agent, the parent corporation 'became directly involved in environmental and regulatory matters.'. . . Thus, the Supreme Court found that the parent corporation's 'operation' of the facility was an issue and remanded the case for further proceedings.").

### 3.    What theories have been sufficiently raised by Plaintiff

Based on Plaintiff's briefing in this and other matters, Plaintiff has raised different types of veil-piercing theories, whether classified as "integrated enterprise"/"single employer" from labor law or the more traditional alter ego theory to "pierce the corporate veil." In its reply, MGI asserts Plaintiff has not sufficiently pleaded that MPSI is the alter ego of MGI, that he was jointly employed

54

by MPSI and MGI, or that MGI should be held vicariously liable for the acts of MPSI under any corporate veil piercing or other similar theories; thus, according to MGI, Plaintiff's SOX retaliation-claim against MGI should be dismissed.  Docket Entry # 92 at p. 5.

There is some authority pre-dating the Dodd-Frank amendment which supports MGI's assertion in its reply that a plaintiff must plead facts supporting a single employer or joint employers theory. In *Trusz v. UBS Realty Investors*, 2010 WL 1287148 (D. Conn.2010), the plaintiff brought suit against UBS AG and its non-publicly traded subsidiary UBS Realty, alleging they jointly constituted an "integrated employer" because of their interrelated operations and control. *Id.* at *5. In ruling on the defendants' motion to dismiss, the court discussed the so-called integrated employer test, also referred to as the single employer test, and concluded the test would be applicable in a SOX case. *Id.* at *6. According to the court, the plaintiff had alleged that UBS AG and UBS Realty constituted an "integrated employer," sharing common management, human resources strategies, integrated training, and compensation plans. *Id.* at *7. The plaintiff also alleged "he was directly employed by UBS Realty, his employment was governed by UBS AG's policies and procedures and that UBS AG officials were involved in and made decisions concerning the functioning of UBS Realty." *Id.*  The court concluded the plaintiff pleaded "a sufficient level of interrelatedness and control in human resources decisions between UBS AG and UBS Realty." *Id.* Thus, the court held the allegations were sufficient to defeat a Rule 12(b)(1)  motion to dismiss.[11] *Id*.

---

[11]Six years later, in an Amended Ruling on Cross-Motions for Summary Judgment, another district judge in the same court noted that a threshold question was whether UBS Realty– as distinct from UBS AG– was subject to the whistleblowing provisions of the Act.  *Trusz v. UBS Realty*, No. 3:09-CV-00268 (JAM), 2016 WL 1559563, at *4 (D. Conn. Apr. 18, 2016). Noting the events at issue in the case all took place before the passage of Dodd-Frank, the court agreed with the "weight of case law in this circuit and the analysis of the ARB" in *Johnson v. Siemens Building Technologies, Inc*., discussed in this Report and Recommendation below, that the Dodd-Frank amendment to § 1514A "merely clarified existing law and therefore applie[d] to past conduct consistent with well-established principles of retroactivity." *Id*. at *5. According to the court, both UBS Realty and UBS AG were subject to Sarbanes-Oxley during the events at issue. *Id.*

Although it does not involve claims against both a subsidiary and a parent corporation, the Court also finds instructive *Gladitsch v. Neo@Ogilvy*, No. 11 CIV. 919 -DAB, 2012 WL 1003513 (S.D.N.Y. Mar. 21, 2012). There, the plaintiff brought SOX retaliation claims against defendants Neo and Ogilvy, two subsidiaries of publicly traded company WPP, whose financial information was consolidated in WPP's financial statements. *Id.* at *1. The plaintiff worked under the supervision of two individual defendants who were directors at Neo. *Id.* In considering the defendants' Rule 12(b)(6) motion to dismiss, the court first addressed the defendants' argument that because the plaintiff worked for subsidiaries of a publicly traded company and not for the publicly traded company itself, defendants Neo and Ogilvy were not subject to SOX. *Id.* at *4.

Noting Dodd-Frank was enacted while the plaintiff's OSHA complaint was pending, the court held Dodd-Frank is a "clarifying" amendment, functioning to correct a misinterpretation rather than effect a substantive change in the law; therefore, Section 929A of Dodd-Frank applied to the plaintiff's pending case. *Id.* (citing *Johnson v. Siemens Building Technologies, Inc.*, ARB Case No. 08–032 at 8–9, ALJ Case No.2005–SOX–015 (Dept. of Labor ARB Mar. 31, 2011)). According to the court, because Neo and Ogilvy were subsidiaries whose financial information was included in publicly traded parent company WPP's financial statements, they were subject to SOX. *Id.*

The court then denied the defendants' motion to dismiss the plaintiff's SOX claims against sister subsidiary Ogilvy on grounds that Ogilvy and its sister subsidiary Neo were not a "single employer." *Id.* at *5. The court explained as follows:

---

Notably, in a footnote, the court stated that even if the Dodd-Frank amendment did not apply to the relevant conduct, UBS Realty might still be liable, on the ground—as set forth by the district judge in her previous ruling on the motion to dismiss—that UBS AG and UBS Realty were together an "integrated employer." *Id.* at *5 n. 3 (citing *Trusz*, 2010 WL 1287148, at *5).

> Here, Plaintiff's Complaint alleges that [publically traded parent company] 'WPP exercises control over the board of directors, management and, shares the same Human Resource policies and procedures, and maintains bottom-line financial responsibility for Neo and [Ogilvy].' (SAC ¶ 12.) Neo and Ogilvy share common ownership, premises, directors and/or officers, and financial control. (SAC ¶ 14.) Moreover, Neo's own description of its relationship with Ogilvy explains that 'Neo@Ogilvy is a fully integrated division of OgilvyOne Worldwide, and therefore part of Ogilvy & Mather Worldwide. As part of the Ogilvy network, [Neo@Ogilvy is] uniquely positioned to work in partnership with Ogilvy companies . . . Neo@Ogilvy develops and implements media and search concepts for the entire Ogilvy Group.'

*Id.* The court concluded the complaint, combined with publicly available information and documents integral to the complaint, sufficiently showed that sister subsidiaries Ogilvy and Neo were a single or joint employer. *Id.*

Here, if it were to rely on the so-called labor-specific veil-piercing integrated enterprise or single employer test in this SOX case, the Court would similarly find that the allegations in the SAC (which allege MGI and MPSI file consolidated financial statements and that MPSI is a wholly owned subsidiary of MGI), combined with the publicly available information and documents integral to the complaint (DPA, Amended DPA, and FTC orders), are sufficient to put MGI on notice that Plaintiff might be asserting the integrated enterprise or single employer test.[12] This is bolstered by the fact that as early as June 2019, Plaintiff raised the integrated enterprise or single employer test in response to MPSI's motion to dismiss for failure to exhaust; thus, Defendants have been on notice of Plaintiff's possible reliance on a veil-piercing type theory for over ten months before MGI filed its current motion for summary judgment. *See* Docket Entry # 34 at p. 7.

---

[12] The Court notes that to the extent a plaintiff's claims fail for insufficiency of his pleadings, and not as a matter of law, he would be afforded an opportunity to re-plead. *Foster v. UPS Freight, Inc.*, No. 18CV10294 (NSR)(LMS), 2020 WL 5350446, at *11 (S.D. N.Y. Sept. 4, 2020) (citing *White v. Best Cheese Corp.*, No. 17 CV 4487 (NSR), 2018 WL 4684163, at *6 (S.D. N.Y. Sept. 27, 2018)). The Court further notes that this case is currently at the motion for summary judgment stage of the case, with motions to dismiss having been decided over eight months ago. The pretrial conference is scheduled in two weeks.

However, based on its consideration of the extensive case law discussed in detail below, the Court does not find Plaintiff must rely on such veil-piercing theories of liability in order to defeat MGI's motion, as Plaintiff's pleadings and evidence also sufficiently raise vicarious liability based on general agency principles as well as direct liability.

In his response, Plaintiff specifically disputed MGI's assertion that only MPSI was his employer. *See* Docket Entry # 89 at p. 4. Although Plaintiff's response focused on alter ego and "piercing the corporate veil" theories, in his surreply, Plaintiff argues (without focusing on any indirect liability theory) that he is an employee of both MPSI and MGI for purposes of SOX liability. Although MGI attempts to refute Plaintiff's alter ego theory to "pierce the corporate veil," MGI does little to negate the asserted theories of vicarious liability based on general agency principles and direct liability of MGI.

In a sur-surreply allowed by the Court, MGI asserts Plaintiff alleges for the first time in his surreply, without pleading or proof, that "Mr. Lozada was an employee of ***both*** the subsidiary, MoneyGram Payment Systems, Inc. (MPSI) and the parent, MoneyGram International, Inc. (MGI)." Docket Entry # 119 at p. 1 (citing Docket Entry # 118 at p. 1 (emphasis added by MGI)). According to MGI, instead of briefing the alter ego issue or some other unpleaded theory of vicarious liability as anticipated, "Plaintiff has taken advantage of the Court's decision to permit a surreply to advance an entirely new legal argument: 'whether an employee of a subsidiary is also an employee of the parent company for purposes of SOX protection.'" *Id.* at p. 4 (quoting Docket Entry # 118 at p. 1). MGI argues Plaintiff should not be allowed to raise this argument in his surreply.[13]

---

[13] In the event the Court considers the argument, MGI asserts it fails as a matter of law. Docket Entry # 119 at p. 4. MGI attempts to distinguish the cases relied upon by Plaintiff, asserting they predate the Dodd-Frank amendments. *Id.* at pp. 4-5. MGI asserts the issue of whether a parent could have been held liable for the actions of its subsidiary against a subsidiary's employee is "now moot because SOX, as currently enacted, unambiguously provides a direct cause

To the extent the Court finds the theories appropriate after considering of the case law set out below, the Court will consider whether there is a genuine issue of material fact that MGI is also Plaintiff's employer under general agency principles and/or a direct theory of liability. The Court finds that Plaintiff sufficiently alleged direct liability of the parent corporation. Although Plaintiff has argued various theories of parent-subsidiary derivative or indirect liability in briefing in this case, Plaintiff's SAC contains allegations which suggest MGI is subject to direct, rather than derivative or vicarious liability, to the extent there is sufficient evidence to create a genuine issue of material fact that MGI was also his employer along with MPSI. *See In re Managed Care Litig.*, 298 F. Supp. 2d 1259, 1309 (S.D. Fla. 2003); *see also* Docket Entry # 21, ¶ 9 ("MGI violated a number of federal statutes as well as government directives by failing to establish, implement and maintain comprehensive anti-fraud and anti-money laundering programs, failing to conduct due diligence on its agents, failing to adequately monitor, investigate and discipline its agents for significant breaches of its global compliance policy, and failing to ensure that its agents met their obligations to detect and prevent fraud, and money laundering, as outlined in both MGI's Agent's Global Partner Compliance Policy and government filings."), ¶ 10 ("Plaintiff raised complaints to management regarding MGI's continuing and willful violations of its policy, applicable laws and regulations as well as the government directives. He was terminated for seeking to stop MGI's illegal acts."), ¶ 11 ("On October 21, 2009, MGI entered a Stipulated Order with the Federal Trade Commission ('FTC')."), ¶ 12 ("On November 9, 2012, MGI entered a Deferred Prosecution Agreement ('DPA') with the United States Department of Justice ('DOJ')."), ¶ 14 ("On November 8, 2018, the DOJ levied a substantial fine against MGI and entered into an Amendment and Extension of Deferred

---

of action against the subsidiary." *Id.* at p. 5.

Prosecution Agreement ('Amended DPA') with MGI."), ¶ 22 ("While the Amended DPA and the Modified FTC Order did not single out any one of MGI's agents, they identified a wide range of systemic, illegal conduct that forms the basis for the Amended DPA. This was the same conduct that Plaintiff began complaining about almost immediately after he was hired at MGI, e.g., insufficient transaction analysis; insufficient suspicious activity reports ('SARs'); insufficient oversight of minority owned stores; failure to conduct independent reviews, and breakdown of the fraud interdiction system, specifically the Individual Watch List ('IWL') program."), ¶ 23 ("This illegal conduct by MGI continued during Plaintiff's tenure at MPSI."), ¶ 24 ("As Senior Manager for the U.S. Regional Compliance Team, Plaintiff was responsible for supervising MGI's regional compliance officers ('RCOs'), senior regional compliance officers ('Sr. RCOs') and managers on the United States team."), ¶ 26 ("Plaintiff also was responsible for monitoring MGI's agents' implementation of MGI's Global Partner Compliance Policy, which contained MGI's anti-fraud and anti-money laundering policies and procedures."), ¶ 28 ("During Plaintiff's entire tenure at MPSI, MGI was operating under the requirements of the Amended DPA and the Modified FTC Order."), ¶ 29 ("During Plaintiff's tenure, MGI had knowledge of, yet ignored, suspicious activities of several of its largest agents, including Wal-Mart, Schnucks, SuperValu, RaceTrac, Valero and CVS."), ¶ 30 ("MGI knew of the suspicious activities by virtue of annual on-site regional compliance reviews of all of its large agents. These reviews were conducted by MGI's Sr. RCOs. The findings of the Sr. RCOs' reviews were recorded in reports called Review Worksheets, Agent (Headquarter) Review – Enhanced Due Diligence Program Review (hereafter 'Agent Review Worksheets')."), ¶ 32 ("Agent Review Worksheets were kept on file by MGI."), ¶ 33 ("At the end of the annual review, the agent received two documents from the Sr. RCO: one, somewhat similar to a report card, was called an

'AML/Fraud Compliance Review Report' and the other, similar to a 'to-do' list, was called an 'Acknowledgement Form.' The Acknowledgement Form was then signed by the agent's Sr. RCO or its compliance department representative and returned to MGI."), ¶ 36 ("Shortly after starting his position at MPSI, Plaintiff began observing significant flaws with the way in which MGI was implementing and enforcing its anti-fraud and antimoney laundering policies, particularly when it involved large agents of MGI."), ¶ 46 ("Kristi Diehl ('Diehl'), the VP of Global Compliance Enhancement Program and Technology Projects, managed a large team that was the target of constant criticism within compliance for its lack of effectiveness and inability to fix significant problems. Plaintiff recalls having a frank discussion with Diehl about the IWL program in January 2017. . . ."), ¶ 47 ("That same week, Plaintiff met with Craig Bernier, the Head of Compliance Monitoring (Financial Intelligence Unit), and Bernier told Plaintiff that he was aware of the problem and that he also was frustrated with the lack of a solution."), ¶ 49 ("MGI continued to turn a blind eye to ongoing violations of the DPA, the 2009 FTC Order, and the BSA."), ¶ 55 ("Plaintiff also brought his concerns regarding MGI's compliance infractions to the attention of Christopher Ponder ('Ponder'), the Director of Human Resources for the Compliance Department of MGI. Ponder refused to investigate Plaintiff's claims of ethical violations on the part of Gonzalez, and subsequently criticized Plaintiff for his lack of deference to Gonzalez."), ¶ 58 ("Over and over again, senior employees at MGI portrayed an image that completely misrepresented MGI's compliance program and bragged about the effectiveness of MGI's IWL, even though they knew it was false."), ¶ 63 ("MGI, therefore, concealed its ongoing infractions of the DPA, the FTC Order and the BSA for its own gain."), ¶ 68 ("MGI enforced a hiring freeze from November 2016 to January 2017. During that time, over one-third of the Regional Compliance Team ('RCT') positions in the U.S.

remained vacant, and the RCT remained seriously understaffed. Plaintiff became convinced that the main goal of MGI was to cut expenses, even if that meant hiding the program's flaws from the Monitor, MGI's own partner agents and its investors."), ¶ 69 ("In one particular meeting in January or February 2017, Gonzalez told members of the RCT to not put compliance deficiencies in writing but, instead, to pick up the phone and call their colleagues to avoid creating a paper trail. Gonzalez reminded the RCT that the Monitor would use key words to search all emails sent within compliance, and that MGI wanted to avoid having to explain an email to the Monitor."), ¶ 71 ("Another example of MGI hiding its compliance problems from the Monitor occurred during a conference in Miami, where Plaintiff was to give a presentation to the RCT team about the DPA. One of the attorneys assigned to the Monitor's team, Phil Underwood ('Underwood'), attended the conference. Plaintiff took advantage of this opportunity to raise some of his concerns with Underwood. . . ."), ¶ 72 ("Peter Green, MGI's Head of Regional Compliance for the Americas and Europe, also saw Plaintiff speaking to Underwood and asked Plaintiff what their conversation entailed."), ¶ 75 ("Plaintiff again was amazed by how senior leaders in MGI compliance were working hard to ensure that the Monitor was kept in the dark. This was clearly not a Gonzalez issue alone; Plaintiff had seen attorneys from MGI attend a meeting where Gonzalez told RCT team members not to communicate with other members of the team about compliance deficiencies in writing."), ¶¶ 82-83 ("Plaintiff was concerned that Gonzalez's decision [to allow certain stores to continue to operate contrary to MGI's written policies and in violation of the BSA] and told Gonzalez this. Plaintiff also told Gonzalez that this issue needed to be brought to MGI's legal department, but Gonzalez ignored Plaintiff's recommendation."), ¶ 84 ("Plaintiff approached the legal department a few days later and was told that Gonzalez's decision was troubling by Leah

Carlisle Pfeifer, an attorney with MGI."), ¶ 85 (" Four days after Plaintiff's conversation with MGI's legal department, Gonzalez called Plaintiff and told him that he could not believe that Plaintiff had gone to the legal department behind his back and that he did not think that Plaintiff could continue to work as one of his managers anymore. Plaintiff was stunned. A few days after this phone conversation, Plaintiff was fired.").

In short, the Court will not, based on Plaintiff's pleadings, limit consideration of any potential theory of recovery against MGI which would be appropriate under the facts of this case. As pointed out by Plaintiff in his surreply, pre-Dodd-Frank cases holding that a parent corporation can be sued under SOX for the conduct of a subsidiary arrived at that conclusion in several ways. Docket Entry # 118 at p. 2. According to Plaintiff, those ways include "an analysis of the definition of 'employee' in the Act itself, the agency relationships between parent and subsidiary companies and the arguably incontrovertible analysis set forth by" the ALJ in *Morefield v. Exelon Servs.*, 2004-SOX-2, 2004 WL 5030303 (ALJ Jan. 28, 2004). *Id.* In the following section, the Court attempts to summarize the various ways administrative proceedings and federal courts have dealt with the issue, both before and after Dodd-Frank.

## C.    Sarbanes-Oxley Section 806 (codified at 18 U.S.C. § 1514A)

### 1.    Interpretations of § 1514A prior to Dodd-Frank

Prior to Dodd-Frank's enactment, Section 806 provided that SOX's whistleblower provision applied to companies with securities registered under Section 12 of the Exchange Act or required to file reports under Section 15(d) of that Act. Section 806 read as follows:

(a) Whistleblower protection for employees of publicly traded companies.

No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l ), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(d)), or any officer, employee, contractor, subcontractor, or agent of such company, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee—

(1) to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by—

(A) a Federal regulatory or law enforcement agency;

(B) any Member of Congress or any committee of Congress; or

(C) a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct); or

(2) to file, cause to be filed, testify, participate in, or otherwise assist in a proceeding filed or about to be filed (with any knowledge of the employer) relating to an alleged violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders.

*Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582, 588-89 (S.D. N.Y. 2012) ("*Leshinsky I*")

(quoting 18 U.S.C.A. § 1514A (2002)).

After SOX was enacted, a question that arose frequently in administrative proceedings and in federal courts was whether subsidiaries of publicly held companies were subject to Section 806. Under the pre-Dodd-Frank version of 18 U.S.C. § 1514A, it was unclear whether "employees of

64

publicly traded companies" included employees of the public company's wholly owned subsidiaries, or if the statute applied only to employees who were employed directly by the publicly traded parent company. *Leshinsky I*, 873 F. Supp. 2d at 588.

### a.    Administrative proceedings

Because SOX also covered any "officer, employee, contractor, subcontractor, or agent of" a covered company, the DOL's ARB and ALJs typically applied traditional tests such as "agency" or "pierc[ing] a corporate veil" to determine whether SOX coverage extended to employees of non-public subsidiaries. Q 27:01 What Companies May be Subject to SOX Whistleblower Claims?, CPSAB Q 27:01(citing *Klopfenstein v. PCC Flow Techs. Holdings, Inc.*, ARB No. 04-149, ALJ No. 2004-SOX-011, 2006 WL 3246904 (ARB May 31, 2006) ("*Klopfenstein I*"), *aff'd sub nom. Klopfenstein v. Administrative Review Bd.* 402 Fed. Appx. 936 (5th Cir. 2010) (holding that non-public subsidiaries of covered parent companies may be covered where the subsidiary is deemed an agent of the parent for purposes of the complainant's employment); also citing *Morefield v. Exelon Servs.*, 2004-SOX-2, 2004 WL 5030303 (ALJ Jan. 28, 2004) (holding that a non-publicly traded company was a covered entity simply because it was a subsidiary of a publicly traded company)). Administrative law judges adjudicating pre-Dodd-Frank Section 806 cases approached the issue of private subsidiaries in several ways: "One judge has held private subsidiaries will always fall under the scope of 806 [*Morefield*], while others have based their rulings on common law principles of agency [*Klopfenstein*], used the integrated enterprise test [*Merten v. Berkshire Hathaway, Inc.*, ALJ No. 2008-SOX-00040, at 5-7 (Dep't of Labor ALJ Oct. 21, 2008)], or utilized corporate veil-piercing principles [*Pittman v. Siemens AG*, ALJ No. 2007-SOX-00015, at 3 (Dep't of Labor ALJ July 26, 2007)]." *See* Meghan Elizabeth King, Blowing the Whistle on the Dodd-Frank Amendments: The

Case Against the New Amendments to Whistleblower Protection in Section 806 of Sarbanes-Oxley, 48 Am. Crim. L. Rev. 1457, 1466 (2011).

In *Platone v. Atlantic Coast Airline Holdings, Inc*., ALJ No. 2003-SOX-00027 (Apr. 30, 2004), ACA Holdings argued that Platone was not one of its employees, but was instead employed by ACA. *In The Matter Of: Stacy M. Platone v. Flyi, Inc*., ARB No. 04-154, 2006 WL 3246910, at *5 (U.S. Dept. of Labor SAROX Sept. 29, 2006). In addressing ACA Holdings' argument, the ALJ acknowledged the corporate law principle that a parent company was not liable for the acts of its subsidiary; however, she found that ACA Holdings had disregarded ACA's separate corporate identity in its dealings with the public, the SEC, and with its own employees. *Id*. "The ALJ, therefore, held ACA Holdings liable on the grounds that it was ACA's alter ego." *Id.*

On appeal to the ARB, ACA Holdings continued to object to its designation as a party to the complaint. *Id.* at *8. For the purpose of its decision, the ARB assumed, without holding, that the ALJ correctly ruled that ACA Holdings was a proper respondent. *Id.* The ARB's review of Platone's whistleblower claim addressed the issue of whether she engaged in protected activity; because the ARB held that she did not, "her inability to establish that element of her SOX cause of action [was] fatal to her claim, and [the ARB] need not address other issues raised on appeal."[14] *Id.*

In *Morefield*, extensively relied upon by Plaintiff in this case, the complainant sued both his employer, which was not publicly traded, as well as its public parent company, alleging a violation of pre-Dodd-Frank version of § 1514A. In their motion to dismiss, the respondents argued the whistleblower provisions of SOX were not available to Morefield because he was not an employee

---

[14]The Fourth Circuit Court of Appeals affirmed the decision of the ARB in *Platone v. U.S. Dep't of Labor*, 548 F.3d 322 (4th Cir. 2008).

of a publicly traded company, but rather worked for a subsidiary of a subsidiary of a publicly traded company, Excelon Corporation. *Morefield*, 2004 WL 5030303, at *1. In denying the motion, ALJ Levin noted the term "employees of publically traded companies" in Section 806, when considered in context, would include the employees of the subsidiaries of publically traded companies. *Id.* at *2.

Although the complainant argued the subsidiaries of a publicly traded company should be considered "agents" for accounting and financial reporting purposes, the ALJ in *Morefield* observed that while it would not be inappropriate to view subsidiaries as "agents" as the complainant suggested, subsidiaries, for Sarbanes-Oxley purposes, "are more than mere agents like an outside auditor or consultant." *Id.* at *2-*3. Noting SOX imposed extensive reporting and disclosure obligations on public companies, which include obligations to report information about the companies' subsidiaries, the ALJ stated subsidiaries like Excelon Services "are an integral part of the publicly traded company, inseparable from it for purposes of evaluating the integrity of its financial information." *Id.* at *3. As further explained by the ALJ in *Morefield*:

> The publicly traded entity is not a free-floating apex. When its value and performance [are] based, in part, on the value and performance of component entities within its organization, the statute ensures that those entities are subject to internal controls applicable throughout the corporate structure, that they are subject to the oversight responsibility of the audit committee, and that the officers who sign the financials are aware of material information relating to the subsidiaries. A publicly traded corporation is, for Sarbanes-Oxley purposes, the sum of its constituent units; and Congress insisted upon accuracy and integrity in financial reporting at all levels of the corporate structure, including the non-publicly traded subsidiaries.

*Id.* The ALJ concluded, "the term 'employee of a publicly traded company' as used in the caption of the whistleblower provision of Sarbanes–Oxley is sufficiently broad to include a[n officer] of a non-publicly traded subsidiary, within and integral to, the corporate structure" of the parent. *Id.* at

*5.

In a second administrative proceeding five years later, ALJ Levin again indicated Section 806 would apply to the private subsidiaries of publicly traded companies. In that case, the plaintiff sued both his former employer, subsidiary Schweiz, and the parent corporation, Deutsche Bank AG. *Matter of Walters v. Deutsche Bank AG*, ALJ No. 2008-SOX-70, 2009 WL 6496755, at *2 (U.S. Dept. of Labor SAROX March 23, 2009). According to the ALJ, in the years following Section 806's enactment, a number of administrative decisions construing the pre-Dodd-Frank provision denied Section 806 protection to employees of non-publicly traded wholly owned subsidiaries of publicly traded companies, basically theorizing "that the publicly traded parent is not the whistleblower's employer, and the subsidiaries are not publicly traded; therefore, wholly owned subsidiaries are not subject to Section 806 unless they are 'agents' of the parent company for employment matters." *Id*. at *4. Although the ALJ framed the issue as assessing the direct responsibility of a publicly traded parent corporation for the termination of a whistleblower who worked for one of its wholly owned subsidiaries, the ALJ noted a number of administrative cases had relied upon the "labor law" approach to dismiss whistleblower complaints against both the parent and the subsidiary. *Id.* at *5. The ALJ explained that in labor law cases, the courts employ an "integrated enterprise test" as a "sort of labor-specific veil-piercing test" when parent/subsidiary relationships are involved, and the labor law test is simply another method of establishing derivative, rather than direct, liability upon a corporate parent for the action of its subsidiaries. *Id.*

Although the ALJ's decision in *Walters* was not predicated on derivative agency liability between Deutsche Bank AG and Schweiz, the ALJ stated the labor law approach to Section 806 was "questionable from yet another perspective," noting the labor law test would, for example, deny

protection to a whistleblower working for a contractor or agent like the accounting firm Arthur Andersen which helped shred Enron documents. *Walters*, 2009 WL 6496755, at *7 (citation omitted). According to the ALJ, no evidence was uncovered that the accounting firm was Enron's agent for personnel or employment matters, or that Enron controlled Arthur Andersen's employment practices related to whistleblowers within Arthur Anderson's ranks; yet, "Congress was clearly concerned about whistleblowers in such situations because it knew Enron was an important client of Arthur Anderson and a significant source of its revenue. . . ." *Id.*

The ALJ stated that"[u]nder such circumstances, simply to state the labor law test in the context of Sarbanes-Oxley seems sufficient to refute it, because it leaves essentially unchanged conditions Congress passionately wanted to reform." *Id.*  As further explained by the ALJ, "proof of agency for financial reporting purposes or even for the commission of fraud that may wipe out the equity of public shareholders has not been factored into the administrative labor law decisions denying Section 806 coverage." *Id.* at *8.  In *Walters*, the ALJ further elaborated as follows:

> If Congress wanted to encourage corporate insiders to monitor and report financial fraud and deception, and clearly it did, very little in cases that apply the labor law test and deny that protection seems consistent with that goal. To the contrary, any employee of a subsidiary familiar with the labor test case law might still find it difficult to ignore the advice of the attorney who advised Enron of the minimal risk associated with the terminating [of] a whistleblower. Yet even more important, the burdens and hurdles associated with proof of agency for labor law purposes seem misdirected and unnecessary not only because Section 806 imposes direct responsibility on the publicly traded company, but also because Section 806 is fundamentally an antifraud law, not a labor law.

*Id.*

According to the ALJ, "[d]irect parent company responsibility was, therefore, Sarbanes-Oxley's answer to the tangled web of entities used to obfuscate the value of the public

shareholders' investments and the answer to protecting public shareholders from financial misrepresentation by their company's own management." *Id.* at *17. The ALJ stated Senator Leahy laid out in considerable detail "how public shareholders were defrauded by parent companies through the use and operations of subsidiaries, partnerships, and off-the-book entities," but his efforts "seem largely lost in a thicket of [pre-Dodd-Frank] Section 806 cases which uncritically apply corporate law doctrine." *Id*. According to the ALJ, "a careful reading of the legislative history of Sarbanes-Oxley yields nothing which suggests that Congress was in any mood to entertain the type of notions which protect the corporate parent while leaving exposed a whistleblower whose protection is smothered under a 'corporate veil.' Such concepts may, in a different setting, be consistent with general corporate law doctrine, but they fall far short of the Congressional vision of Section 806 as a meaningful antifraud measure." *Id.*

After quoting the *Morefield* opinion, the ALJ in *Walters* concluded as follows:

I conclude that the term 'employee of a publicly traded company' in Section 806 is, for parent/wholly owned subsidiary relationships, co-extensive with the employee coverage in Section 301 and includes, within its meaning, all employees of every constituent part of the publicly traded company, including subsidiaries and subsidiaries of subsidiaries which are consolidated on its balance sheets, contribute information to its financial reports, are covered by its internal controls and the oversight of its audit committee, and subject to other Sarbanes-Oxley reforms imposed upon the publicly traded company. . . . In summary, the scope of Sarbanes-Oxley whistleblower protection: 'at a minimum, tracks the flow of financial and accounting information throughout the corporate structure and remains as permeable to the internal "corporate veils" as the financial information itself,' *see, Morefield* at 3; and considering the legislative history, specific provisions, special policies, and purposes which anchor Sarbanes-Oxley and Section 806, in particular, *Bestfoods* supports this conclusion.

As such, I conclude that Complainant is, for Sarbanes-Oxley purposes, an employee of the publicly traded company as that term is used in Section 806, and that the corporate parent, Deutsche Bank AG, is directly responsible for acts of

discrimination against a whistleblower working in one of its operating units within a non-publicly traded, consolidated subsidiary of a subsidiary of a subsidiary within Deutsche Banks AG's corporate family.

*Id.* at *20 (internal citations omitted).

Other administrative law judges adjudicating Section 806 cases "with issues of subsidiaries have not accepted ALJ Levin's rationale and have declined to extend whistleblower protection to all employees of every subsidiary of a publicly traded company. Many have instead made their determination based on the principles of common law agency." *See* Meghan Elizabeth King, Blowing the Whistle on the Dodd-Frank Amendments: The Case Against the New Amendments to Whistleblower Protection in Section 806 of Sarbanes-Oxley, 48 Am. Crim. L. Rev. 1457, 1467 (2011).

In *Klopfenstein*, the claimant filed a SOX retaliation claim only against his employer's parent, PCC Flow Technologies Holdings, Inc. ("Holdings"), and its representative, Allen Parrott. *Klopfenstein I*, 2006 WL 3246904, at *1. Following an ALJ's recommendation that the complaint be dismissed, the ARB determined in *Klopfenstein I* that the ALJ erred in his legal analysis of two of the four contested elements: coverage and causation. *Id.* On appeal, the ARB noted Klopfenstein began employment with Flow Products, Inc., ("Flow Products or Flow"), which was "a division of PCC Flow Technologies, LP, a limited partnership wholly owned by PCC FT I LLC and PCC FT II LLC, which in turn [were] wholly-owned subsidiaries of PCC Flow Technologies Holdings, Inc. (Holdings)." *Id.* According to the ARB, Holdings was a wholly owned subsidiary of Precision Castparts Corp. (PCC), and PCC was a company with a class of securities registered under Section 12 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78l. *Id.* Parrott, the other named

71

respondent, was Flow's Vice President of Finance when Klopfenstein's employment was terminated. *Id.*

In considering first whether the ALJ erred in concluding that Holdings and/or Parrott were not covered parties under § 1514A, the ARB noted Klopfenstein argued Holdings and Parrott were agents of PCC and that agents could be named respondents in a SOX case. *Id.* The ARB did not interpret the pre-Dodd-Frank version of § 1514A to require a complainant to name a corporate respondent that itself was registered under Section 12 of the Exchange Act or required to file reports under Section 15(d) of that Act, "so long as the complainant names at least one respondent who is covered under the [SOX] as an 'officer, employee, contractor, subcontractor, or agent' of such a company." *Id*.

The ARB stated nothing in the meaning of the term "agent" gave it reason to conclude that a subsidiary, or an employee of a subsidiary, could not ever be a parent's agent for purposes of the employee protection provision. *Id.* The ARB noted the issue of whether a particular subsidiary or its employee is an agent of a public parent for purposes of the SOX employee protection provision should be determined according to principles of the general common law of agency. *Id.* The ARB noted certain facts identified by the ALJ made it "hard to imagine that Holdings was not PCC's agent for purposes of the termination of Klopfenstein's employment." *Id.*

The ARB in *Klopfenstein I* remanded the case with instructions for the ALJ to make whatever factual findings were necessary to properly apply agency principles in determining whether either or both respondents were PCC's agents with regard to the termination of Klopfenstein's employment. *Id.* The ARB also expressly "le[ft] it to the ALJ to determine whether to grant

72

Klopfenstein's motion to add [the parent] as a party." [15] *Id.* The ARB also asked the ALJ to clarify his holding on causation.

Following remand, the ALJ affirmed his prior findings of fact.[16] *See In the Matter of Keith Klopfenstein v. PCC Flow Technologies Holdings, Inc. and Allen Parrott*, ALJ Case No. 2004-SOX-011, ARB Case Nos. 07-021 07-022, 2009 WL 6546648, at *3 (U.S. Dept. of Labor SAROX) (Aug. 31, 2009) ("*Klopfenstein II*"). "Applying the ARB's guidance on the agency doctrine, he ruled that Holdings was PCC's agent with regard to the termination of Klopfenstein's employment." *Id.* "However, applying agency principles, the ALJ held that Parrott was not PCC's agent with regard to Klopfenstein's discharge." *Id.* On the issue of causation, the ALJ held that Klopfenstein's concerns were not a contributing factor in his termination, and that Holdings provided clear and convincing evidence that Klopfenstein's violation of a policy was the sole reason for his discharge. *Id*. at *4. Therefore, the ALJ issued a recommended decision and order on remand, dismissing Klopfenstein's complaint.

Holdings and Klopfenstein appealed the ALJ's decision on remand to the ARB. *Id.* Holdings sought review of the ALJ's decision that it was an agent of PCC in the adverse action taken against Klopfenstein, and Klopfenstein appealed the balance of ALJ's decision, "namely that Parrott was

---

[15] As explained by ALJ Levin in *Walters*, the ARB in *Klopfenstein I* specifically noted that the publicly traded parent was not involved in the proceeding before it, and left it "to the ALJ to determine whether to grant Klopfenstein's motion to add PCC [the publicly traded parent] as a party" on remand. *Matter of Walters v. Deutsche Bank AG*, ALJ No. 2008-SOX-70, 2009 WL 6496755, at *6 (U.S. Dept. of Labor SAROX March 23, 2009) (quoting *Klopfenstein I*, 2006 WL 3246904). Because the publicly traded parent was not a party to the complaint, the ARB "sought to make clear, although apparently not sufficiently clear in some quarters, that its decision was limited to the circumstances in which the non-publicly traded subsidiary, acting as an agent, could itself be directly liable as a covered employer under the Act. *Id.* According to the ALJ in *Walters*, the ARB was not called upon to address the parent company's liability, and nothing in its holding in *Klopfenstein I* "is, therefore, inconsistent with direct parent company liability for adverse actions against a whistleblower by one of its wholly owned subsidiaries." *Id.*

[16] On remand, the publicly traded parent was not joined as a party to the proceedings. *Walters*, 2009 WL 6496755, at *6 n. 6 (citation omitted).

not a PCC agent and that Klopfenstein did not prove that his alleged protected activity was a contributing factor in his termination." *Id.*

In its Final Decision and Order Following Remand, the ARB affirmed in *Klopfenstein II*. The ARB noted it had indicated in *Klopfenstein I* that subsidiaries can be held liable as agents of publicly held companies for SOX purposes; and that an ALJ can apply the common law of agency to the facts in making the determination. *Id.* at *6 (citing *Klopfenstein I*, slip op. at 13-15). In *Klopfenstein II*, the ARB did not need to "go beyond that statement or define the degree of congruence required between a subsidiary and an agent to reach the proper resolution of th[e] case." *Id.* The ARB held substantial evidence supported the ALJ's conclusion that Holdings was PCC's agent for the purpose of discharging Klopfenstein, noting the policy Klopfenstein allegedly violated was a PCC policy that it applied to its subsidiaries. *Id.* at *6. According to the ARB, Holdings officials became "the instrumentality for enforcing a violation of PCC policy." *Id.* The ARB agreed with the ALJ that Parrott was not a decision maker in the termination of Klopfenstein's employment. *Id.* Regarding the causation issue, the ARB concluded substantial evidence supported the ALJ's findings. *Id*. at *7. Accordingly, the ARB denied Klopfenstein's complaint.[17] *Id.* at *8.

Instead of using the test outlined by the ARB, some ALJs subsequently used the integrated enterprise test from labor law to determine whether a subsidiary was an agent of the public parent. *See, e.g. Merten v. Berkshire Hathaway, Inc*., ALJ No. 2008-SOX-00040 (Dep't of Labor ALJ Oct.

_____

[17] Klopfenstein sought review of the decision of the ARB. Because the Fifth Circuit Court of Appeals could not conclude the ARB's decision was arbitrary and capricious, the court denied the petition. *Klopfenstein v. Admin. Review Bd., U.S. Dep't of Labor*, 402 Fed. Appx. 936, 937 (5th Cir. 2010) ("*Klopfenstein III*"). Holdings did not appeal the ARB's decision, and Klopfenstein did not appeal the ARB's conclusion regarding Parrott. *Id.* at n. 2. Therefore, even though the SEC filed an amicus brief discussing the applicability of Section 806 to employees of contractors and agents, the Fifth Circuit did not address the brief's arguments, including several arguments why Section 806 was applicable to Holdings. *Id.*

21, 2008).

**b.      Federal court decisions**

Before the enactment of Dodd-Frank, few federal courts considered the issue of whether employees of publicly traded companies included employees of the public company's wholly owned subsidiaries, or if the statute applied only to employees who were employed directly by the publicly traded parent company. *Leshinsky I*, 873 F. Supp. 2d at 588. However, a handful of district courts held the statute did not apply to employees of non-public subsidiaries. *Id.* (citations omitted). For example, a district court for the Eastern District of Michigan considered whether and under what circumstances a non-public subsidiary of a public parent was subject to SOX's whistleblower protection provisions, concluding a non-public subsidiary was not an agent of its parent for purposes of § 1514A merely on the basis of its subsidiary status. *Rao v. Daimler Chrysler Corp.*, 2007 WL 1424220 (E.D. Mich. May 14, 2007). In reaching this conclusion, the court rejected a line of ALJ opinions which, based on SOX's remedial nature and extensive financial reporting requirements, broadly interpreted § 1514A's whistleblower protection provisions as covering all "constituent units" of a public company, including its non-publicly traded subsidiaries. *Malin v. Siemens Med. Sols. Health Servs.*, 638 F. Supp. 2d 492, 499–500 (D. Md. 2008) (citing *Rao*, 2007 WL 1424220, at *3 (quoting *Morefield*, 2004–SOX–00002 at 6)).

The *Rao* court adopted instead the reasoning of another line of ALJ opinions that applied "the general principle of corporate law that a parent is not automatically liable for the actions of a subsidiary, absent a clear intent from Congress to the contrary." *Malin*, 638 F. Supp. 2d at 500 (citing *Rao*, 2007 WL 1424220, at *4 (citing *Lowe v. Terminix Int'l Co., L.P.*, 2006–SOX–00089 at 7–8

(A.L.J. Sept. 15, 2006); also citing *Bothwell v. Am. Income Life*, 2005–SOX–00057 at 6, 2005 WL 4889047 (A.L.J. Sept. 19, 2005))). Applying similar reasoning, the *Rao* court also held that a general agency relationship between the public parent and non-public subsidiary was insufficient to implicate the whistleblower provisions of § 1514A; rather, the subsidiary must have the authority to act and actually take some action against the whistleblowing employee on behalf of the public company. *Id.* (citing *Rao*, 2007 WL 1424220 at *4–*5 (citing *Klopfenstein I*, 2006 WL 1788436) (remanding the matter to the ALJ to "make whatever factual findings are necessary to properly apply agency principles in determining whether either or both [subsidiaries] were [the parent's] agents with regard to the termination of Klopfenstein's employment.")).

According to the court in *Malin*, in pre-Dodd-Frank cases where non-public subsidiaries were held to be subject to § 1514A, "the subsidiary was found to have acted as an agent of its public parent particularly with respect to employment matters or the parent was involved in some direct manner in the alleged misconduct." *Malin*, 638 F. Supp. 2d at 501-02 (citing *Carnero v. Boston Scientific Corp.*, 433 F.3d 1, 4–7 (1st Cir. 2006) (holding that complainant could proceed on a SOX whistleblower claim despite the fact that he was directly employed by a non-public subsidiary of a public company where he presented evidence that the parent company's employees exercised "extensive and continuous control" over his work duties, he frequently traveled to the parent company's office to "meet with supervisors there" and he reported his concerns of alleged accounting misconduct to employees of the parent company); also citing *Collins v. Beazer Homes USA, Inc.*, 334 F. Supp. 2d 1365, 1369–70, 1373 n. 7 (N.D. Ga. 2004) (Addressing the issue in a footnote, the court allowed the plaintiff to proceed on her SOX whistleblower claim against the publicly-traded parent of her non-public employer where the parent company admitted that it had the

authority to affect the terms and conditions of her employment; in the recitation of facts, the court also noted that the plaintiff had presented evidence that she made complaints concerning her employment and her employer's activities directly to the parent company, which undertook an investigation and was consulted regarding the decision to terminate her.); also citing *Platone v. Atlantic Coast Airlines, Holdings, Inc*., 2003–SOX–27, 2004 WL 5032621, at *21 (ALJ Apr. 30, 2004) (holding that complainant demonstrated sufficient facts to warrant holding a public parent company liable for the acts of its non-public subsidiary where the complainant received her offer letter on letterhead that bore the logo of the parent company, her 401K plan and other employee benefits were provided by the parent company, and one of the board members of the parent company was also president and CEO of the subsidiary and made the ultimate decision to terminate the complainant's employment)).

## 2. *Lawson* opinions

The United States Supreme Court expanded the scope of SOX's whistleblower protections in *Lawson v. FMR L.L.C.*, 571 U.S. 429, 134 S.Ct. 1158, 188 L.Ed.2d 158 (2014), the case relied upon primarily by MGI in its motion for summary judgment. In *Lawson III*, the first SOX whistleblower case to be heard by the Supreme Court, the Court considered the class of individuals that the pre-Dodd-Frank version of § 1514A protects. *Moody v. Am. Nat'l Ins. Co.*, No. 3:19-CV-00206, 2020 WL 3128259, at *2 (S.D. Tex. June 12, 2020) (citing *Lawson III*, 571 U.S. 429, 134 S.Ct. 1158). In that case, two plaintiffs brought whistleblower retaliation claims against their former employers, private companies that provided contracted advisory and management services to a family of mutual funds. *Id.* (citing *Lawson III*, 571 U.S. at 433). The mutual funds were public companies but had no employees; thus, the mutual funds themselves employed no potential

whistleblower to raise concerns about putative fraud related to the funds. *Id.* "The plaintiffs raised concerns related to accounting methodologies that allegedly overstated the expenses associated with operating the funds and inaccuracies in a draft for a registration statement that was to be filed with the SEC." *Id.* (citing *Lawson III*, 571 U.S. at 438).

After one plaintiff was constructively discharged and the other was fired, each filed suit against their respective employer, alleging retaliation proscribed by pre-Dodd-Frank § 1514A.[18] *Id.* Before delving into the Supreme Court's analysis in *Lawson III*, the Court must look for context to the lower court opinions in that case.

a.    ***Lawson I***

The defendants in Lawson's suit were three privately held companies involved in the business of mutual fund investments: Defendant FMR LLC was the successor to Defendant FMR Corp., and Defendant Fidelity Brokerage Services, LLC was its subsidiary. Lawson's specific employer until her resignation in 2007 was Fidelity Brokerage. *Lawson v. FMR L.L.C.*, 724 F. Supp. 2d 141, 144–45 (D. Mass. 2010), *rev'd in part*, 670 F.3d 61 (1st Cir. 2012), *rev'd and remanded*, 571 U.S. 429, 134 S. Ct. 1158, 188 L. Ed. 2d 158 (2014) ("*Lawson I*").

The defendants in Zang's suit were Defendant FMR LLC, the parent company of Defendant Fidelity Management & Research Company, which itself was the parent of Defendant FMR Co., Inc. Plaintiff Zang began his employment for Fidelity Management in 1997, but in 2001 his specific employer changed from Fidelity Management to FMR Co., Inc. and remained so until his termination

---

[18] In *Lawson III*, the Supreme Court noted Congress amended § 1514A in 2010 to extend whistleblower coverage to employees of public companies' subsidiaries and nationally recognized statistical ratings organizations. *Lawson v. FMR L.L.C.*, 571 U.S. 429, 435 & n. 2, 134 S. Ct. 1158, 1163, 188 L. Ed. 2d 158 (2014) (further noting the plaintiffs did not fall in either category and holding, in any event, their claims were governed by the prior version of § 1514A).

in 2005. Under Zang's employment agreement, he was employed "by FMR Corp., and/or any entity which is directly or indirectly owned or controlled wholly or in part by FMR Corp." *Lawson I*, 724 F. Supp. 2d at 146-47.

In motions to dismiss, the private-company defendants argued that § 1514A protected only employees of a publicly traded company from retaliation by the company or the company's contractors. *Id.* (citing *Lawson III*, 571 U.S. at 441). The defendants argued Lawson and Zang, as employees of privately held companies, were not covered by the SOX whistleblower provision. *Lawson I*, 724 F. Supp. 2d at 152. "For their part, Lawson and Zang argue[d] that the statute encompasse[d] not only employees of public companies but also employees of private companies, particularly those that act as investment advisers to public investment companies." *Id.* Specifically, the plaintiffs argued that "an employee" also includes employees of "any officer, employee, contractor, subcontractor, or agent of such company." *Id.*

Starting with the statutory text itself, which protected "an employee" but did not directly state at which entity the individual must be employed, the district court interpreted the word "employee" by reference to the rest of the language in the subsection, which required choosing between two interpretations: "the Defendants' reading ('an employee of a publicly traded company'), or a more expansive reading ('an employee of a publicly traded company or of any officer, employee, contractor, subcontractor, or agent of such company.')." *Id.* at 152-53. According to the district court, under the plaintiffs' proposed construction, the subject and object of the sentence would be distinct groups: the subject would be a "publicly held company" or its "officer, employee, contractor, subcontractor, or agent," while the object of the sentence would be the "employee" of one of these discriminating entities. *Id.* at 153.

Noting both of the opposing interpretations suggested somewhat "awkward applications to various business relationships," the court could not rule out either interpretation given "their comparable feasibility as grammatical and logical constructions." *Id.* at 154. Further noting decisional law had done "little to enlighten the issue," the court found the meaning of "employee" in § 1514A was ambiguous and turned to other considerations to provide further guidance. *Id.* at 154-55. Because the scope of SOX requires whistleblowing activity that must "relat[e] to fraud against shareholders," the court stated protecting employees of a public company's "related entities would not result in an overly broad application of the statute that would be counter to the statute's purpose." *Id.* at 159-60. According to the court, this was "a compelling limiting principle for the Plaintiffs' reading of the statute." *Id.* at 160. The court further noted that the defendants' construction, while not inconsistent with the text, "would result in an excessively forced and formalistic reading," whereas the "legislative history of SOX makes clear that Congress was concerned about the related entities of a public company becoming involved in performing or disguising fraudulent activity, and wanted to protect employees of such entities who attempt to report such activity." *Id.*

Having determined that pre-Dodd-Frank Section 806 protected employees of any related entity of a public company (i.e., employees of agents, contractors, and subcontractors of public companies), the district court then determined whether Lawson and Zang fell into this category, noting that to do so, the plaintiffs' employer must be an "officer, employee, contractor, subcontractor, or agent," or rather, have a plausible claim to being one of these entities. *Id.* at 161; *see also id.* at 163. The court concluded that Lawson and Zang had sufficiently pleaded facts indicating the defendants were either contractors, subcontractors, or agents of publicly held

investment companies. *Id.* at 161. The court found that Lawson and Zang, as employees of investment advisors to mutual funds, were covered by Section 806. *Id.* at 162.

**b.**     ***Lawson II***

On appeal, a divided panel of the First Circuit Court of Appeals reversed with respect to the applicability of the Sarbanes-Oxley whistleblower claims. *Lawson v. FMR L.L.C.*, 670 F.3d 61 (1st Cir. 2012) (*"Lawson II"*). The majority agreed with the defendants that "an employee" referred only to employees of public companies and did not cover a contractor's own employees. *Id.* at 68-80.

**c.**     ***Lawson III***

In *Lawson III*, the Supreme Court reversed the decision of the First Circuit. In deciding that pre-Dodd-Frank § 1514A "shelters employees of private contractors and subcontractors, just as it shelters employees of the public company served by the contractors and subcontractors," and thus extended to the plaintiffs, the Court started with the language of the statutory provision. *Lawson III*, 571 U.S. at 433, 440.  The Supreme Court noted the dissenting opinion from the First Circuit's judgment observed that "boiling [§ 1514A(a)] down to its relevant syntactic elements, it provides that 'no ... contractor ... may discharge ... an employee.'" *Id*. at 440 (quoting *Lawson II*, 670 F.3d at 84 (quoting § 1514A(a))). According to the Supreme Court, the ordinary meaning of "an employee" in this proscription is the contractor's own employee. *Lawson III*, 571 U.S. at 440.

Presuming the operative language means a contractor may not retaliate against its own employee for engaging in protected whistleblowing activity, the Court further explained as follows:

> Section 1514A's application to contractor employees is confirmed when we enlarge our view from the term 'an employee' to the provision as a whole. The prohibited retaliatory measures enumerated in § 1514A(a)—discharge, demotion, suspension,

> threats, harassment, or discrimination in the terms and conditions of employment—are commonly actions an employer takes against its *own* employees. Contractors are not ordinarily positioned to take adverse actions against employees of the public company with whom they contract. FMR's interpretation of § 1514A, therefore, would shrink to insignificance the provision's ban on retaliation by contractors.

*Id.* at 441 (emphasis in original). The Court made clear that SOX's whistleblower protection is limited to employees suing their employers. *Id.* at 442 ("Moving further through § 1514A to the protected activity described in subsection (a)(1), we find further reason to believe that Congress presumed an employer-employee relationship between the retaliator and the whistleblower."); 443 ("The reference to employer knowledge is an additional indicator of Congress' expectation that the retaliator typically will be the employee's employer, not another entity less likely to know of whistleblower complaints filed or about to be filed. Section 1514A's enforcement procedures and remedies similarly contemplate that the whistleblower is an employee of the retaliator."). Under *Lawson III*, SOX whistleblower protection could even extend to the employees of a public company's officers and employees, which could, in theory, include housekeepers or gardeners (though the Supreme court noted that "[f]ew housekeepers or gardeners, we suspect, are likely to come upon and comprehend evidence of their employer's complicity in fraud"). *Id.* at 445-46.

The Court stated its textual analysis of § 1514A fit the provision's purpose, which is to prevent future fraud like the "Enron debacle." *Id.* at 447. According to the Court, as the ARB observed in *Spinner*,[19] "Congress plainly recognized that outside professionals—accountants, law

---

[19] Several months after *Lawson II*, the ARB issued a decision in an unrelated case, *Spinner v. David Landau & Assoc., L.L.C.*, ALJ No. 2010–SOX–029, ARB No. 10–111 etc., 2012 WL 1999677 (May 31, 2012), disagreeing with the First Circuit's interpretation of § 1514A. *Lawson III*, 571 U.S. at 439. "In a comprehensive opinion, the ARB explained its position that § 1514A affords whistleblower protection to employees of privately held contractors that render services to public companies." *Id.*

firms, contractors, agents, and the like—were complicit in, if not integral to, the shareholder fraud and subsequent cover-up [Enron] officers . . . perpetrated." *Id*. (quoting *Spinner*, ALJ No. 2010–SOX–029, pp. 12–13).

In arguing that legislative events subsequent to SOX's enactment show Congress did not intend to extend § 1514A's protections to contractor employees, the defendants pointed to the 2010 Dodd-Frank, which amended § 1514A to read as follows:

> No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l), or that is required to file reports under [section 12] of the [1934 Act] (15 U.S.C. 78o (d)) *including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the [1934 Act] (15 U.S.C. 78c)*, or any officer, employee, contractor, subcontractor, or agent of such company *or nationally recognized statistical rating organization*, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any [protected activity].

*Id.* at 455 (quoting 18 U.S.C. § 1514A(a) (2012 ed.) (emphasis added and footnote omitted in *Lawson III*)). The defendants argued that Congress's decision to add nationally recognized statistical rating organizations ("NRSROs") to § 1514A "shows that the provision did not previously cover contractor employees." *Id.* The Court rejected that argument, noting that at the time of the Dodd-Frank amendments "DOL regulations provided that § 1514A protects contractor employees. . . ." *Id.*

### 3.    Interpretations of § 1514A following Dodd-Frank

As noted by the Supreme Court in *Lawson III*, on July 21, 2010, Section 806 was amended by Dodd–Frank to provide that no public company, "including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company," may

retaliate against a whistleblowing employee. *Leshinsky I*, 873 F. Supp. 2d at 588 (quoting Dodd–Frank § 929A). Dodd-Frank thus clarified the issue by providing that SOX's whistleblowing provisions apply to employees of subsidiaries or affiliates "whose financial information is included in the consolidated financial statements of [a publicly traded company]," substantially expanding the number of companies that may be subject to SOX whistlebower claims. Thus, SOX whistleblower provisions apply to publicly-traded companies with a class of securities registered under Section 12 of the Exchange Act, or that are subject to the periodic reporting requirements of Section 15(d), as well as to their subsidiaries whose financial information is consolidated into their financial statements.

The Court has not located many cases interpreting the post-Dodd-Frank version of § 1514A under facts similar to those raised in this case. However, the Court finds helpful two more recent federal court decisions (one of which utilized the pre-Dodd-Frank version in its discussion) and the ARB opinion on which they rely (*Johnson v. Siemens Bldg. Tech., Inc.*, ARB No. 08–032, 2011 WL 1247202 (DOL ARB Mar. 31, 2011) (en banc)). The Court starts with the ARB's opinion in *Johnson*.[20]

---

[20] The Court notes the Fifth Circuit has not decided whether the ARB's reasonable interpretations of § 1514A are entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Getman v. Admin. Review Bd.*, 265 Fed. Appx. 317, 319 n.7 (5th Cir. Feb. 13, 2008) ("We have not addressed *Chevron* deference in the context of an ARB decision on Sarbanes-Oxley. It appears that *Chevron* deference is due, as the ARB is an adjudicative body, but we leave that question for another day.").

Under *Chevron*, courts defer to an agency's permissible interpretation of the law if Congress has not spoken to the precise issue by statute. *Rhinehimer v. U.S. Bancorp Investments, Inc.*, 787 F.3d 797, 809 (6th Cir. 2015) (citing *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778). *Chevron* deference should be applied "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of such authority." *Id.* (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226–27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001)). Agency interpretations not entitled to *Chevron* deference may nonetheless "merit some deference" in light of agency expertise and the value of uniformity in interpreting of the law. *Id.* (quoting *Mead*, 533 U.S. at 234, 121 S.Ct. 2164). "The deference due in such cases is governed by *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)." *Id.* (citing *Mead*, 533 U.S. at 238–39, 121 S.Ct. 2164 (remanding with instructions for the Federal Circuit to determine whether the customs ruling letters at issue were entitled to deference under *Skidmore*)).

a.      **Administrative proceeding**

On March 31, 2011, the ARB held the Dodd-Frank amendment should apply to a case on appeal because the amendment is a mere clarification of Section 806, intended to make "what was intended all along ever more unmistakably clear." *Leshinsky I*, 873 F. Supp. 2d at 588 (quoting *Johnson*, 2011 WL 1247202, at *11 (citation omitted in *Leshinsky I*)). The ARB also held that even "absent Dodd–Frank's amendment for subsidiary coverage in Section 929A, [the Board] would nonetheless hold that subsidiaries for the same reasons are covered under pre-amendment Section 806's term 'company.'" *Id.* The ARB also briefly addressed the issue of agency coverage under Section 806. *Id.* (citing *Johnson*, 2011 WL 1247202, at *12 ("Section 806 provides 'No company . . . or any officer, employee, contractor, subcontractor, or *agent* of such company, . . . may . . . discriminate . . . .' 18 U.S.C.A. § 1514A(a)")). The ARB held the ALJ, by exclusively focusing on the agency factors to hold the subsidiary was not acting as the parent's agent and thus was not covered as an "agent" under Section 806, "failed to consider alternative bases and factors upon

---

Circuits holding that the ARB's decisions interpreting § 1514A are entitled to *Chevron* deference note that the statute expressly provides for adjudication of whistleblower complaints by the Secretary of Labor, who in turn "delegated the authority to review appeals under Section 806 and issue final agency decisions to the ARB." *Id.* (quoting *Wiest v. Lynch*, 710 F.3d at 131 (citing Delegation of Authority and Assignment of Responsibility to the Administrative Review Board, 75 Fed. Reg. 3924, 3924–25 (Jan. 25, 2010))). In *Lawson III*, the Supreme Court declined to decide whether the ARB's interpretations of the statute were entitled *Chevron* deference. *Id.* (citing *Lawson v. FMR L.L.C.*, —— U.S. ——, 134 S.Ct. 1158, 1165 n. 6, 188 L.Ed.2d 158 (2014)). In her dissent, Justice Sotomayor argued that Congress granted the SEC, rather than the Secretary of Labor, interpretive authority over § 1514A. *Id.* (citing *Lawson III*, 134 S.Ct. at 1186–87 (Sotomayor, J., dissenting) (arguing that the ARB has not been granted interpretive authority over § 1514A)).

In *Rhinehimer*, the Sixth Circuit Court of Appeals declined to reach whether the ARB's interpretations of § 1514A were entitled to *Chevron* deference and instead found them persuasive even under lesser *Skidmore* deference. *Id.* The court noted *Skidmore* deference is grounded in the recognition that "the rulings, interpretations, and opinions" of the agency that administers an act "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Id.* at 809-10 (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161). "The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 810 (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161). In determining whether an agency's interpretation is persuasive under *Skidmore*, "[courts] look to the statute's text and design, including whether the [interpretation] is consistent with the congressional purpose." *Id.* (quoting *S. Rehab. Grp., PLLC v. Sec'y of Health & Human Servs.*, 732 F.3d 670, 685 (6th Cir.2013) (citations omitted in *Rhinehimer*)).

which common law agency might be established." *Id.* Thus, in light of the ARB's conclusion that a consolidated subsidiary is covered under Dodd-Frank, and the indication in the record that SBT was a consolidated subsidiary at all relevant times, the ARB remanded for the ALJ to determine if SBT was consolidated with Siemens AG at the time of the termination and, if so, whether it unlawfully retaliated against Johnson. *Id.*

### b.    Federal court decisions

In *Wiest v. Lynch*, 15 F. Supp. 3d 543 (E.D. Pa. 2014), the district court relied upon the opinion in *Johnson* but did not need to decide, like the ARB in *Johnson* did, that Section 929A is a clarification of Section 806 and thus should apply to the case. Even though the court considered the pre-Dodd-Frank version of § 1514A and the case did not involve both a subsidiary and a parent, the Court finds instructive the *Wiest* court's discussion on agency, as illuminated by both the concurrence in *Johnson* and the Supreme Court's decision in *Lawson III*.

In *Wiest*, the plaintiff sued Tyco Electronics Corporation ("Tyco") and four individual defendants under § 1514A for retaliating against him for his intracompany reports of suspected fraud and violations of federal tax law. *Wiest*, 15 F. Supp. 3d at 547. The defendants filed a motion to dismiss raising four arguments, the last of which is relevant to the issue raised in MGI's motion. According to the defendants in *Wiest*, Section 806 of Sarbanes–Oxley did not, at the time of the events alleged in the complaint, provide coverage to employees, like the plaintiff, of non-publicly traded subsidiaries of publicly held companies. *Id.* at 550. The defendants pointed out Tyco was a non-publicly traded subsidiary of Tyco Electronics Ltd. ("Tyco Limited"), which the defendants did not dispute was allegedly covered by Section 806 but which the plaintiff had not named as a

86

defendant. *Id.*

The district court granted in part and denied in part the defendants' motion to dismiss. In so doing, the court rejected the defendants' assertions that the plaintiff had not sufficiently pleaded either an adverse employment action or a sufficient causal connection between the protected activity and any adverse employment action. *See id.* at 558–67. The court granted the motion, however, with respect to three of the four individually named defendants—Lynch, Curtin, and Post—but concluded that the plaintiff had "just barely state[d] a claim" with respect to the fourth individual, Dougherty. *Id.* at 566–67. Regarding the last issue, the district court held the plaintiff could proceed against Tyco and Dougherty on the grounds that Tyco was an agent of publicly held Tyco Limited. *Id.* at 568.

The court did not need to decide whether to apply the post-Dodd-Frank version of § 1514A because the plaintiff "highlighted (without elaboration) in his Memorandum in Opposition [to the defendants' motion to dismiss], section 806 provides that '[n]o company . . . or such agent of such company' may discriminate against an employee for that employee's protected whistleblowing activity." *Id.* (quoting pre-Dodd-Frank version of 18 U.S.C. § 1514A(a)). In considering that version, the court first noted that both "parties ostensibly ignore the potential impact of the Supreme Court's recent *Lawson* decision with respect to the question of whether an employee of an agent was covered by pre-Dodd–Frank section 806." *Id.* (citing *Lawson III*, 134 S.Ct. 158). According to the court in *Wiest*, if there was any doubt, "perhaps sowed by the First Circuit Court of Appeals' opinion" in *Lawson II*, the Supreme Court's decision in *Lawson III* "should have resolved it by analogy to contractors." *Id*.

The court in *Wiest* stated there was "no reason to think that the Supreme Court's holding in

87

*Lawson* does not also apply, beyond contractors of public companies, to agents of public companies and those agents' employees." *Id.* (noting the ARB's discussion in *Spinner v. Landau & Associates, L.L.C.*, ARB Nos. 10–111, 10–115, 2012 WL 1999677 (Dep't of Labor May 31, 2012) "makes clear that at least the ARB and DOL read section 806's provisions as extending protection to employees of agents of publicly held companies"). The court also cited *Klopfenstein I* for the proposition that, at least with regard to the pre-Dodd-Frank version of Section 806, the ARB's approach had been to determine the issue of whether a particular subsidiary or its employee is an agent of a public parent for purposes of the SOX employee protection provision according to principles of the general common law of agency. *Id.* at 568-69 (citing *Klopfenstein I*, 2006 WL 3246904, at *10 ("Nothing in . . . the Act, the interim and final regulations, and the common meaning of the term 'agent' gives us reason to conclude that a subsidiary, or an employee of a subsidiary, cannot ever be a parent's agent for purposes of the employee protection provision.")).

The court noted the disagreement among lower courts and the ARB as to the scope or nature of the required agency relationship and further noted that at the time of the *Wiest* court's decision, no tribunal had considered, to the *Wiest* court's knowledge, "the issue of the scope or nature of the required agency relationship since the Supreme Court's decision in *Lawson*." *Id.* at 569. However, the *Wiest* court noted the ARB had recently "continued to expand section 806's coverage." *Id.* (citing *Johnson*, 2011 WL 1247202). According to the court in *Wiest*, in reversing the ALJ on the alternative ground "that a consolidated subsidiary is covered under Dodd–Frank, and the indication in the record that [the defendant] was a consolidated subsidiary at all relevant times," the ARB "decline[d] to discuss further subsidiary coverage under agency law," but nevertheless hinted that "[t]he ALJ, by exclusively focusing on the agency factors upon which the [ARB's] ruling in *Klopfenstein* turned,

failed to consider alternative bases and factors upon which common law agency might be established." *Id.* at 570 (quoting *Johnson*, 2011 WL 1247202, at *12).

The court in *Wiest* focused on Deputy Chief Administrative Appeals Judge E. Cooper Brown's concurrence in *Johnson*, wherein he "addressed the agency issue in thorough detail suggesting the direction in which the ARB is headed." *Id.* at 570. The court in *Wiest* quoted Judge Brown as follows:

> In finding the subsidiary in *Klopfenstein* to have acted as an agent of the publicly traded parent company with regard to the challenged employment action therein at issue, the Board focused on the common law factors relevant to a determination under employment law of the existence of 'actual' agency authority. However, 'actual authority' is not the only basis upon which common law agency may be found in an employment or labor law context. Common law agency contemplates at least two other basis for attributing legal consequences of one party's actions to another party, *i.e.*, 'apparent authority' and 'respondeat superior.' By exclusively focusing on the agency factors upon which the Board's ruling in *Klopfenstein* turned, the ALJ in the instant case failed to consider these alternative bases for establishing agency within an employment law context. . . .

> Fundamentals of statutory construction support the conclusion that liability for retaliation against whistleblowing extends to an agent of a publicly traded company engaged in securities related activities *independent* of whether or not the infringing entity acts as the agent of the public company with respect to the challenged adverse employment action. . . .

> To interpret 'agency' under Section 806 as limited to imposing liability in only those situations where an entity acts as a publicly traded company's agent in an employment/labor law context would fly in the face of the foregoing canons of statutory construction, for such an interpretation would effectively render the words 'officer, employee, contractor, subcontractor' superfluous. . . .

> We are well aware of the lower court decisions that have reached a contrary conclusion. Nevertheless, the rationale adopted by the courts is unpersuasive. In each instance, the court was concerned that viewing 'agency' as applicable to anything other than an employment/labor law context would result in expansion of Section 806's coverage protection far beyond Congress's intent. In *Brady v. Calyon Secs.*, 406

89

F.Supp.2d 307 (S.D.N.Y.2005), the court refused to impose liability for whistleblower retaliation on a securities broker for publicly traded companies for fear that doing so would result in the adoption of 'a general whistleblower protection provision governing the employment relationships of any privately-held employer, such as a local realtor or law firm, that has ever had occasion, in the normal course of its business, to act as an agent of a publicly traded company, even as to employees who had no relation whatsoever to the publicly traded company.' 406 F.Supp.2d at 318. For similar reasons, in *Malin v. Siemens Med. Solutions Health Servs.*, 638 F.Supp.2d 492 (D. Md.2008), agency liability was rejected in the absence of a showing that the agent acted on behalf of the public company with respect to the alleged retaliation. *See also Rao v. Daimler Chrysler Corp.*, 2007 WL 1424220 (E.D. Mich.2007) (not reported) (general agency relationship between the public parent and non-public subsidiary insufficient to implicate whistleblower provisions of Section 806).

Assuredly, Section 806 does not go so far as to create a general whistleblower protection provision imposing liability on any private company or entity acting as an agent of a publicly traded company with respect to any matter whatsoever. However, a proper construction of the scope of agency coverage outside of the employment law context is more limited. Outside of the employment law context, an entity will be held independently liable as a covered agent under Section 806 where it is established that the entity engaged in retaliatory conduct was serving as the public company's agent with respect to securities related matters.

In terms of what a whistleblower must prove to establish the agency relationship referenced in Section 806, distinguishing SOX as predominantly an antifraud measure is significant. Construed as an antifraud provision, rather than an employment or labor law, it is sufficient, as an example, to establish that the retaliating entity exists as an agent of the publicly traded parent company for purposes of producing accounting or financial information which is consolidated into the parent's financial reports, or that an agent or contractor facilitated fraud like the subsidiaries, off-the-books special purpose entities (SPEs), and the accounting firms that helped precipitate the financial collapse of Enron, the key corporate figure in the legislative history of Sarbanes–Oxley. In such instances, the focus for coverage purposes is on the agent's role in preparing financial data or its participation in fraud or deception.

Construing Section 806 as extending coverage to an agent of a publicly traded company engaged, on behalf of that company, in securities related activities, thereby imposing liability for whistleblower retaliation upon such an entity, is not to say that Section 806 precludes an employment law agency analysis for purposes of finding

the publicly traded company liable (or for holding the agent liable in such a context, as was the case in *Klopfenstein*). At the same time, an employment law agency analysis does not preclude inquiry under Section 806 into whether the entity charged with retaliation exists as an agent of a publicly traded company for securities related purposes, nor does it bar the imposition of liability upon an agent acting in such capacity where it independently retaliates against a whistleblower in violation of Section 806.

*Wiest*, 15 F.Supp. 3d at 570-71 (quoting *Johnson*, 2011 WL 1247202, at *14–18 (Brown, J., concurring) (citations, internal quotation marks, and footnotes omitted in *Wiest*)).

According to the court in *Wiest*, in addition to Judge Brown's "persuasive reasoning and possible reasons for deferring to such a position as may become a majority of the ARB's in an appropriate case in the future, the Supreme Court's decision in *Lawson* also suggests that Judge Brown's approach is largely correct." *Id.* at 571.  The *Wiest* court noted the "main modification to Judge Brown's view would be that, in addition to agency based on engagement 'in securities related activities,' agency might also be based on types of services with regard to which fraud contemplated under section 806 might be perpetrated (in essence, Judge Brown's rationale). In other words, agency could also be based on the performance, inter alia, of accounting and tax services and the like, as here." *Id.*

The court in *Wiest* held the plaintiff's complaint contained "sufficient allegations—although Mr. Wiest does not go so far as to identify, collect, and analyze them—to establish, for purposes of adjudicating the Defendants' Motion to Dismiss, that Tyco acted as an agent for Tyco Limited, which, Defendants do not dispute, is allegedly covered by section 806." *Id.* According to the court, if, as Judge Brown observed, "[o]utside of the employment law context, an entity will be held independently liable as a covered agent under Section 806 where it is established that the entity

91

engaged in retaliatory conduct was serving as the public company's agent with respect to securities related matters," it seems clear enough from the allegations in the *Wiest* case that Tyco served as Tyco Limited's agent with respect to accounting- and tax-related matters (and that Tyco took adverse action against the plaintiff). *Id.* at 572-73 (quoting *Johnson*, 2011 WL 1247202, at *17).

Unlike the court in *Wiest*, the court in *Leshinsky I*, the second case which relied upon the *Johnson* opinion which the Court finds helpful, did conclude – similar to the ARB in *Johnson* – that the Dodd-Frank amendment is a clarification of Congress's intent with respect to the Sarbanes–Oxley whistleblower provision, and thus should be applied to the federal case. *See Leshinsky v. Telvent GIT, S.A.*, 873 F. Supp. 2d 582 (S.D. N.Y. 2012). *Leshinsky I* was decided in 2012 following the enactment of Dodd-Frank, but dealt with claims that arose prior to Dodd-Frank; therefore, the court discussed, in the context of its retroactivity analysis,[21] the state of the law prior to the enactment of Dodd-Frank. Although there is no question in this case that the Dodd-Frank amendment applies to Plaintiff's claims with respect to the SOX whistleblower provision, the Court finds the facts and detailed discussion contained in *Leshinsky I* illustrative here.

In *Leshinsky I*, the plaintiff alleged that defendant subsidiaries Telvent Farradyne and Telvent Caseta, along with publicly traded defendant Telvent GIT and two individuals, wrongfully terminated his employment in violation of the whistleblower provisions of Sarbanes–Oxley. *Id.* at 584. The plaintiff was formally employed by Telvent Farradyne, but he reported to the president of

---

[21] In the retroactivity analysis, courts consider ambiguity and conflict in the preexisting interpretation of a statute an indication that the amendment to the text was intended to clarify the preexisting text rather than create a substantive change in the law with new legal consequences. *Johnson v. Siemens Building Technologies, Inc.*, ARB Case No. 08–032 at 8–9, ALJ Case No.2005–SOX–015, 2011 WL 1247202, at *9 (Dept. of Labor ARB Mar. 31, 2011). As noted by the ARB in *Johnson* and as demonstrated herein, ALJs and the courts have varied in both theory and application concerning the scope of subsidiary coverage under Section 806. *Id.*

Another factor courts consider in determining if an amendment is a clarification is whether the amendment is a reasonable interpretation of the prior statute and its legislative history. *Id.*

Telvent Caseta, in addition to continuing to report to the president of Telvent Farradyne. *Id*. at 585. There was no dispute that at all times relevant to the case Telvent GIT included the financial information of its subsidiaries, including Telvent Farradyne and Telvent Caseta, in its consolidated financial statements. *Id.*

The defendants argued that pre-Dodd-Frank Section 806, by its plain language, applied only to employees of publicly traded companies, but that the plaintiff was employed only by non-public subsidiaries Telvent Farradyne and Telvent Caseta of the publicly traded defendant Telvent GIT. *Id.* at 584. Arguing the plaintiff was never directly employed by Telvent GIT, the defendants argued Section 806 did not apply to the case. *Id.*

The court in *Leshinsky* held an evidentiary hearing and allowed each side to submit proposed findings of fact and conclusions of law following the hearing. *Id.* The plaintiff argued the Dodd-Frank amendment should be applied retroactively, and the statute, as amended by Dodd–Frank, makes explicit that non-public subsidiaries of publicly traded companies may be liable under Sarbanes–Oxley's whistleblower provisions. *Id.* Alternatively, the plaintiff also argued the evidence established the defendants could be liable under the earlier version of the statute. *Id.*

The court treated the defendants' written and oral arguments as a Rule 12(b)(1) motion to dismiss. *Id.* According to the court, the motion required resolution of the novel question of whether the Dodd-Frank amendment should be applied retroactively. *Id.* Finding the reasoning of the ARB in *Johnson* persuasive, the court in *Leshinsky I* concluded the Dodd-Frank amendment is a clarification of Congress's intent with respect to the Sarbanes–Oxley whistleblower provision, and thus it applied, giving the court subject matter jurisdiction over the plaintiff's claims. *Id.* at 584, 589-

93

90.

In its discussion of the relationship among Telvent GIT and the Telvent subsidiaries, the *Leshinsky* court noted Telvent's subsidiaries all adhered to certain corporate branding guidelines; Telvent Farradyne employees were given "telvent.com" email addresses; Telvent companies used a uniform "Telvent" logo and color; and press releases from Telvent companies all referenced "Telvent GIT S.A. (NASDAQ TLVT), the Global RealTime IT Company." *Id.* at 586. According to the court, the plaintiff's employment agreement was written on "Telvent" letterhead and was signed by the president of Telvent Farradyne, and it referred to "Telvent" benefits and vacation entitlements as well as "Telvent" employee application forms. *Id*. The court further noted the parent company was involved, to an extent, in the day-to-day management of its subsidiaries. *Id.* The decision to terminate the plaintiff's employment was made after discussions involving the president of Telvent Farradyne and the president of Telvent Caseta and others at those subsidiary companies. *Id.* at 587.

In concluding the Dodd-Frank amendment clarifies, rather than changes, the statute's meaning, and thus applied to the plaintiff's claims, the *Leshinsky* court discussed the conflict and ambiguity regarding the statute's meaning prior to the amendment. *Id.* at 589-92. As explained by the court in *Leshinsky I*, the *Rao* and *Malin* courts based their holdings on "the general principle of corporate law that a parent is not automatically liable for the actions of a subsidiary, absent a clear intent from Congress to the contrary." *Leshinsky I*, 873 F. Supp. 2d at 588 (quoting *Rao*, 2007 WL 1424220, at *4). The court in *Leshinsky* also noted the ALJs of the DOL, which was responsible for administering the provision, "reached widely divergent views on the issue, although a majority appeared to agree with the district courts' conclusion." *Id.*

As explained by the *Leshinsky* court, some ALJs interpreted the pre-Dodd-Frank "language of Section 806 to hold that the statute did not protect the employees of non-public subsidiaries of public companies." *Id*. at 593. "These decisions were based upon the principle that the subsidiary was 'not a publicly traded company and [was] therefore not covered by the Act,' *Grant v. Dominion East Ohio*, No. 2004–SOX–63, 2005 WL 6185928, at *31 (DOL ALJ March 10, 2005), along with the '[t]he general principle of corporate law . . . that a parent corporation is not liable for the acts of its subsidiaries.' *Lowe v. Terminix Int'l Co.*, No. 2006–SOX–89, 2006 WL 6576807, at *5 (DOL ALJ Sept. 15, 2006)." *Id.* The court in *Leshinsky I* noted these decisions recognized limited exceptions to this rule under principles of corporate law and agency law from the employment and labor context. *Id.* The *Leshinsky* court elaborated as follows:

> Thus, some decisions held that a non-public subsidiary could be covered by the Act if the judge could pierce the corporate veil and find that 'the parent company and its wholly owned subsidiary are so intertwined as to represent one entity.' *Hughart v. Raymond James & Assocs., Inc.*, No. 2004 SOX 9, 2004 WL 5308719, at *43 (DOL ALJ, Dec. 17, 2004); *see also Bothwell v. Am. Income Life*, No. 2005 SOX 57, 2005 WL 6476839, at *7 (DOL ALJ Sept. 19, 2005) ('Even in decisions holding that the whistleblower protections found in the Act apply to employees of a non-public subsidiary of a publicly traded company, the administrative law judges have required the complainants to name the publicly traded parent as a respondent and to show sufficient commonality of management and purpose to justify piercing the corporate veil and holding the parent company liable for its subsidiary's actions.' (citing cases)). Other ALJs, focusing on the term 'agent' from the statute itself, held that a non-public subsidiary could be liable if it acted as the public company's agent with respect to the adverse employment action. *See, e.g., Savastano v. WPP Group, PLC*, No. 2007–SOX–34, 2007 WL 6857428, at *7 (DOL ALJ July 18, 2007) (holding that complainant was required to show that the non-public subsidiaries were 'acting as agents of [the public parent] in connection with the termination of her employment'). And other decisions imported the 'integrated enterprise test' from labor law in order to 'focus on labor relations and economic realities, rather than corporate formalities, to determine whether a parent corporation and its subsidiary are both liable for statutory violations.' *Merten v. Berkshire Hathaway, Inc.*, No. 2008–SOX–40, 2008 WL 7835816, at *5 (DOL ALJ Oct. 21, 2008) (citing *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485–86 (3d Cir.2001)). That test requires a plaintiff to show (1)

> interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control. *Id.* (holding that parent and subsidiary were not integrated enterprise, despite extensive personnel links and management controls by parent).

*Id.* at 593-94 (footnote omitted).  In a footnote, the *Leshinsky* court noted these decisions also were not in accord as to whether an employee of a subsidiary must also name the public parent as a defendant. *Id.* at 594, n. 9 (comparing *Hughart*, 2004 WL 5308719, at *4 ("A publicly traded entity must be named in any complaint involving its subsidiaries to be held liable.") *with Lowe*, 2006 WL 6576807, at *5 ("A publicly held company does not have to be named as a respondent and it is possible for a privately held subsidiary of a publicly held company to fall within the Act" if the complainant "establish[es] an agency relationship" between the companies.)).

"At the same time, a different line of ALJ decisions looked more broadly at the remedial purposes of Sarbanes–Oxley and held that these purposes would be fulfilled only if the whistleblower protection was interpreted to include employees of subsidiaries of the public company." *Id*. at 594 (citing *Morefield v. Exelon Servs., Inc.*, ALJ No. 2004 SOX 2, 2004 WL 5030303, at *4 (DOL ALJ, Jan. 28, 2004) ("Nothing in the Act persuades me that Congress intended to wall off from whistleblower protection [under] Sarbanes–Oxley vast segments of corporate America that reside under the umbrella of publicly traded companies. . . . To limit whistleblower coverage exclusively to those in the know, and their contractors or agents, at the level of the corporate parent is not compatible with the Act's intended purpose.")). In *Morefield*, discussed above, the ALJ concluded "the term 'employee of a publicly traded company' as used in the caption of the whistleblower provision of Sarbanes–Oxley is sufficiently broad to include a[n officer] of a non-publicly traded subsidiary, within and integral to, the corporate structure" of the parent. *Id.* at

595 (citing *Morefield*, 2004 WL 5030303, at *3, *5; also citing *Gonzalez v. Colonial Bank*, No. 2004–SOX–39, 2004 WL 5840274, at *3 (DOL ALJ Aug. 24, 2004) (declining to dismiss complaint where employee of subsidiary also named parent as respondent because "it is determined that Congress intended to provide whistleblower protection to employees of subsidiaries of publicly traded companies"); also citing *Walters v. Deutsche Bank AG*, No. 2008 SOX 70, 2009 WL 6496755, at *20 (DOL ALJ Mar. 23, 2009) (providing comprehensive overview of "the legislative history, specific provisions, special policies, and purposes which anchor Sarbanes–Oxley and Section 806," as well as decisions interpreting the provision, and concluding that Section 806 protects employees of subsidiaries of public companies)).

The *Leshinsky* court noted some "federal court decisions embraced the possibility that the statute could protect employees of non-public subsidiaries, even without piercing the corporate veil or finding an agency relationship." *Id.* at 596. According to the *Leshinsky* court, in *Collins v. Beazer Homes USA, Inc*., 334 F. Supp. 2d 1365 (N.D. Ga. 2004), the district court looked to the OSHA regulations to determine that an employee of a non-public subsidiary of a public parent was covered by the statute because her employment "could be affected" by the public parent. *Id.* (citing *Collins*, 334 F.Supp.2d at 1373 n. 7). In *O'Mahony v. Accenture, Ltd.*, 537 F. Supp. 2d 506 (S.D.N.Y.2008), the plaintiff was an employee of the U.S. subsidiary of a Bermuda-based publicly traded company. *Id.* The court in *Leshinsky* stated as follows:

> The [*O'Mahony*] court examined whether it would have 'extraterritorial jurisdiction' over the different entities, and concluded that it would have subject matter jurisdiction over the United States subsidiary 'because the alleged wrongful conduct and other material acts occurred in the United States by persons located within the United States.' *Id.* at 515. The court also held that, based upon the allegations in the pleadings, it was unclear to what extent the parent participated in the alleged fraud or retaliation, or whether the parent maintained control over the subsidiary sufficient

> to pierce the corporate veil to hold the parent liable for the acts of its subsidiary. *Id.* But the court apparently did not question whether the fact that the plaintiff was employed by the subsidiary and not the public parent would have divested the court of jurisdiction under Section 806, even if the parent itself was not directly liable.

*Id.* at 596-97.

According to the court in *Leshinsky*, in *Carnero v. Boston Scientific*, 433 F.3d 1 (1st Cir. 2006), a case dealing with similar issues of extraterritorial application of Section 806, the court assumed, "without deciding," that an employee of foreign subsidiaries of a publicly traded U.S. company was a covered employee of the public company.[22] *Id*. at 597 (citing *Carnero*, 433 F.3d at 6). In *Carnero*, "[n]either party contested that the plaintiff was a covered employee, but the court noted that the plaintiff, 'by virtue either of his own asserted contacts with [the parent] or his direct employment by its subsidiaries, or both, may well be an 'employee' of [the parent] for purposes of seeking whistleblower relief under Sarbanes–Oxley,' citing both the Northern District of Georgia's decision in *Collins*, 334 F.Supp.2d at 1373 n. 7, and the ALJ's decision in *Morefield*, 2004 WL 5030303." *Id.*

The *Leshinsky* court then discussed a case which acknowledged the line of ALJ decisions holding that non-public companies can be liable if they "acted as agents of publicly traded companies with respect to their employment relationships." *Id.* (quoting *Brady v. Calyon Securities*, 406 F.Supp.2d 307, 318 n. 6 (S.D.N.Y.2005)). According to the court in *Leshinsky*, the *Brady* court cited the *Morefield* decision "to support the proposition that ALJs have held subsidiaries liable when they

---

[22] As pointed out by MGI in its sur-surreply, in *Carnero* neither party contested that the plaintiff was a covered employee of the parent. *See* Docket Entry # 119 at p. 5. In this proceeding, however, MGI has raised the issue. "Consequently, the assumption which facilitated the Court's decision in *Carnero*, that the whistleblower was an employee of the publicly traded parent, is a contested issue in this proceeding." *Matter of Walters v. Deutsche Bank AG*, 2009 WL 6496755, *3 (U.S. Dept. of Labor SAROX March 23, 2009).

are 'found to be almost inseparable from the publicly traded company, or subject to the same internal controls.'" *Id.*

The *Leshinsky* court concluded, contrary to the defendants' assertion, the pre-Dodd-Frank statute was ambiguous as to its application to employees of non-public subsidiaries, and "this ambiguity is confirmed by the extensive conflict among the different judicial and administrative decisions applying the statute." *Leshinsky I*, 873 F. Supp. 2d at 597. The court in *Leshinsky* then considered whether the Dodd-Frank amendment is consistent with a reasonable interpretation of the prior enactment and its legislative history, noting that for purposes of SEC reporting, a "public company" includes its subsidiaries and several of SOX's provisions "expressly reinforce the importance of a company's subsidiaries in gaining a picture of the overall financial state of that company." *Id.* at 599. The court noted the *Leshinsky* case perfectly illustrated the principle set forth by the ALJ in *Morefield*, 2004 WL 5030303, *3, wherein the ALJ stated that a publicly traded entity is not a "free-floating apex" and is, for Sarbanes-Oxley purposes, the sum of its constituent parts. *Id.* at 600.

The court in *Leshinsky* held, in light of the policy behind Sarbanes–Oxley, and the treatment of subsidiaries throughout the statutory scheme, the Dodd–Frank amendments reflect a reasonable interpretation of Section 806. *Id.* at 601. The court then concluded other recent decisions did not preclude applying Dodd-Frank to Section 806 retroactively. *Id.* at 601-02. Finally, the *Leshinsky* court considered application of the earlier labor law tests (*i.e.* single employer, "integrated enterprise"). *Id.* at 602-03.

The court noted that the plaintiff alternatively argued, in the event Dodd-Frank was not

applied retroactively, the defendants might still be liable because the subsidiaries, which directly employed the plaintiff, were agents of Telvent GIT. *Id.* In particular, the plaintiff argued that because "Telvent GIT directed and controlled the operations and employment decisions of its subsidiaries," the plaintiff should be deemed an employee of Telvent GIT. *Id.* at 603. On the other hand, the defendants argued that a non-public subsidiary could be liable only if the plaintiff could demonstrate the existence of "extraordinary circumstances" that justify "treat[ing] the employees of a corporate entity as the employees of a related entity." *Id.* (quoting *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir.1996)).

The court in *Leshinsky* stated "[a]pplying the earlier labor law-derived tests to this case only serves to further demonstrate that the amended language is more consistent with the statute's purpose than the contrary reading." *Id.* at 602. After setting forth the "single employer" test adapted from the labor and employment context, *id.* at 603, the court explained as follows:

> The evidentiary hearing in this case revealed many indicia of control of operations in general—and employment matters in particular—by Telvent GIT. For example, Plaintiff's employment agreement with Farradyne was on 'Telvent' letterhead. And although the human resources or information technology functions at Farradyne were not administered by employees of Telvent GIT itself, the fact that these functions were administered out of different Telvent subsidiaries demonstrates the interrelationship between the subsidiaries and the parent.

> In addition, the fact that Sanchez Ortega, CEO of Telvent GIT, installed the general managers of Telvent's newly acquired subsidiaries, and that those general managers had extensive control over day-to-day operations and personnel management, demonstrates some involvement by the parent, even if those managers were not directly consulting with the parent itself with regard to each decision. . . .

> At the same time, it is not clear that Telvent GIT was so directly involved as to meet the standards established by the cases that arise in the employment context. It is difficult to conclude that Telvent GIT's control of labor relations truly 'exceeds the

100

control normally exercised by a parent corporation which is separate and distinct from the subsidiary.'. . . And it is undisputed that no representative from the parent itself was involved in the 'final decision' to terminate Plaintiff. . . . But this only illustrates the inappropriateness of the labor law approach to this issue.

The 'integrated enterprise' test is designed to test whether a parent company can be liable for the employment decisions of a related entity. Thus, the test naturally focuses on the degree of control by the parent over employment matters. In the context of an employment discrimination case, it makes sense to look primarily at who was involved in making the decision giving rise to the charge of discrimination. . . .

*Id.* at 604 (internal citations omitted).

As explained by the *Leshinsky* court, "Sarbanes–Oxley, however, is not a labor or employment statute—it is an anti-fraud statute concerned with corporate transparency." *Id.* at 604 (citing *Johnson*, 2011 WL 1247202, at *16). Relying on Judge Levin's opinion in *Walters*, the *Leshinsky* court stated, as a matter of policy under Sarbanes–Oxley, "it makes more sense to focus on whether a subsidiary was the parent's agent 'for purposes of producing accounting or financial information which is consolidated into the parent's financial reports,' than whether the subsidiary was the parent's agent with respect to human resources matters." *Id.* at 605 (quoting *Matter of Walters v. Deutsche Bank AG*, 2009 WL 6496755, at *7 (U.S. Dept. of Labor SAROX March 23, 2009)).

**D.    Discussion**

MGI and Plaintiff both rely on a few snapshots from the vast landscape of administrative and federal court decisions dealing with § 1514A, with MGI focusing on the Supreme Court's statements in a different context in *Lawson III* that SOX retaliation claims must be asserted against a defendant-employer and Plaintiff focusing in his surreply on *Morefield* and a few other pre-Dodd-Frank federal

court cases. With no discussion of how the term "employee" should be interpreted in the context of

a parent/wholly owned subsidiary relationship, MGI asserts the Supreme Court in *Lawson III* held

there must be a "direct employer-employee relationship between a SOX plaintiff and the entity the

plaintiff seeks to hold liable for alleged misdeeds." Docket Entry # 119mat p. 4. According to MGI,

Plaintiff was a former employee of only MPSI and not also MGI; thus, under the current version of

§ 1514A, Plaintiff's remedy is against MPSI only.

> On the other hand, Plaintiff argues in his surreply as follows:
>
> As noted in the *Morefield* opinion, there is no question that a parent corporation
> should face SOX consequences for termination of a subsidiary employee when the
> parent's value and performance is based on the value and performance of subsidiaries
> within its organization. A publicly traded corporation is, for Sarbanes-Oxley
> purposes, the sum of its constituent units; and Congress insisted upon accuracy and
> integrity in financial reporting at all levels of the corporate structure, including the
> non-publicly traded subsidiaries. . . . MGI has represented to investors, the
> government and the public that MPSI employees are its employees. Nowhere does
> MGI take the position that MPSI employees are not its employees EXCEPT in this
> lawsuit in order to avoid liability (and perhaps other litigation)—one of the very
> things that SOX is designed to fix. Plaintiff Juan Lozada was an employee of MPSI
> and of MGI for purposes of SOX liability.

Docket Entry # 118 at p. 9 (emphasis in original). In its sur-surreply, MGI asserts Plaintiff has now

asked the Court to hold MGI liable for its own alleged actions (not for the actions of MPSI), and

"Plaintiff has not directed the Court to any authority for the proposition that an employee of a

subsidiary can reach the parent without pleading and proving alter ego or some other theory of

vicarious liability." Docket Entry # 119 at p. 3.

> The Court first addresses Plaintiff's direct liability theory raised in the surreply and supported

by the SAC. It is the Court's intent, in providing an exceedingly lengthy recitation of the law

regarding § 1514A from both before and after Dodd-Frank, to minimize the analysis which must be

done in order to recommend MGI's motion for summary judgment be denied on this ground. It is clear to the Court the interpretations of the pre-Dodd-Frank version of § 1514A set forth in the *Morefield* and *Walters* opinions have become even more persuasive in light of *Lawson III* and the cases interpreting § 1514A in light of Dodd-Frank's "clarification," including consideration of how the Department of Labor's most recent regulations define "employee."

SOX fails to define the term "employee," which has led to debates about how restrictively the term "employee" should be applied. Jonathan Lee, Whistle with A Purpose: Extending Coverage Under Sox to Employees Discharging Their Duties, 93 Wash. U.L. Rev. 1613, 1615 (2016). Under the Department of Labor regulations effective until November 2, 2011, an "employee" meant "an individual presently or formerly working for a company or company representative, an individual applying to work for a company or company representative, or an individual whose employment could be affected by a company or company representative," and "company representative" meant any "officer, employee, contractor, subcontractor, or agent of a company."  However, the current regulations define "employee" as "an individual presently or formerly working for a covered person, an individual applying to work for a covered person, or an individual whose employment could be affected by a covered person." *Moody v. Am. Nat'l Ins. Co.*, No. 3:19-CV-00206, 2020 WL 3128259, at *3 (S.D. Tex. June 12, 2020) (quoting 29 C.F.R. § 1980.101(g)). "Covered person means any company, including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or any nationally recognized statistical rating organization, or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization."[23] *Potts v. Ctr. for Excellence in Higher Educ.,*

---

[23] The Court affords *Skidmore* deference to DOL regulations. *See Kshetrapal v. Dish Network, L.L.C.*, No. 14-CV-3527 (PAC), 2018 WL 1474375, at *7 n. 1 (S.D. N.Y. Mar. 23, 2018), *appeal withdrawn sub nom. Kshetrapal*

*Inc.*, 908 F.3d 610, 617 (10th Cir. 2018) (quoting 29 C.F.R. § 1980.101(f)).

As persuasively set forth by ALJ Levin in *Morefield* when interpreting the pre-Dodd-Frank version of § 1514A, although it would not be inappropriate to view subsidiaries as "agents" as the complainant suggested in that case, subsidiaries, for Sarbanes-Oxley purposes, "are more than mere agents like an outside auditor or consultant." *Morefield*, 2004 WL 5030303 at *2-*3. Noting SOX imposed extensive reporting and disclosure obligations on public companies, which include obligations to report information about the companies' subsidiaries, the ALJ stated subsidiaries "are an integral part of the publicly traded company, inseparable from it for purposes of evaluating the integrity of its financial information." *Id.* at *3. As further explained by the ALJ in *Morefield*:

> The publicly traded entity is not a free-floating apex. When its value and performance [are] based, in part, on the value and performance of component entities within its organization, the statute ensures that those entities are subject to internal controls applicable throughout the corporate structure, that they are subject to the oversight responsibility of the audit committee, and that the officers who sign the financials are aware of material information relating to the subsidiaries. A publicly traded corporation is, for Sarbanes-Oxley purposes, the sum of its constituent units; and Congress insisted upon accuracy and integrity in financial reporting at all levels of the corporate structure, including the non-publicly traded subsidiaries.

*Id.*

In *Leshinsky I,* the federal district court stated the case perfectly illustrated the principle set forth in *Morefield*. *Leshinsky I,* 873 F. Supp. 2d at 600 (quoting *Morefield*, 2004 WL 5030303, at *3). Explaining how, the court in *Leshinsky* stated as follows:

> According to the testimony at the hearing, Telvent GIT itself was effectively a holding company, with only approximately *a dozen* employees. The Telvent family of companies, however, had approximately 6,100 employees. Telvent GIT had annual

---

*v. Dish Network L.L.C.*, No. 18-1152, 2018 WL 3493036 (2d Cir. June 22, 2018) (citing *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 220 (2d Cir. 2014)).

revenues of approximately $1.2 billion, *all* of which was generated by the various subsidiaries. Thus, the financial condition of Telvent GIT was entirely dependent upon the financial condition of its subsidiaries. And further, corporate malfeasance within Telvent GIT's subsidiaries would directly affect the value of Telvent GIT's stock. To the extent that Congress sought to protect investors in Telvent GIT through protection of whistleblowers who could provide valuable information about the workings of the company, the employees of the subsidiaries are at least as important as, if not more important than, the dozen employees of the parent company.

*Leshinsky I*, 873 F. Supp. 2d at 600 (emphasis in original).

In the second administrative proceeding before ALJ Levin, the plaintiff – similar to Plaintiff here – sued both his former employer, subsidiary Schweiz, and the parent corporation, Deutsche Bank AG. *Walters*, 2009 WL 6496755, at *2. Importantly, the ALJ framed the issue as assessing the direct responsibility of Deutsche Bank AG for the termination of a whistleblower who worked for one of its wholly owned subsidiaries, rather than predicated on derivative agency liability. After quoting the *Morefield* opinion, the ALJ in *Walters* concluded as follows:

I conclude that the term 'employee of a publicly traded company' in Section 806 is, for parent/wholly owned subsidiary relationships, co-extensive with the employee coverage in Section 301 and includes, within its meaning, all employees of every constituent part of the publicly traded company, including subsidiaries and subsidiaries of subsidiaries which are consolidated on its balance sheets, contribute information to its financial reports, are covered by its internal controls and the oversight of its audit committee, and subject to other Sarbanes-Oxley reforms imposed upon the publicly traded company. . . . In summary, the scope of Sarbanes-Oxley whistleblower protection: 'at a minimum, tracks the flow of financial and accounting information throughout the corporate structure and remains as permeable to the internal 'corporate veils' as the financial information itself,' *see, Morefield* at 3; and considering the legislative history, specific provisions, special policies, and purposes which anchor Sarbanes-Oxley and Section 806, in particular, *Bestfoods* supports this conclusion.

As such, I conclude that Complainant is, for Sarbanes-Oxley purposes, an employee of the publicly traded company as that term is used in Section 806, and that the corporate parent, Deutsche Bank AG, is directly responsible for acts of

discrimination against a whistleblower working in one of its operating units within a non-publicly traded, consolidated subsidiary of a subsidiary of a subsidiary within Deutsche Banks AG's corporate family.

*Id.* at *20 (internal citations omitted).

Similar to Judge Levin in *Walters*, the Court concludes that under the term "employee" in § 1514A, as illuminated by the DOL regulations' more recent definitions of "employee" and "covered person," Plaintiff can be considered, for Sarbanes-Oxley purposes, an employee of the publicly traded company as that term is used in Section 806, and that the corporate parent, MGI, can be directly responsible for acts of retaliation against Plaintiff working in its subsidiary MPSI. Plaintiff contends he was an employee of both MPSI and MGI, stating in his declaration he never made a distinction between MPSI and MGI because "we always referred to ourselves as being employees of MoneyGram. . . ." Plaintiff's Decl., p. 2. Plaintiff has presented summary judgment evidence in support of this assertion.

In his declaration, Plaintiff states he learned through LinkedIn about a job opening in MoneyGram's compliance department in late August 2016; he visited the MoneyGram website posting the job vacancy and applied for the position; and he never visited a website or applied for any jobs listed by "MoneyGram Payment Systems." Plaintiff's Decl., p. 1. Plaintiff has presented evidence indicating that after he applied for a job with MoneyGram, Alan Brooks, a Senior Recruiter for MGI, wrote Plaintiff an email in which Brooks stated, "Thank you for applying to MoneyGram International." Docket Entry # 89, Ex. 17 at p. 1. Brooks initially interviewed Plaintiff for the job. Plaintiff's Decl. at pp. 1-2. Brooks scheduled a second interview and stated in an email as follows: "Friday September 9th: Onsite interview with MoneyGram International." *Id.*, Ex. 19.

After Plaintiff was hired, Juan Manuel Gonzalez, Plaintiff's boss, sent an email to the compliance department at MoneyGram on October 7, 2016, announcing that Plaintiff had been hired to lead the U.S. Regional Compliance Team. *Id.*, Ex. 18. Gonzalez's signature block indicated Gonzalez worked for MGI. *Id.* and

In his declaration, Plaintiff states he showed his agents a MGI-issued badge that identified him as an employer of MGI, not MPSI. Plaintiff's Decl., p. 3. Additionally, in testifying about MGI's obligations under the FTC injunction, Derya White acknowledged the injunction's reference to "defendants, officers, agents, employees, attorneys" included White, Gonzalez, and Plaintiff "in that . . . **we were all employees of MoneyGram**." White Dep. at 91:4-94:24 (emphasis added). This evidence, viewed in the light most favorable to Plaintiff, raises a genuine issue of material fact on the issue of whether Plaintiff was an employee of MGI.

This finding is bolstered by the fact that § 1514A forbids employers from "discharg[ing], demot[ing], [or] suspend[ing] . . . an employee in the terms and conditions of employment because of any lawful act done by the employee." *See also Lawson III*, 571 U.S. at 441 ("Section 1514A's application to contractor employees is confirmed when we enlarge our view from the term 'an employee' to the provision as a whole. The prohibited retaliatory measures enumerated in § 1514A(a)—discharge, demotion, suspension, threats, harassment, or discrimination in the terms and conditions of employment—are commonly actions an employer takes against its *own* employees.") (emphasis in *Lawson III*)). In his deposition in this case, Gonzalez testified he is the individual who decided to terminate Plaintiff's employment, though he partnered with his H.R. business partner Ponder in that decision. Gonzalez Dep. at 89:9-24. In previous briefing, Plaintiff attached an excerpt of the October 18, 2018 deposition of Chris Ponder, wherein Ponder stated he worked for

107

"MoneyGram." Docket Entry # 34-7 at 23:24-25. Gonzalez testified they also partnered with "internal labor counsel to discuss the circumstances of the case, and everybody agreed that we were ready to move forward." *Id.* at 89:24-90:14 (also testifying they shared information with Peter Green and the company's chief compliance officer, Andy Villareal). According to Plaintiff's declaration, "[w]e were told that our bosses were Andres Villarreal, the Chief Compliance Officer for MoneyGram and Alex Holmes, the CEO of MoneyGram International, Inc."[24] Plaintiff's Decl., pp. 2-3.

Although it predates Dodd-Frank, the Court notes a federal district court within the Fifth Circuit reached a similar conclusion in rejecting the defendants' similar argument in a motion for summary judgment. *See Ciavarra v. BMC Software*, 2008 WL 352273, at *3 (S.D. Tex. 2008). There, the plaintiff first identified a $67 million recognition issue and then was suddenly given a negative evaluation and ultimately terminated. *Frankl v. Netopia, Inc.*, No. 3:05-CV-1757-B, 2008 WL 11424145, at *5 (N.D. Tex. Apr. 24, 2008) (citing *Ciavarra*, 2008 WL 352273, at *4). The defendants (BMC Software, Inc. and BMC Software Distribution, Inc.) argued the plaintiff was an employee of BMC Software Distribution, Inc., a subsidiary company that was not publicly traded; thus, the plaintiff was not a "covered employee" for purposes of the pre-Dodd-Frank § 1514A claim. *Ciavarra*, 2008 WL 352273, at *1, *3. The court reasoned as follows:

> As an initial matter, the Court notes that Plaintiff has alleged that he was an employee of BMC Software, Inc., a publicly traded company, and has presented evidence that raises a genuine issue of material fact on that issue. Specifically, Plaintiff has presented evidence that he was presented with a proposed Separation Agreement, prepared by or at the direction of BMC Software, Inc. . . . The proposed

---

[24]Plaintiff also points to MGI's 2017 10-K, which provides that Alex Holmes has served as the Chief Executive Officer since January 2016. Docket Entry # 89 at p. 10. MGI's 2017 10-K also lists Andres Villareal as a member of its executive leadership team and states that Andres Villareal has been MoneyGram International's Chief Compliance Officer since March 2016. *Id.* at pp. 10 and 11.

Separation Agreement provides clearly that it is between Ciavarra and BMC Software, Inc. and that Ciavarra has been employed by BMC Software, Inc., the publicly-traded company. . . .

Additionally, an employee of a subsidiary is a covered employee for § 1514A purposes where the officers of the publicly-traded parent company have the authority to affect the employment of the subsidiaries' personnel. *See Carnero v. Boston Scientific Corp*., 433 F.3d 1, *6 (1st Cir.2006). Plaintiff has presented evidence that a BMC Software, Inc. officer was the supervisor of Plaintiff's immediate supervisor. There is a fact issue as to whether the BMC Software, Inc. individual had the authority to affect Ciavarra's employment. Defendants argue that the BMC Software, Inc. officer did not exercise any authority in connection with the decision to terminate Plaintiff's employment, but there is a genuine issue of material fact regarding whether he possessed such authority.

Plaintiff has presented evidence from which a trier of fact could find that he was a covered employee for purposes of his § 1514A claim.

*Id.; see also Carnero*, 433 F.3d at 6 (Even though neither party contested that the plaintiff was a covered employee, the court noted the plaintiff, "by virtue either of his own asserted contacts with [the parent] or his direct employment by its subsidiaries, or both, may well be an 'employee' of [the parent] for purposes of seeking whistleblower relief under Sarbanes–Oxley.").

In finding Plaintiff has sufficiently alleged direct liability for MGI's retaliation against Plaintiff in violation of § 1514A and presented evidence from which a trier of fact could find he was an employee of MGI for purposes of his § 1514A claim, the Court does not need to consider also the two other bases of parent-subsidiary liability (piercing the corporate veil theories or vicarious liability based on general agency principles). However, the Court would note that in addition to covering employees of publicly traded companies and their subsidiaries, the whistleblower protection provisions in SOX also cover "any officer, employee, contractor, subcontractor or agent" of a covered company. 18 U.S.C. § 1514A(a). For the alternative reasons set out below, under general

principles of agency, the Court would find there is sufficient evidence in the record to defeat summary judgment, especially when construing SOX as an antifraud provision rather than an employment or labor law.

Even though the ALJ's decision in *Walters* was not predicated on derivative agency liability, the ALJ addressed the administrative cases which had previously relied upon the "labor law" approach to dismiss whistleblower complaints against both the parent and the subsidiary. *Walters*, 2009 WL 6496755,  at *5. The ALJ explained that in labor law cases, the courts employ an "integrated enterprise test" as a "sort of labor-specific veil-piercing test" when parent/subsidiary relationships are involved, and the labor law test is simply another method of establishing derivative, rather than direct, liability upon a corporate parent for the action of its subsidiaries. *Id.*  The ALJ stated the labor law approach to Section 806 was "questionable," *id.* at *7, noting "proof of agency for financial reporting purposes or even for the commission of fraud that may wipe out the equity of public shareholders ha[d] not been factored into the administrative labor law decisions denying Section 806 coverage." *Id.* at *8. According to the ALJ, "the burdens and hurdles associated with proof of agency for labor law purposes seem misdirected and unnecessary not only because Section 806 imposes direct responsibility on the publicly traded company, but also because Section 806 is fundamentally an antifraud law, not a labor law." *Id.*

In part of Judge Brown's concurrence in *Johnson* not quoted by the district court in *Wiest*, Judge Brown noted the SEC had persuasively argued in its amicus brief before the ARB that Sarbanes-Oxley is not predominantly a labor law but a law intended to prevent securities fraud.[25]

---

[25]In *Leshinsky II*, the court noted that "ARB Opinions are entitled to some level of deference from federal courts, although the level of deference still remains in dispute." *Leshinsky v. Telvent GIT, S.A.*, 942 F. Supp. 2d 432, 443 (S.D. N.Y. 2013) (*comparing Leshinsky I*, 873 F. Supp. 2d at 589 (giving *Mead* deference to an ARB interpretation of Section 806) *with Wiest v. Lynch*, 710 F.3d 121, 133 (3rd Cir.2013) (giving *Chevron* deference to ARB's rejection of

*Johnson*, 2011 WL 1247202, at *14 (Brown, J., concurring). As noted by Judge Brown, the Supreme Court has repeatedly recognized such laws "should be construed 'not technically and restrictively, but flexibly to effectuate [their] remedial purposes.'" *Id*. (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 386-87 (1983) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195 (1963))). According to Judge Brown, while the ARB in *Klopfenstein I* recognized agency coverage within an employment law context, "Section 806's distinction as an antifraud provision designed to facilitate SOX's overall purpose of protecting investors and capital markets necessarily requires that Section 806 be construed as also extending coverage to, and imposing liability for retaliation upon, agents of a publicly traded company engaged in securities related activities." *Id*. Judge Brown stated "a thorough discussion [was] warranted of the basis for recognizing that Section 806 extends its prohibition against whistleblower retaliation to any officer, employee, contractor, subcontractor or agent of a publicly traded company engaged, on behalf of the public company, in securities related activities, and protects employees of any entity engaged in such activities from whistleblower retaliation by such entity regardless of whether the retaliation is or is not rendered on behalf of the public company." *Id*. at *15.

As noted by Judge Brown, in terms of what a whistleblower must prove to establish the agency relationship referenced in Section 806, distinguishing SOX as predominantly an antifraud measure is significant. *Id*. at *18. "Construed as an antifraud provision, rather than an employment or labor law, it is sufficient, as an example, to establish that the retaliating entity exists as an agent

---

the "definitive and specific" test in *Sylvester v. Parexel Int'l L.L.C.*, ARB Case No. 07–123, 32 IER Cases 497, 508, 2011 WL 2517148 (ARB May 25, 2011)); *also citing Wos v. E.M.A. ex rel. Johnson*, ——U.S. ——, 133 S.Ct. 1391, 1404, 185 L.Ed.2d 471 (2013) (Breyer, J., concurring) ("I cannot measure the degree of deference with the precision of a mariner measuring a degree of latitude.")). In any event, the Court finds Judge Johnson's arguments in the *Johnson* concurrence, as relied upon by the courts in *Wiest* and *Leshinsky I*, persuasive pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

of the publicly traded parent company for purposes of producing accounting or financial information which is consolidated into the parent's financial reports, or that an agent or contractor facilitated fraud like the subsidiaries, off-the-books special purpose entities (SPEs), and the accounting firms that helped precipitate the financial collapse of Enron, the key corporate figure in the legislative history of Sarbanes–Oxley. In such instances, the focus for coverage purposes is on the agent's role in preparing financial data or its participation in fraud or deception." *Id.* As noted by Judge Brown, construing Section 806 as extending coverage to an agent of a publicly traded company engaged, on behalf of that company, in securities related activities, thereby imposing liability for whistleblower retaliation upon such an entity, "is not to say that Section 806 precludes an employment law agency analysis for purposes of finding the publicly traded company liable (or for holding the agent liable in such a context, as was the case in *Klopfenstein*)." *Id.*

In *Leshinsky I*, the defendants argued that because the plaintiff was employed only by non-public subsidiaries Tevent Farradyne and Telvent Caseta, and was never directly employed by publicly traded parent Telvent GIT, the plaintiff was not a covered employee. The court denied the defendants' motion to dismiss, finding that the plaintiff, as an employee of the subsidiary of a public company whose financial information was included in the consolidated financial statements of the public company, was a covered employee. *Leshinsky I*, 873 F.Supp.2d at 605. In considering the plaintiff's alternative argument under agency principles ("Telvent GIT directed and controlled the operations and employment decisions of its subsidiaries" and the plaintiff should therefore be deemed an employee of Telvent GIT), the court noted there were "many indicia of control of operations in general – and employment matters in particular – by Telvent GIT," but it was not clear that Telvent GIT was so directly involved as to meet the standards established by the cases that arise

in the employment context. *Id.* at 603-04.

In concluding its analysis, the *Leshinsky* court found noteworthy the fact that SOX is not a labor or employment statute but is an antifraud statute concerned with corporate transparency. *Id.* at 604. The court relied on the ALJ's opinion in *Walters* and stated, as a matter of policy under Sarbanes–Oxley, "it makes more sense to focus on whether a subsidiary was the parent's agent 'for purposes of producing accounting or financial information which is consolidated into the parent's financial reports,' than whether the subsidiary was the parent's agent with respect to human resources matters." *Id.* at 605 (quoting *Walters*, 2009 WL 6496755, at *7). The court concluded as follows:

> Telvent sought to establish a uniform, global corporate brand that included all of its subsidiaries. Indeed, press releases by subsidiaries included a reference to the parent company and the fact that it is publicly traded on the NASDAQ exchange. Although day-to-day operational and personnel decisions were largely performed by the subsidiaries independently of the parent, the subsidiaries directly contributed to the financial state of the company, and the financial information of the subsidiaries was included in the consolidated financial statements of the parent. A whistleblower statute that protects investors in Telvent GIT would be concerned not so much with who made the day-to-day employment decisions, but rather with decisions that affect the value of the company.

*Leshinsky I*, 873 F. Supp. 2d at 605.

Similarly here, to the extent the Court would also need to consider general principles of agency under a derivative theory of liability, the Court would find sufficient evidence to create a genuine issue of material fact that MPSI was MGI's agent for purposes of financial information which is consolidated into the parent's financial reports or for security related matters, rather than focusing on human resources matters. Plaintiff alleges in his SAC that subsidiary "MPSI's financial information is included in the consolidated financial statements of MGI." Docket Entry # 21, ¶¶ 5-7.

113

MGI admitted this allegation in its answer. Docket Entry # 89, Ex. 11, ¶¶ 5-7.

There is more. According to Plaintiff, "MGI represents to the federal government, its investors, and the world at large that MGI is one and the same with its subsidiaries," including MPSI. Docket Entry # 118 at pp. 4-5 (citing Docket Entry # 89, Ex. 5 at p. 3). Plaintiff asserts employees and agents of MPSI do not distinguish between MPSI and MGI; rather, they refer to the company as MoneyGram. *Id.* at p. 5. In its 2017 Form 10-K, MGI states under "Overview" that "MoneyGram International, Inc. (together with our subsidiaries, 'MoneyGram,' the 'Company,' 'we,' 'us,' and 'our') is a global provider of innovative money transfer services and is recognized worldwide as a financial connection to friends and family." Docket Entry # 89, Ex. 5 at p. 3. MGI further stated as follows: "We conduct our business primarily through our wholly-owned subsidiary, MoneyGram Payment Systems, Inc. ("MPSI"), under the MoneyGram brand." *Id.*

According to Plaintiff, MoneyGram also had a 2016 Global Partner Compliance Policy which did not identify whether it was an MGI policy or an MPSI policy. Docket Entry # 89, Ex. 8. The definition of "Agent" in the policy included "any party entering into a contractual relationship with MoneyGram or its subsidiaries and affiliates for the purposes of providing MoneyGram's products and services to consumers." *Id*. at n. 1. In his declaration, Plaintiff states all the materials they gave their agents "said MoneyGram, the policies that [they] drafted were MoneyGram policies." Plaintiff's Decl., p. 3.

Importantly, as it relates to the alleged violations of MoneyGram policy, applicable laws and regulations, and government directives, Plaintiff asserts both the DPA and the 2012 Amended DPA combined all of MGI's employees together in terms of oversight, with no distinction as to which

114

entity (parent or subsidiary) was actually the employer. According to Plaintiff, in both the DPA and the Amended DPA, MGI acquiesced and consented to recognizing all of its employees as subject to those agreements. Plaintiff has presented evidence indicating that MGI requires its employees, including employees of MPSI, to acknowledge, read, and receive training regarding the DPA and Amended DPA entered into between the United States of America and MGI. Plaintiff asserts the "Compliance employees" (Craig Bernier, Sylvia Gil, Fredy Morales, and Derya White) each confirmed they were informed that they were bound by the DPA and were each trained/instructed that their jobs encompassed addressing the deficiencies found by the DOJ against MGI.

During his deposition, Bernier, head of anti-money laundering and counter financing of terrorism (AML CFT),stated he is required to comply with the DPA and the FTC's injunction,[26] and that in order to do that, he needs "to have an understanding of what is in there, and then [he] can also rely on our internal legal counsel for interpretations when things may not be clear . . . in those particular requirements." Bernier Dep. at 13:2-23 (further stating it is "very important for me to have an understanding of the requirements to perform my job functions"). Bernier testified he signed an acknowledgment that he received a copy of the federal injunction. *Id*. at 13:24-14:9.When asked about the DPA entered against MGI, Bernier testified as follows:

> Q.  I want you to -- let me ask you this:   As a MoneyGram manager -- you're a senior manager, aren't you?
>
> A.  Yes.  Yes.
>
> Q.  As a senior MoneyGram manager, do you have any responsibility for complying with this [DPA] agreement?

---

[26] The 2018 Modified FTC Order expressly provides that "Defendant" meant MoneyGram International, Inc., its subsidiaries and affiliates, and its successors and assigns.

> A.   Yes, I do.

*Id.* at 48:23-49:4; *see also id.* at 47:1-7.

> Q. I'm asking you specifically about MoneyGram's agreement with the federal government. You understand that you are bound by this agreement? You, in your role as the head of Anti-Money Laundering and Counter Financing of Terrorism, are bound by this agreement?
>
> A.  I understand the company is bound by it.   **I work for the company**.   I've signed that I acknowledged it, and, yes, my job is to make some of the issues that were identified in the Deferred Prosecution Agreement better and not have the same challenges that the company was fined for in the past.

*Id.* at 51:6-18 (emphasis added).

When asked if he received training on what MoneyGram's obligations are under the DPA and the injunction, Bernier testified that the company conducts annual training, including some training on the continuing obligations under the FTC order against MGI. *Id.* at 226:9-17. Similarly, Fredy Morales testified everybody in compliance at MoneyGram received the same training, which included reading the DPA. Morales Dep. at 26:18-27:19.

In sum, under an alternative derivative analysis based on general agency principles, keeping in mind SOX is predominantly an antifraud measure, the Court would find the evidence of record, when viewed in the light most favorable to Plaintiff, is sufficient to establish that Plaintiff can be considered an employee of MGI as well as MPSI. The Court now considers Defendants' combined motion for summary judgment, which raises the issue of whether Plaintiff is barred from litigating his SOX claim in this Court because the initial OSHA complaint was factually insufficient.

## VI. WHETHER PLAINTIFF IS BARRED FROM LITIGATING
## HIS SOX CLAIMS IN THIS COURT BECAUSE THE INITIAL OSHA COMPLAINT
## WAS FACTUALLY INSUFFICIENT

**A.      Applicable law, generally**

As noted above, before an employee can assert a cause of action in federal court under Section 806 of SOX, that employee must first file a written complaint with OSHA and allow OSHA to resolve the employee's claims administratively. *Wingo v. S. Co.*, No. 2:17-CV-01328-LSC, 2018 WL 2416447, at *4 (N.D. Ala. May 29, 2018) (citing 18 U.S.C. § 1514A(b)(1)(A)). "The administrative complaint must be filed '[w]ithin 180 days after an alleged violation of the Act occurs,' 29 C.F.R. § 1980.103(d), but '[n]o particular form of complaint is required.' *Id.* § 1980.103(b)." *Wingo*, 2018 WL 2416447, at *4.  If the employee has met these requirements for a particular violation, and a final administrative decision has not issued within 180 days of the filing,[27] the employee can proceed with an action in federal court based on that violation. *Id.* (citing 18 U.S.C. § 1514A(b)(1)(B)).

If an employee has not exhausted their claims administratively, a court may not hear those claims. The purpose of an administrative charge with OSHA "is to trigger the agency's defined

---

[27] Under the Sarbanes–Oxley Act's regulations, there are only two scenarios under which OSHA's "preliminary findings" may eventually become "final decisions." *Hanna v. WCI Communities, Inc.*, 348 F. Supp. 2d 1322, 1326 (S.D. Fla. 2004). Under the first scenario, a plaintiff may appeal OSHA's preliminary findings to an ALJ for a hearing. *Id.* at 1326–27 (citing 29 C.F.R. § 1980.106). Then, if the plaintiff loses in front of the ALJ, he may "file a written petition for review with the Administrative Review Board ('the Board'), which has been delegated the authority to act for the Secretary and issue final decisions under this part." *Id.* (quoting 29 C.F.R. § 1980.110(a)). In other words, under the first scenario, a plaintiff may exhaust his administrative appeals until he receives a "final decision" by the Department of Labor's "Administrative Review Board." *Id.* Under the second method, "[i]f no timely objection is filed with respect to . . . the preliminary order, the . . . preliminary order, . . . shall become the final decision of the Secretary, not subject to judicial review." *Id.* (quoting 29 C.F.R. § 1980.106(b)(2)). In summary, a "preliminary order" only becomes a "final decision" if, either the plaintiff fails to appeal the preliminary order; or, if the preliminary order is affirmed after taking two subsequent administrative appeals with the DOL. *Id.*

investigation and conciliation procedures." *Wingo*, 2018 WL 2416447, at *4 (quoting *Wallace*, 796 F.3d at 476 (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970))).

Plaintiff filed a formal complaint under Section 806 of the SOX with OSHA on September 28, 2017. OSHA complaint, Docket Entry # 109, Ex. 2. He then filed this action on January 23, 2019. Docket Entry # 1. There is no dispute that Plaintiff first commenced the administrative process and then appropriately waited at least 180 days to file his district court complaint. *See* 18 U.S.C. § 1514A(b)(1)(B).

## B.     Summary judgment evidence

Plaintiff's OSHA complaint first stated Section 806 protects, of course, employees of publicly-traded companies (and subsidiaries of same) from retaliation when they complain and "reasonably believe" (that the complained-of conduct) constitutes a violation of one of six federal laws, e.g., Sections 1341, 1343, 1344, or 1348, any rule or regulation of the [SEC], or any provision of federal law relating to fraud against shareholders. Docket Entry # 109, Ex. 2 at p. 1. Plaintiff listed MGI as respondent. *Id.* Under "facts," Plaintiff stated he was hired on October 18, 2016, and had the job title of Manager, AML/CTF Regional Compliance USA. *Id.* at pp. 1-2. Plaintiff further stated as follows:

> Two of his essential responsibilities were (1) compliance with anti-money laundering rules and regulations; and (2) compliance with a consent decree that required, *inter alia,* compliance with anti-money laundering rules and regulations.
>
> In a scenario that is becoming increasingly predictable, his efforts to achieve compliance were met with (1) resistance; (2) outright hostility, and (3) finally resulted in his termination on April 4, 2017.

*Id.* at p. 2.

118

Under "[p]rotected conduct," Plaintiff stated as follows:

> This is essentially a *Sharkey v. JP Morgan Chase* case, with one additional twist: on top of violating the underlying anti-money laundering laws, the employer here **violated an existing consent decree that prohibited future violations** of the underlying anti-money laundering laws. (Emphasis added).[28]

*Id.* According to Plaintiff, in addition to "on-the-job harassment, verbal abuse, isolation, and marginalization," Plaintiff was terminated on April 4, 2017. *Id.*

OSHA issued a determination letter on October 12, 2017. Determination letter, Docket Entry # 109, Ex. 3. The letter advised as follows:

> Following an investigation by a duly-authorized Investigator, the Secretary of Labor, acting through his agent, the Acting Regional Administrator for the Occupational Safety and Health Administration (OSHA), Region VI, finds there is insufficient evidence to prove the complaint has merit.

*Id.* The letter further stated Plaintiff "did not present a prima facie showing." *Id.* Because OSHA did not have reasonable cause to believe a violation of SOX occurred, the complaint was dismissed. *Id.* at p. 2. The letter advised Plaintiff he had "30 days from the receipt of these Findings to file objections and to request a hearing before an Administrative Law Judge." *Id.*

Plaintiff lodged objections on November 13, 2017, requesting a hearing in front of an ALJ. Docket Entry # 23-4. Thereafter, the Department of Labor opened Case Number 2018-SOX-00004, which it styled *Juan Lozada-Leoni v. MoneyGram International. See* Docket Entry # 23, Exs. 5 and 6. As instructed in the Notice of Case Assignment and Prehearing Order, Plaintiff filed a detailed pleading complaint on March 5, 2018, containing the principal contentions of fact and law upon

---

[28] According to Plaintiff's OSHA complaint, in *Sharkey*, the Second Circuit Court of Appeals established that complaints pertaining to a violation of the anti-money laundering statute qualify as protected conduct under SOX. Docket Entry # 109, Ex. 2 at p. 2, n. 2.

which Plaintiff relied and citing to applicable legal authorities. Juan Lozada-Leoni's Original Complaint, Docket Entry # 23-8. Plaintiff filed his First Amended Complaint on March 26, 2018. Docket Entry # 23-9.

MPSI responded to Plaintiff's First Amended Complaint on April 6, 2018. Response to Revised First Amended Complaint, Docket Entry # 23-10. Among other things, MPSI admitted MoneyGram is a party to a 2012 Deferred Prosecution Agreement; that it paid a fine in 2009 as part of an agreement with the Federal Trade Commission; that it terminated Plaintiff's employment; and that Gonzalez told Plaintiff he was not a good fit. *Id.*, ¶¶ 28, 37, 156. MPSI, as Respondent, further stated on behalf of MoneyGram that Plaintiff's claims were barred, in whole or in part, by Plaintiff's failure to exhaust his administrative remedies. *Id.*, ¶ 225. According to MPSI, "in his September 28, 2017, initial complaint presented to [OSHA], [Plaintiff] alleged only that his 'protected conduct' included 'efforts to achieve compliance' with 'anti-money laundering laws,' and with the DPA that 'prohibited future violations of the underlying anti-money laundering law.'" *Id.* MPSI asserted Plaintiff's allegations in the amended complaint were "far broader than those [Plaintiff] presented to OSHA for investigation, and all such claims are barred." *Id.*

On December 19, 2018, Judge Daly set the ALJ proceeding for a bifurcated final hearing, the first session January 16, 2019 and the second session June 4-6, 2019. Docket Entry # 23-12. In the Order Establishing Hearing Filing Deadlines and Notice of Additional Hearing Session, Judge Daly advised the parties that at the first session the court would address all pending motions for appropriate relief submitted by either party; and at the second session the parties would present all witness testimony and any additional documentary exhibits, if any. *Id.* at p. 1.

120

On December 21, 2018, counsel for Plaintiff "informally notified" Judge Daly's office of his client's intention to "exercise his right under 29 C.F.R. 1980.114 to bring this matter in a U.S. District Court." Docket Entry # 23-13. Specifically, Plaintiff's counsel advised that "next week we will be filing the formal removal notice under Section 1980.114." *Id*. Judge Daly entered an order suspending the existing filing deadlines until January 4, 2019 and directing Plaintiff to provide a copy of the federal complaint within seven days after filing in federal court. *Id.*

Plaintiff filed his original complaint in federal court on January 23, 2019. Docket Entry # 1. On January 24, 2019, Judge Daly issued an Order of Dismissal, ordering that "the complaint filed in this matter under the Sarbanes-Oxley Act is DISMISSED with prejudice." Docket Entry # 23-16.

## C.    Parties' assertions

In their combined motion for summary judgment, Defendants raise failure to exhaust for the second time in this case. Whereas MPSI raised an exhaustion issue in its motion to dismiss based on Plaintiff's failure to name MPSI as a respondent in the administrative complaint, Defendants now raise an exhaustion issue based on the sufficiency of the allegations raised in the initial OSHA complaint. According to Defendants, Plaintiff is limited to the sweep of the OSHA investigation that could reasonably be expected to ensue from Plaintiff's OSHA complaint. Defendants describe Plaintiff's OSHA complaint (which was filed by Plaintiff who is an "experienced attorney" with the assistance of "his then-counsel" who is a "self-professed expert in handling SOX whistleblower matters") as consisting of one sentence of "vaguely-alleged 'protected activities,'" with no description of what Plaintiff observed, to whom he communicated, or what he told his alleged audience. Docket Entry # 109 at p. 5; *see also* Docket Entry # 113 at p. 3.

Defendants assert the reasonably expected sweep of any OSHA investigation expected from this "purposefully vague and void of detail" complaint is "nil;" thus, Defendants argue Plaintiff's claim in this case fails as a matter of law. Docket Entry # 109 at pp. 9-10. For this proposition, Defendants cite *Wallace v. Tesoro Corp.*, 796 F.3d 468, 476 (5th Cir. 2015). According to Defendants, under *Wallace*, "this Court ***may not review*** what OSHA could not reasonably have been expected to investigate." *Id.* at p. 10 (emphasis in original).

In his response, Plaintiff asserts *Wallace* holds essentially that the employee has to provide information that he reasonably believes relates to one or more of the six categories of laws and regulations: "four specific types of fraud, a federal offense that related to fraud against shareholders, or a rule or regulation of the SEC." Docket Entry # 110 at p. 3 (citations omitted) (emphasis added by Plaintiff). Thus, according to Plaintiff, "[r]ather than requiring an OSHA complaint to be factually specific, *Wallace* . . . only requires that the complaint state a 'category' of offense or violation of a 'rule or regulation' of the SEC." *Id.; see also id.* at p. 5 (arguing the court is focused in Title VII cases dealing with exhaustion issues on the "category of the claim ('sex' verses 'race') rather than factual recitations"). Plaintiff states he clearly put OSHA and Defendants on notice of the nature of, and bases for, his claims and specifically stated categories of misconduct that fall within § 1514A, namely "violation of anti-money laundering laws" and "violation of a consent decree." *Id.* at pp. 4-5. Plaintiff asserts any "reasonable investigation of this complaint would address the specific factual underpinning of the alleged violations of anti-money laundering laws as well as violations of the 'consent decree' which are the basis of this lawsuit." *Id.* at p. 4.

In their reply, Defendants reference the "detailed" OSHA complaint filed in *Wallace*, asserting "the lesson from *Wallace* is that the OSHA complaint must be factually specific ***and*** must

122

state every 'category' of law enumerated in 18 U.S.C. § 1514A that the complaint alleged observed being violated."   Docket Entry # 113 at p. 5, n. 2 & p. 6 (emphasis in original).   According to Defendants, in his initial OSHA complaint, Plaintiff "made no attempt to allege that he engaged in protected activity, and no attempt to allege a causal link between that protected activity and any adverse action." *Id.* at p. 7 (further stating "OSHA informed him that it was barred from investigating the complaint, which Lozada never sought to amend").

**D.     Discussion**

In *Trusz v. UBS Realty Investors*, 2010 WL 1287148 (D. Conn. 2010), discussed above, the plaintiff had filed an original OSHA complaint and an amended OSHA complaint. *Id.* at *4. The plaintiff filed his complaint in federal court more than 180-days after he filed his administrative complaint but less then 180 days after filing the amended complaint. The defendants argued the amended OSHA complaint, which Trusz filed with forty new paragraphs of factual allegations, should constitute a new OSHA complaint and cited cases that held that "all facts raised in a SOX claim in federal court must first be presented to OSHA, so that OSHA can adequately fulfill its statutory and regulatory review obligations." *Id.* (citing *Willis v. Vie Fin. Group, Inc.*, No. 04cv435, 2004 WL 1774575 (E.D. Pa. Aug.6, 2004); also citing *Portes v. Wyeth Pharms., Inc.*, No. 06cv2689, 2007 WL 2363356(WHP) (S.D. N.Y. Aug.20, 2007)). The defendants further argued "that in order to 'afford OSHA the opportunity to resolve the allegations administratively,' *Willis*, 2004 WL 1774575 at * 5, OSHA must be given the full 180 days after amendment of an administrative complaint to consider all facts alleged." *Id.*

The court denied the motion, rejecting the defendants' argument that the filing of an amended

complaint with OSHA restarted the 180-decision period under the "kick out" provision. *Id.* at *5.

In so holding, the court in *Trusz* noted as follows:

> While *Willis* and *Portes* dismissed for lack of subject-matter jurisdiction SOX claims based on facts that had not been presented to OSHA,[29] Trusz did give OSHA the opportunity to adjudicate his claims, including his amended complaint. He did not initiate a new OSHA complaint. Instead, he amended his initial complaint, alleging facts and subsequent developments related to the conduct alleged his original complaint. The text of the relevant OSHA statute and regulations specifically confer jurisdiction on federal courts 180 days after the filing of the complaint, which Trusz undisputedly did, and there is neither caselaw nor any statutory or regulatory language mandating that a plaintiff must wait an additional 180 days after he amends his complaint before a federal court has jurisdiction. Since 79 days passed between the time when after Trusz amended his complaint and when he requested that OSHA dismiss his complaint so he could sue in federal court, OSHA was given an opportunity to make a merits determination on the entirety of the allegations now before this Court.

*Id.* at *5.

In *Sharkey v. J.P. Morgan Chase & Co.*, 805 F. Supp. 2d 45 (S.D. N.Y. 2011), the court

noted it had previously granted the defendants' motions to dismiss the plaintiff's original complaint

---

[29] As pointed out by another court, both *Willis* and *Portes* were decided under Rule 12(b)(6), not Rule 12(b)(1). *See King v. Indiana Harbor Belt R.R.*, No. 2:15-CV-245-JD-PRC, 2017 WL 9565363, at *8 (N.D. Ind. Feb. 1, 2017), *report and recommendation adopted sub nom. King v. Indiana Harbor Belt R.R. Co.*, No. 2:15-CV-245 JD, 2017 WL 1089212 (N.D. Ind. Mar. 23, 2017)).

This Court noted in its Report and Recommendation on Defendants' motions to dismiss that Defendants had presented their administrative exhaustion arguments under Rules 12(b)(1) and 12(b)(6) and that the Second Circuit Court of Appeals recently considered whether SOX's administrative exhaustion requirements are a jurisdictional prerequisite to suit, noting it had not found clear guidance among the "sister circuits." *Lozada-Leoni v. MoneyGram Int'l, Inc.*, No. 5:19CV11-RWS-CMC, 2019 WL 7875058, at *4 (E.D. Tex. Nov. 25, 2019), *report and recommendation adopted*, No. 519CV00011RWSCMC, 2020 WL 428080 (E.D. Tex. Jan. 28, 2020) (citing *Daly v. Citigroup Inc.*, 939 F.3d 415, 426-28 (2d Cir. 2019)). According to the Second Circuit in *Daly*, the Fourth Circuit has assumed, without deciding, that a claimant's failure to exhaust the statute's administrative remedies would deprive a district court of jurisdiction, citing as support several district court cases and an administrative decision of the DOL. *Id.* (citing *Daly*, 939 F.3d at 426 (citing *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 345 n.7 (4th Cir. 2014))). Noting the court in *Daly* stated the Fifth Circuit Court of Appeals similarly implied the SOX exhaustion requirements are a jurisdictional prerequisite to suit, the Court considered the exhaustion arguments under Rule 12(b)(1). *Id.* (citing *Daly*, 939 F.3d at 426 (citing *Heaney v. Prudential Real Estate Affiliates, Inc.*, 328 Fed. Appx. 314, 314 n.1 (5th Cir. 2009) (per curiam) (noting the court was "satisfied that the plaintiff exhausted his administrative remedies under the Sarbanes-Oxley Act and thus that the district court had jurisdiction over the matter"))).

because the illegal activity reported was not adequately alleged, but the plaintiff had been granted leave to replead. *Id*. at 47-48. The plaintiff then filed an amended complaint which contained allegations of multiple occasions on which the plaintiff reported her concerns, twelve paragraphs alleging that the plaintiff believed the "Suspect Client was violating one or more of the enumerated SOX statutes in addition to money laundering," and thirty paragraphs and subparagraphs outlining the factual basis that gave rise to that belief. *Id*. at 48. The defendants filed another motion to dismiss arguing, among other things, the court lacked jurisdiction because the newly pled allegations in the amended complaint were not contained in the plaintiff's OSHA complaint. *Id.*

Relying on *Trusz*, *Willis*, and *Fraser v. Fiduciary Trust Co., Int'l*, No. 04 Civ. 6958, 2005 WL 6328596, at *6 (S.D. N.Y. June 23, 2005), the defendants argued the new factual allegations set forth in paragraphs 25-36 of the amended complaint deprived the court of jurisdiction, "as these facts were not contained in Sharkey's OSHA complaint." *Sharkey*, 805 F. Supp. 2d at 51. The plaintiff argued the additional allegations in his federal court complaint were "simply more detailed recitations of the allegation in paragraph 12 of the OSHA complaint and [were] an extension or amplification of paragraph 13 of that complaint." *Id.* at 52. Similar to Plaintiff here, Sharkey asserted "these allegations were reasonably related to the OSHA charges under EEOC precedents" and that therefore jurisdiction was not defeated. *Id.*

The court discussed the cases relied upon by the defendants, specifically pointing out that the courts in both *Willis* and *Trusz* "were essentially presented with the question as to whether the SOX exhaustion requirement precludes recovery for a discrete act of retaliation that arose after the filing of the Administrative Complaint but was never presented to the administrative agency for investigation." *Id.* at 52 (internal quotation marks and citation omitted). According to the court, in

125

*Willis*, the plaintiff failed to amend his administrative complaint to allege an additional act of retaliation (termination) after the filing of his OSHA complaint; conversely, in *Trusz*, the plaintiff had filed an amended complaint before OSHA, alleging new acts of retaliation as well as his termination, which occurred after the filing of the original OSHA complaint. *Id.* at 52-53. Noting there was no adverse employment action in the *Sharkey* case that arose after the filing of the plaintiff's OSHA complaint or that was not pled in it that the plaintiff sought to complain of before the federal court, the court in *Sharkey* noted the "appropriate inquiry under SOX is not whether every fact forming the basis for the belief that gave rise to a plaintiff's protected activity was previously administratively pled, but whether each separate and distinct claim was pled before the agency." *Id.* at 53.

What is more, the court stated "a refusal by this court to consider the facts alleged in the [federal court complaint] would be inappropriate as 'no particular form of complaint' is required to trigger a claim before OSHA, 29 C.F.R. § 1980.103(b), and the heightened pleading standards of this court do not apply to SOX claims filed there." *Id.* (citing *Sylvester v. Parexel*, ARB No. 07–123, ALJ Nos. 2007–SOX–039, –042, slip op. at 12–13, 2011 WL 2517148 (May 25, 2011) (en banc) (holding heightened pleading standards to no apply to SOX claims initiated with OSHA));[30] *see also*

---

[30] The ARB at one time required employee's communications to be related "definitively and specifically to the subject matter of the particular statute under which protection is afforded." *Hendrick v. ITT Engineered Valves, L.L.C.*, No. 1:16-CV-204-SA-DAS, 2018 WL 837600, at *3 (N.D. Miss. Feb. 12, 2018) (citing *Platone v. FLYI, Inc*., ARB Case No. 04–154, 2006 WL 3246910, at *8 (ARB Sept. 29, 2006)). In *Sylvester v. Parexel Int't L.L.C.*, ARB No. 07–123, 2011 WL 2517148 (ARB May 25, 2011), the ARB reconsidered the issue and interpreted SOX not to require that the communication definitively and specifically relate to one of the six SOX categories. *Id*.(citing Sylvester, 2011 WL 2517148, at *14–*15).

According to the ARB in *Sylvester*, a SOX claim begins with OSHA, where "no particular form of complaint" is required, except that it must be in writing and "should contain a full statement of the acts and omissions, with pertinent dates, which are believed to constitute the violations." *Id.* (quoting 29 C.F.R. § 1980.103(b) (effective to November 2, 2011)). The Court notes the current version, effective March 5, 2015, provides as follows: "No particular form of complaint is required. A complaint may be filed orally or in writing. Oral complaints will be reduced to writing by OSHA. If the complainant is unable to file the complaint in English, OSHA will accept the complaint in any language." 29 C.F.R. § 1980.103.

126

*Feldman-Boland v. Stanley*, No. 15CV6698, 2016 WL 3826285, at *5 (S.D. N.Y. July 13, 2016)

("[Gi]ven that the OHSA complaints pled allegations concerning Defendants' 'improper and

unlawful broker practices,' and because 'no particular form of complaint' is required to trigger a

claim before OSHA,' *Sharkey*, 805 F. Supp. 2d at 53 (quoting 29 C.F.R. § 1980.103(b)), this Court

finds that Plaintiffs exhausted their administrative remedies with respect to their SOX claims against

Morgan Stanley." (internal quotation marks omitted)).

The court in *Sharkey* concluded as follows:

> Accordingly, where Plaintiff's claims, including specific adverse employment
> actions, protected activity, and the general nature of the facts that formed Plaintiff's
> belief in violations of the enumerated statutes giving rise to the protected activity,
> were timely presented in her OSHA Complaint, and where more specific allegations
> naturally originating from those assertions have been alleged in the AC in direct
> response to this Court's decision to grant Plaintiff leave to do so, the entirety of the
> AC is appropriately subject to the jurisdiction of this Court.

*Id.* at 53-54.[31]

---

According to current DOL regulations, for purposes of determining whether to investigate, the complainant will be considered to have met the required burden if the complaint on its face, supplemented as appropriate through interviews of the complainant, alleges the existence of facts and either direct or circumstantial evidence to meet the required showing, i.e., to give rise to an inference that the respondent knew or suspected that the employee engaged in protected activity and that the protected activity was a contributing factor in the adverse action. 29 C.F.R. § 1980.104(e)(3) (effective March 5, 2015).

[31] Later, the district judge granted the defendants' motion for summary judgment. *Sharkey v. J.P. Morgan Chase & Co.*, No. 10 CIV. 3824, 2013 WL 10796833 (S.D. N.Y. Dec. 12, 2013), *vacated and remanded*, 580 Fed. Appx. 28 (2d Cir. 2014). The Second Circuit Court of Appeals vacated and remanded that decision on October 9, 2014 for reconsideration in light of *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221-22 (2d Cir. 2014) and *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 451 (2d Cir. 2013). *Sharkey v. J.P. Morgan Chase*, 580 Fed. Appx. 28 (2d Cir. 2014).

The defendants again moved for summary judgment, and on October 9, 2015, the motion was granted on the basis that Sharkey had failed to make a *prima facie* showing that any protected activity under SOX was a contributing factor in her firing. *Sharkey v. J.P. Morgan Chase & Co.*, No. 10 CIV. 3824, 2015 WL 5920019 (S.D. N.Y. Oct. 9, 2015), *vacated and remanded sub nom. Sharkey v. JPMorgan Chase & Co.*, 660 Fed. Appx. 65 (2d Cir. 2016). The Second Circuit vacated and remanded that finding, holding the temporal proximity between the protected activity and her discharge was sufficient to establish a prima facie case. *Sharkey v. JP Morgan Chase*, 660 Fed. Appx. 65 (2d Cir. 2016). The Second Circuit also declined to affirm on the basis of the defendants' alternative ground, that Sharkey lacked a reasonable belief for her reports of fraud, holding the issue gave rise to disputes of fact and did not compel the conclusion that Sharkey lacked a reasonable belief of fraud. *Id.*

After pending for nearly nine years, the case was tried to verdict before a jury in November 2017. *Sharkey v.*

Recently, a federal court considered what it called a "partial exhaustion" issue raised by the defendants in a motion for summary judgment on the plaintiff's whistleblower retaliation claims:

> Although Erhart filed an administrative complaint, BofI argues that Erhart's district court complaint is still improper on partial exhaustion grounds. The Bank claims his complaint impermissibly exceeds the scope of the administrative filing by identifying 'six new categories' of conduct Erhart believed was wrongful. . . . Consequently, BofI argues these categories are unexhausted and this Court 'lacks statutory jurisdiction' over part of Erhart's claim. . . .

*Erhart v. BofI Holding, Inc*., No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *6 (S.D. Cal. Mar. 31, 2020). The court, noting it was unaware of any binding authority addressing a partial exhaustion issue in the Sarbanes–Oxley context, first stated the DOL's regulations for retaliation complaints under § 1514A provide that "[n]o particular form of complaint is required." *Id.* (quoting 29 C.F.R. § 1980.103(b)). The court pointed out "a complaint may even be made orally, in which case the complaint 'will be reduced to writing by OSHA.'" *Id.*

According to the court, this "absence of formal pleading requirements" means "complaints in OSHA administrative proceedings are not expected to meet the standards of pleading that apply to claims filed in federal court under Rule 12(b)(6)." *Id.* (quoting *Wadler v. Bio-Rad Labs., Inc*., 141 F. Supp. 3d 1005, 1020 (N.D. Cal. 2015); also citing *Sharkey*, 805 F. Supp. 2d at 53). That said, the court also noted "an exhaustion requirement would be meaningless if the complainant were free to litigate claims bearing little or no connection to the preceding administrative complaint." *Id.* (quoting *Jones v. Southpeak Interactive Corp. of Del*., 777 F.3d 658, 669 (4th Cir. 2015)).

---

*J.P. Morgan Chase & Co.*, No. 10CV3824 (DLC), 2018 WL 1229831, at *1 (S.D. N.Y. Mar. 5, 2018). The defendants moved for post-verdict relief. Finding the award of damages reflected a verdict that was "infected by passion and prejudice," the court entered judgment as a matter of law in the defendants' favor on a portion of the damages claim, conditionally ordered a new trial on that portion of the damages, and ordered a new trial on liability and the remainder of the plaintiff's request for damages. *Id.*

The court then set out the various approaches courts have used "when a defendant argues the lawsuit exceeds the scope of the OSHA complaint." *Id.* at *7. According to the court,"[o]ne district court examined whether the administrative complaint provided the opposing party 'fair notice' of the charges against it."[32] *Id.* (citing *Wadler*, 141 F. Supp. 3d at 1020). "Another district court reasoned the 'appropriate inquiry' is 'not whether every fact forming the basis for the belief that gave rise to a plaintiff's protected activity was previously administratively pled, but whether each separate and distinct claim was pled before the agency.'" *Id.* (quoting *Wong v. CKX, Inc.*, 890 F. Supp. 2d 411, 418 (S.D. N.Y. 2012) (quoting *Sharkey*, 805 F. Supp. 2d at 53)). The court in *Erhart* then summarized the approach used by the Fourth and Fifth Circuits, wherein they "looked to their jurisprudence under Title VII of the Civil Rights Act to inform the Sarbanes-Oxley exhaustion inquiry." *Id.* (citing, in its summary, *Jones*, 777 F.3d at 669 (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996)); also citing *Wallace v. Tesoro Corp.*, 796 F.3d 468, 476 (5th Cir. 2015)). Before discussing how the court in *Erhart* resolved the issue, the Court sets out the facts of *Wallace*, relied upon primarily by Defendants here.

In *Wallace*, the plaintiff appealed the district court's dismissal of his retaliation claim against Tesoro Corporation. *Wallace*, 796 F.3d at 472. The Fifth Circuit affirmed in part and reversed in part, finding the plaintiff did not satisfy the applicable exhaustion requirement for some of his allegations and failed to state a claim for others, but that the plaintiff had stated a claim relating to

---

[32] Relying on an administrative decision, the court in *Wadler* reasoned an administrative complaint "is sufficient so long as the whistleblower complainants give an opposing party 'fair notice' of the charges against it." *Erhart v. BofI Holding, Inc.*, No. 15-CV-02287-BAS-NLS, 2020 WL 1550207, at *7 n. 4 (S.D. Cal. Mar. 31, 2020) (quoting *Wadler*, 141 F. Supp. 3d at 1020). This standard requires only that an administrative complaint "provide (1) some facts about the protected activity, showing some 'relatedness' to the laws and regulations of one of the statutes in [the agency's] jurisdiction, (2) some facts about the adverse action, (3) a general assertion of causation and (4) a description of the relief that is sought." *Id.* (quoting *In re Evans v. EPA*, 2012 WL 3164358, at *6 (DOL Adm. Rev. Bd., July 31, 2012)).

his investigation of Tesoro's accounting practices. *Id.* The Fifth Circuit noted the plaintiff had filed a complaint with OSHA, stating that Tesoro had retaliated against him for engaging in the following protected activity: "marking 'yes' to the retaliation questions on the certificates of compliance, investigating 'the continuing anti-trust issues in Idaho Falls,' and 'discovering taxes collected by Tesoro were being booked as revenue.'" *Id.* at 473. The OSHA complaint did not reference price signaling, inconsistent discounts, or wire fraud. *Id.*

After some proceedings in district court not relevant to the appeal, "Wallace filed a second amended complaint alleging essentially four categories of protected activity: investigating and reporting the booking of taxes as revenues, investigating the Idaho Falls issue, identifying retaliation on the certificates of compliance, and investigating and reporting suspected wire fraud from inconsistent discounts and price signaling." *Id.*

Tesoro moved to dismiss, and the magistrate judge recommended granting the motion as to the first three categories of protected activity and allowing amendment to cure deficiencies related to the wire fraud-based claim. *Id.* In addition to filing objections, Wallace filed a third amended complaint. *Id.* at 474. "Tesoro moved to dismiss it, raising for the first time the argument that the wire-fraud-based claims had not been presented in the OSHA complaint and were therefore unexhausted." *Id.* The magistrate judge recommended dismissing that complaint based on the failure to exhaust, to which Wallace objected. *Id.* The district judge accepted the recommendations, dismissing the first three categories of protected activity from the second amended complaint. *Id.*

On appeal, the Fifth Circuit used "exhaustion" as shorthand to refer to the specific concept of whether the plaintiff's "OSHA complaint was sufficient to allow the district-court complaint to

130

contain the allegations of wire-fraud-based retaliation." *Id.* at 475. To do that, the Fifth Circuit had

to decide whether SOX retaliation lawsuits are limited in scope by the administrative complaint and

whether the reach of the Wallace lawsuit exceeded what is allowed by application of that rule. *Id.*

The Fifth Circuit noted both Wallace and Tesoro told the district court that the correct exhaustion

standard was the one the Fifth Circuit applies in Title VII cases, which limits a Title VII complaint

"to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge

of discrimination." *Id.* (quoting *Thomas v. Texas Department of Criminal Justice*, 220 F.3d 389, 395

(5th Cir.2000)). According to the Fifth Circuit, the district court held that Wallace did not satisfy the

*Thomas* standard for his contention that he had engaged in protected activity related to suspected

wire fraud. *Id.*

On appeal, the plaintiff argued that "SOX contains no exhaustion requirement and that, to

the contrary, merely filing a charge with OSHA that triggers an investigation is enough to permit a

future district-court filing that is not limited by the scope of that charge." *Id.* (noting the plaintiff's

theory was partly textual because § 1514A allows a plaintiff to bring an action "for de novo review

in the appropriate district court"). According to the Fifth Circuit, the "guarantee of de novo review

prevents deference to OSHA's findings and conclusions if the employee subsequently sues, but it

is not a complete redaction of the administrative proceeding." *Id*. The Fifth Circuit noted Department

of Labor regulations require a complaint to "'allege the existence of facts and evidence to make a

prima facie showing,' including facts and evidence showing that '[t]he employee engaged in

protected activity.'"[33] *Id.* at 476 (quoting 29 C.F.R. § 1980.104(e)). The Fifth Circuit further noted

---

[33] The Fifth Circuit noted in a footnote that even though the regulation states that the complaint, "supplemented as appropriate by interviews of the complainant," must make out the case, the court's exhaustion analysis was not changed by the fact that OSHA did not interview Wallace. *Wallace v. Tesoro Corp.*, 796 F.3d 468, 476 n. 5 (5th Cir. 2015). According to the Fifth Circuit, "[n]othing entitles Wallace to an interview and the chance to supplement his

the plaintiff, in his OSHA complaint, "was required to identify the conduct by his employer that he believes was illegal," and such "exhaustion requirement is consistent with SOX's administrative-enforcement mechanisms." *Id.*

The Fifth Circuit further found the district court correctly concluded that Wallace's wire fraud-based protected activity was outside the scope of the OSHA complaint or any investigation it would reasonably prompt. *Id.* at 474. In so finding, the Fifth Circuit noted the reason for the exhaustion requirement in Title VII applies with equal force to SOX, and the "purpose is to trigger the agency's defined investigation and conciliation procedures." *Id.* at 476. The Fifth Circuit further explained the "exhaustion requirement should go only as far as is necessary to give the agency its initial crack at the case rather than focusing only on the four corners of the facts included in the original agency complaint." *Id.*

In stating the scope of a judicial complaint is "limited to the sweep of the OSHA investigation that can reasonably be expected to ensue from the administrative complaint," the Fifth Circuit noted it was joining the Fourth Circuit Court of Appeals, which had held that "[l]itigation may encompass claims 'reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint.'" *Wallace*, 796 F.3d at 476 & n.7 (quoting *Jones*, 777 F.3d at 699).The Fifth Circuit concluded the OSHA investigation prompted by the plaintiff's OSHA complaint could not reasonably be expected to extend to the plaintiff's belief that Tesoro was committing wire fraud through other practices (price signaling and inconsistent discounts) and the actions the plaintiff took to investigate and report those actions. *Id.* at 477. According to the court,

_____

complaint in that way; a regulation treating interview statements in a particular manner does not implicitly mean that an interview must occur." *Id.*

132

by "failing entirely to reference a distinct category of protected activity in his OSHA complaint, Wallace did not file a complaint whose investigation would reach that activity." *Id.*

Having set out the facts of *Wallace*, the Court now returns to *Erhart*, wherein the court found persuasive the approach used by the Fifth Circuit in *Wallace*. *Erhart*, 2020 WL 1550207, at *7. The court in *Erhart* looked to the Ninth Circuit's Title VII cases for guidance, noting the district court may entertain "any charges of discrimination that are likely or reasonably related to the allegations in the EEOC charge, or that fall within the EEOC investigation which can reasonably be expected to grow out the charge of discrimination." *Id.* (internal quotation marks and citations omitted).

In responding to the defendant's argument that his OSHA complaint failed to exhaust "six new categories" of believed misconduct that appeared in the plaintiff's second amended complaint in federal court, the plaintiff in *Erhart* highlighted that he submitted a cover letter with his OSHA complaint "that also enclosed a thumb drive of documents related to his allegations." *Id.* at *8 (further noting the thumb drive contained "the same documents Mr. Erhart had submitted to the OCC in early March 2015," one of which was a fifteen-page, typewritten document containing factual allegations that corresponded with five out of six of the categories challenged on exhaustion grounds). Noting an OSHA complaint is "not expected to meet the standards of pleading that apply to claims filed in federal court under Rule 12(b)(6)," *see Wadler*, 141 F. Supp. 3d at 1020, and further noting "[n]o particular form of complaint is required," 29 C.F.R. § 1980.103(b), the court in *Erhart* stated a "reasonable investigation of the OSHA Complaint would encompass at least skimming the items Erhart submitted with his pleading." *Id.* at *9. According to the court, the fifteen-page factual timeline and summary sufficiently aligned with almost all of the plaintiff's challenged district court allegations. *Id.*

133

The court further noted the record did not establish the plaintiff "was trying to circumvent the Sarbanes–Oxley Act exhaustion requirement." *Id.* (quoting Jones, 777 F.3d at 669). Although the plaintiff "could have more skillfully completed his administrative pleading," the court in *Erhart* stated Sarbanes–Oxley's "exhaustion requirement should not become a tripwire for hapless plaintiffs." *Id.* In conclusion on this issue, the court denied the defendant's "request to summarily adjudicate five of the conduct categories for Erhart's Sarbanes–Oxley claim on exhaustion grounds," but granted partial summary judgment in the defendant's favor on Erhart's Sarbanes–Oxley "claim with respect to his allegations regarding alteration of financial statements because he did not exhaust this issue." *Id.*

With these cases in mind, the Court does not agree with Defendants that "the lesson from *Wallace* is that the OSHA complaint must be factually specific **and** must state every 'category' of law enumerated in 18 U.S.C. § 1514A that the complaint alleged observed being violated." Docket Entry # 113 at p. 5, n. 2 & p. 6 (emphasis in original). The Fifth Circuit in *Wallace* noted the plaintiff, in his OSHA complaint, "was required to identify the conduct by his employer that he believes was illegal," noting the plaintiff failed "entirely to reference a distinct category of protected activity [wired-fraud issue] in his OSHA complaint." *Wallace*, 796 F.3d at 476-77. The Fifth Circuit held one reference in the OSHA complaint to an "apparent oral agreement with a customer to match prices with a particular station," which the plaintiff stated resulted in "anti-trust issues," was insufficient to prompt an OSHA investigation into the plaintiff's belief that Tesoro was committing wire fraud through practices such as price signaling and inconsistent discounts. *Id.* at 477 (further noting the court had similarly held that an EEOC complaint claiming sex discrimination would not reasonably lead to an investigation that would encompass race discrimination as a motivation for the

134

same adverse action).

By focusing its discussion on whether the OSHA complaint, which listed anti-trust issues as a category of violation, should also encompass another category not referenced at all in the OSHA complaint, *Wallace* does not stand for the proposition that a complainant's OSHA complaint must be factually specific, especially when considering statements of the Fourth Circuit Court of Appeals in *Jones*, which the Fifth Circuit cited in *Wallace*. In *Jones*, the Fourth Circuit stated the appellee's OSHA complaint was substantially similar to her complaint in the federal court action and the alleged harm, a retaliatory termination, was identical. *Jones*, 777 F.3d at 670. According to the Fourth Circuit, "[n]othing more precise is required," noting the Department of Labor regulations in effect at the time the appellee filed the complaint expressly provided that "[n]o particular form of complaint is required." *Id.* (quoting 29 C.F.R. § 1980.103(b) (2009)).

Here, although the factual allegations in the initial OSHA complaint are sparse, Plaintiff asserts any "reasonable investigation of this [OSHA] complaint would address the specific factual underpinning of the alleged violations of anti-money laundering laws as well as violations of the 'consent decree' which are the basis of this lawsuit." Docket Entry # 110 at p. 4. The Court agrees, noting this is not a case where the plaintiff's federal court complaint bears little or no connection to the preceding administrative complaints. The general nature of the allegations pled in the initial OSHA complaint and the complaint before this Court is the same. *See Wong*, 890 F. Supp. 2d at 418; *see also Sharkey*, 805 F.Supp. 2d at 53 (stating the "appropriate inquiry under SOX is not whether every fact forming the basis for the belief that gave rise to a plaintiff's protected activity was previously administratively pled, but whether each separate and distinct claim was pled before the agency"). Plaintiff's OSHA complaint identified the two categories of conduct by his employer that

Plaintiff believes were illegal: "violation of anti-money laundering laws" and "violation of a consent decree."

What is more, Plaintiff's twenty-four page First Amended [Administrative] Complaint filed on March 26, 2018, wherein Plaintiff attached his initial OSHA complaint as Exhibit A, is substantially similar to Plaintiff's complaint in this action. *See* Docket Entry # 23-9. The First Amended Complaint contains allegations similar to those contained in his SAC, including failure to comply with the DPA, factual allegations regarding specific violations of the DPA, and a chronological narrative containing the complainant's protected activities and the respondent's adverse actions.

The Court finds the claims asserted in this case regarding Defendants' alleged violation of anti-money laundering laws and violation of a consent decree "can reasonably be expected to grow out of the charges" found in the initial OSHA complaint, which were subsequently set out in more detail in Plaintiff's administrative complaints before the DOL's ALJ. OSHA was given an opportunity to make a merits determination on the entirety of the allegations now before this Court. As noted by the Fifth Circuit in *Wallace*, the reason for the exhaustion requirement is "to trigger the agency's defined investigation and conciliation procedures." *Wallace*, 796 F.3d at 476. The Fifth Circuit further explained the "exhaustion requirement should go only as far as is necessary to give the agency its initial crack at the case rather than focusing only on the four corners of the facts included in the original agency complaint." *Id.*

Nothing in the record before the Court suggests Plaintiff was trying to circumvent the Sarbanes–Oxley Act exhaustion requirement. *See Jones*, 777 F.3d at 669 (citing *Woodford v. Ngo*,

548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006) ("[E]xhaustion requirements are designed to deal with parties who do not want to exhaust. . . .")). As noted by the court in *Erhart*, Sarbanes–Oxley's "exhaustion requirement should not become a tripwire for hapless plaintiffs." *Erhart*, 2020 WL 1550207, at *9 (quoting *Jones*, 777 F.3d at 669). Recognizing a primary objective of exhaustion requirements is to put parties on notice of the allegations against them, *see Jones*, 777 F.3d at 670, the Court also notes Defendants were put on notice of Plaintiff's allegations against MoneyGram in the underlying administrative action. *See* Docket Entry # 23-10 (In MoneyGram's Response to Revised First Amended Complaint, MoneyGram argued the detailed allegations Plaintiff's First Amended Complaint were broader than those presented in the initial complaint presented to OSHA).

Having determined that Plaintiff's additional allegations are encompassed in the scope of the investigation that could reasonably be expected to grow out of Plaintiff's administrative complaints, the Court recommends Defendants' combined motion for summary judgment be denied.

## VIII. RECOMMENDATION

Based on the foregoing, it is hereby

**RECOMMENDED** that Defendant MoneyGram International, Inc.'s Motion for Summary Judgment, and Brief in Support (Docket Entry # 83) be **DENIED.**  It is further

**RECOMMENDED** that Defendants' Motion for Summary Judgment, and Brief in Support (Docket Entry # 109) be **DENIED**.

<u>Objections</u>

Within fourteen (14) days after service of the magistrate judge's report, any party must serve

and file specific written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.

Failure to file specific, written objections will bar the party from appealing the unobjected-to factual findings and legal conclusions of the magistrate judge that are accepted by the district court, except upon grounds of plain error, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending the time to file objections from ten to fourteen days).

**SIGNED this 19th day of October, 2020.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE